DAVID J. COHEN, ESQ.
California Bar No. 145748
**COHEN & PAIK LLP**
177 Post Street, Suite 600
San Francisco, CA 94108
Telephone: (415) 398-3900

Attorneys for Plaintiff **John Gidding**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Mr. JOHN GIDDING, an individual; PIVOTAL INC., a California
corporation;

**Plaintiffs,**

**vs.**

DEREK ANDERSON, an individual; JOHN ZAPPETTINI, an individual;
OLIVIER LEMAL an individual; PLANTAGENET CAPITAL MANAGEMENT
LLC, a purported California corporation; PLANTAGENET CAPITAL
AMERICA LLC, a purported Delaware corporation; PLANTAGENET
CAPITAL FUND LP, a purported Cayman Island corporation;
PLANTAGENET CAPITAL FUND LP II, a purported Cayman Island
corporation; PLB HOLDINGS SA, a purported Luxembourg
corporation; PLANTAGENET PARTNERS SA, a purported French
corporation; SA SOCIETE CHAMPENOISE D'EXPLOITATION VINICOLE, a
purported French corporation; SERGE HAUCHART, an individual;
PATRICK RAULET, an individual; JEAN-FRANCOIS RAPENEAU, an
individual; CHRISTOPHE RAPENEAU, an individual; SA COMPAGNIE
DES VINS DU LEVANT, a purported French corporation; SA CHAMPS
RENIER, a purported French corporation; MARIE-CLAUDE SIMON, an
individual;
and
DOES 1 through 100 inclusive;

**Defendants.**

**VERIFIED COMPLAINT FOR DAMAGES FOR: (1) RICO (U.S.C. 18
1962(c)); AND (2) CONSPIRACY TO COMMIT RICO (U.S.C. 18 1962(d))**

**JURY TRIAL DEMANDED**

**INTRODUCTION**

1.    This Complaint alleges violations under the Racketeer Influenced and Corrupt Organizations Act of 1970, Title IX of the Organized Crime Control Act of 1970, as amended, 18 U.S.C. Section 1962(c) and Section 1962(d) ("RICO"), and is brought by Plaintiffs Pivotal Inc. and John Gidding in connection with a scheme devised, conducted, and/or participated by the above named defendants: Derek Anderson, Olivier Lemal, John Zappettini, Plantagenet Capital Management LLC, Plantagenet Capital America LLC, Plantagenet Capital Fund LP, Plantagenet Capital Fund LP II, PLB Holdings SA, and Plantagenet Partners SA; Serge Hauchart, Patrick Raulet, Jean-Francois Rapeneau, Christophe Rapeneau, Marie Claude Simon, SA Societe Champenoise d'Exploitation Vinicole, SA Compagnie des Vins du Levant, and SA Champs Renier; each of whom participated, either directly or indirectly, in a fraudulent scheme amounting to operating an enterprise consisting, alternatively, of either (a) a court's of Los Angeles County, Chalons, France, and Luxenbourg; or (b) an association-in-fact of the marketers, sellers and producers of Champagne LeBreun, through a series of predicate acts including, mail fraud and wire fraud, under U.S.C. Section 1341, 1343 to obtain money and property by use of materially false promises and omissions of material fact, and to conspire to do so, all to the detriment of the Plaintiffs.  These acts, at least two of them within ten years, amounted to a pattern of racketeering activity involving relativeness and continuity of the predicate acts.  The relief sought includes treble damages arising from the fraud set forth herein, cost of investigation and suit, and attorneys fees.

1

**JURISDICTION**

2.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. Sections 1331, 1337, 1349 because this matter involves allegations of illegal behavior arising under the laws of the United States, including violations of RICO and the practice of frauds upon the courts of California.  Furthermore, jurisdiction in this Court is proper pursuant to 18 U.S.C. Sections 1964(a), 1964(c).

**PERSONAL JURISDICTION AND VENUE**

3.    Personal Jurisdiction and venue are predicated upon 18 U.S.C. §1965(a), because certain defendants reside, are found, have an agent, and transact affairs in Marin County and San Francisco, and the ends of justice require that other parties residing in other districts be brought before this Court.  Venue is also proper in this Court pursuant to 18 U.S.C. §1965(b) because, to the extent any defendant may reside outside of this District, the ends of justice require such defendant or defendants to be brought before the Court.  Venue is proper under 28 U.S.C. §1391(3) because a defendant may be found in this district.  Venue is also proper in this Court pursuant to 28 U.S.C. §1391(d) because a foreign corporation may be sued in any district, and under 28 U.S.C. §1391(a) because a California corporation may be sued in any district within the state.

**RELEVANT TIMES**

4.    The relevant times in this complaint are from March 2, 2000 when Gidding and Pivotal amended their complaint in the Superior Court for Los Angeles County, previously naming defendants Plantagenet Capital Management, LLC and SCEV, to add

2

defendants PPSA and PLB Holdings, through the date of the filing of this complaint. Further, personal jurisdiction is predicated on the fact that the acts and occurrences in furtherance of the claims herein arose in, arise in and affect the State of California and commence within the State of California.

## THE PARTIES

5.    Plaintiff Pivotal Inc. ("Pivotal") is a corporation organized and existing under the laws of the State of California. At all relevant times Pivotal has had its principal place of business in North Hollywood, Glen Ellen, and San Francisco, California.  Pivotal, from 1988 to the present day, has been licensed by the US Treasury Department to import wines into the United States of America, and is licensed by the California Alcoholic Beverage Commission to sell wine in interstate commerce.

6.    Plaintiff John Gidding ("Gidding"), at all relevant times, has been a resident of Pasadena and San Francisco, California.  Gidding, from 1988 to the present day, has been an officer, director and shareholder of Pivotal.

7.    Defendant SA Societe Champenoise d'Exploitation Vinicole (hereinafter "SCEV") is a corporation organized and existing under the laws of France.  At all relevant times SCEV has had its principal place of business in Chalons-en-Champagne and Reims, France.  SCEV produces, sells, and markets champagne.

8.    Defendant Derek Anderson ("Anderson"), at all relevant times, has been a resident of Mill Valley, California who is a partner in the various Plantagenet entities.

3

9.    Defendant John Zappettini ("Zappettini"), at all relevant times, has been a resident of Atherton, California. Zappettini was or is a partner of Anderson in Plantagenet and was an officer, director and stockholder of SCEV from January 1999 through March 2000.    Zappettini was also a director and stockholder of  PPSA and PLB.

10.    Defendant Olivier Lemal ("Lemal"), at all relevant times, has been a resident of Saint Cloud, France.    Lemal was or is a partner of Anderson in PPSA and was an officer and stockholder of SCEV from January 1999 through March 2000.

11.    Defendant Serge Hauchart ("Hauchart"), at all relevant times, has been a resident of Paris, France.    Hauchart was an officer, director and employee of SCEV from January 1999 through June 1999; and a stockholder of SCEV from January 1999 through December 2003.

12.    Defendant Plantagenet Capital Management LLC ("PCM") is or was a corporation organized and existing under the laws of California.    During the relevant times, PCM had its principal places of business in San Francisco and Mill Valley, California and was directed and controlled by Anderson and Zappettini.

13.    Defendant Plantagenet Capital America LLC is or was a corporation organized and existing under the laws of Delaware. During the relevant times, Plantagenet Capital America LLC had its principal place of business in Dover, Delaware and was directed and controlled by Anderson.

14.    Defendant Plantagenet Capital Fund LP, is or was a corporation organized and existing under the laws of the British West Indies.    During the relevant times, Plantagenet Capital

America LLC had its principal place of business in Grand Cayman, British West Indies and was directed and controlled by Anderson.

15.   Defendant Plantagenet Capital Fund LP II, is or was a corporation organized and existing under the laws of the British West Indies.   During the relevant times, Plantagenet Capital America LLC had its principal place of business in Grand Cayman, British West Indies and was directed and controlled by Anderson.

16.   Defendant Plantagenet Partners SA ("PPSA") is or was a corporation organized and existing under the laws of France. During the relevant times, PPSA had its principal place of business in Paris, France and was directed and controlled by Anderson and Lemal.   The shareholders of PPSA are Lemal, PCM, Anderson and Zappettini.

17.   Defendant PLB Holdings SA ("PLB") is or was a corporation organized and existing under the laws of Luxembourg. During the relevant times, PLB had its principal place of business in Luxembourg City, Luxembourg and was directed by Anderson and Zappettini.  The shareholders of PLB are Plantagenet Capital America LLC, Plantagenet Capital Fund LP, and Plantagenet Capital Fund LP II.  PLB was a shareholder of SCEV from January 1999 to March 2000.   On April 7, 2000, the assets of PLB were liquidated by Zappettini.

18.   Defendant SA Compagnie des Vins du Levant ("Levant") is or was a corporation organized and existing under the laws of France.  During all relevant times, Levant has had its principal place of business in Paris, France and was owned, directed and controlled by Patrick Raulet.   Levant was a stockholder of SCEV from March 2000 through December 2003.

19.  Defendant Patrick Raulet ("Raulet"), at all relevant times, has been a resident of Dole and Rilly-La-Montagne France. Raulet was an officer and director of SCEV from March 2000 through December 2003.

20.  Defendant SA Champs Renier ("Renier") is or was a corporation organized and existing under the laws of France. During all relevant times, Renier has had its principal place of business in Reims, France and was owned, directed and controlled by Jean-Francois Rapeneau and Christophe Rapeneau (Collectively "Rapeneaux").  Renier has been the sole shareholder of SCEV from December 2003 to the present day.

21.  Defendant Jean-Francois Rapeneau, at all relevant times, has been a resident of Epernay, France.  Jean-Francois Rapeneau has been an officer and director of SCEV from December 2003 to the present day.

22.  Defendant Christophe Rapeneau, at all relevant times, has been a resident of Epernay, France.  Jean-Francois Rapeneau has been an officer and director of SCEV from December 2003 to the present day.

23.  Plaintiffs do not know the true names of Does 1 through 100, inclusive, and thereby sues them by such fictitious names. Plaintiffs are informed and believe, that in doing the acts and things alleged in this complaint, the named defendants Does 1 through Does 100, inclusive, each of them, acted as the agents, joint venturers, or co-conspirators of each of the other defendants.

## THE CALIFORNIA CIVIL SUIT

24.  On December 29, 1998, Pivotal and Gidding entered into contracts with SCEV for the future delivery of champagne to the United States.  Pivotal and Gidding, in turn, entered into contracts with customers to the delivery of the wine.  The profit on these latter contracts would have been $1,327,243 over the two years covered by the contracts.

25.  SCEV failed to deliver the champagne.  As a result, Pivotal and Gidding sued SCEV and PCM in the Superior Court for the County of Los Angeles, CA.  Pivotal and Gidding sued Plantagenet because Plantagenet was believed to control SCEV. Pivotal and Gidding sued SCEV for non-delivery.  The lawsuit also sought pre-judgment interest.  A copy of the complaint is attached hereto as Exhibit 1.

26.  SCEV was represented by their own counsel, as was PCM. Because Plantagenet was insured by the Hartford Insurance Company ("Hartford"), Hartford paid for and provided counsel to PCM.

27.  During discovery, Pivotal and Gidding learned that PPSA and PLB owned SCEV, and were the entities who had funds to pay any judgment.  Further, Anderson, Zappatini and Lemal were discovered to be the co-partners who owned and controlled PCM, PPSA and PLB.  It was further learned that Lemal owned and controlled 20% of SCEV, and Hauchart was determined to have been the president of SCEV and a minor stockholder of SCEV.  Unknown to plaintiffs, due to the intentional concealment of this fact by the defendants in the Los Angeles lawsuit, SCEV was actually owned, directed and controlled by Raulet and Levant as of March 2, 2000, when Levant, which is owned and controlled by Raulet,

7

purchased a majority of the shares of SCEV. Raulet and Levant both had more than sufficient assets to pay the amounts plaintiffs were seeking in the lawsuit.

28. In or about April, 2001, PCM and SCEV moved for summary judgment. The motion was denied on April 26, 2001. A copy of the Court's ruling denying the motion is attached as Exhibit 2.

29. On May 2, 2001, Pivotal and Gidding successfully moved to amend the complaint to add PPSA and PLB as defendants. A copy of the motion is attached as Exhibit 3.

30. On September 12, 2001, SCEV filed a substitution of attorneys form in the Superior Court for the County of Los Angeles in which SCEV purported to substitute Anderson as its lawyer for Joseph Decker, Esq. The signatures on the substitution form are dated June 4, 2001. A copy of this substitution is attached as Exhibit 4. Anderson is not a lawyer or member of the bar in any state or country.

31. On September 17, 2001, Pivotal and Gidding had **Huissier** (a member of the French legal profession similar to a bailiff) deliver a verbal and written summons to SCEV at their headquarters in France informing Raulet and SCEV that they were not legally represented in the California lawsuit, and they had not responded to Pivotal & Gidding's $450,000 offer to settle.

32. After several continuances had been granted during the pendency of the lawsuit, the case was set for trial in October, 2001.

33. On September 20, 2001, Hartford, on behalf of PCM, PPSA, PLB, Anderson, and Zappetini, settled the lawsuit. The

settlement was for $150,000. Plaintiffs settled for the $150,000 because Hartford was aggressively litigating the lawsuit, and plaintiffs could not afford to continue; in fact, plaintiffs had virtually no money available, due to lost business and legal fees, at the time of the settlement. A copy of the Hartford agreement is attached as Exhibit 5. Raulet had given Anderson Powers of Attorney to represent himself and SCEV in the settlement talks. SCEV did not settle. A copy of this Power of Attorney is attached as Exhibit 6. Meanwhile, the trial date as between plaintiffs and the remaining defendant, SCEV, was set for December 3, 2001.

34. On November 15, 2001, Pivotal and Gidding had a *Huissier* deliver a verbal and written summons to SCEV at their headquarters in France informing Raulet and SCEV that they were not legally represented in the California lawsuit ; that Hartford had settled for PCM, PPSA, and PLB ; that SCEV was still a party to the lawsuit, and that the trial date was set for December 3, 2001.

35. SCEV failed to appear for trial on December 3, 2001, and the court continued the matter for one day to December 4, 2001. Because both sides had waived jury early on in the lawsuit, the three day court trial commenced on December 4, 2001. The trial included witness testimony, exhibits and deposition testimony. At the conclusion of the trial, judgment was entered against SCEV for $1,327,242 plus pre-judgment interest of $209,300 for a total of $1,536,543. Further, SCEV was to pay 10% annual interest until the judgment was satisfied. Formal judgment was entered on March 22, 2002. A copy of the judgment

is attached as Exhibit 7.

36.  On or about May 22, 2002, the time for SCEV to appeal the judgment expired.

37.  Under California Code of Civil Procedure 473, a motion to set aside a default judgment must ordinarily be made within six months.  On or about September 20, 2002, SCEV moved, through Los Angeles attorneys Thelen, Reid & Priest, LLP to set aside the judgment of the Superior Court of Los Angeles County.  The motion was accompanied by a declaration from Raulet, which included a number of exhibits.  A copy of this declaration is attached as Exhibit 8.  The motion to set aside the judgement and the declaration were both mailed by Thelen, Reed & Priest, LLP to Gidding and Pivotal's attorneys, Seebach and Seebach.  A copy of the supplemental declaration of Denise Kidish, in support of the motion, and proof of its service by mail is attached as Exhibit 9..

38.  Appendix A to the September 20, 2002 Raulet declaration is a redacted version of a purported Contract of Guarantee between PLB and Levant which purportedly obligated PLB to indemnify Levant and Raulet for all legal costs and any judgment taken by plaintiffs against SCEV.  A copy of this purported contract of Guarantee is attached as Exhibit 10.  The fax header on this document reads September 26, 2001, which was six days after Hartford settled with plaintiffs and 18 months after PLB's assets had been liquidated by Zappettini.  A copy of PLB's notice of liquidation filed in the Luxeboug Register of Commerce  is attached as Exhibit 12.  A copy of SCEV's translation of the contract of guarantee, filed in conjunction with Raulet's

10

September 20, 2002 declaration is attached as Exhibit 11.
Raulet's declaration was served on plaintiffs by mail.

39. This redacted Contract of Guarantee, on its face, shows
evidence of being a forgery. The original Contract of Guarantee
was between PLB and PPSA (both Plantagenet entities, the first in
Luxembourg, and the latter in Paris) and Levant. Levant
purchased SCEV from PLB and PPSA on March 2, 2000. A Plantagenet
news release announcing the sale is attached as Exhibit 13. PLB
and PPSA owned SCEV at the time of the March 2, 2000 sale, as
evidenced by the contract of sale produced by Plantagenet in
discovery in the Los Angeles lawsuit, and attached as Exhibit 14.
The contract of sale, showing PLB and PPSA's purchase of SCEV is
dated December 18, 1998. Because a lawsuit was pending between
Pivotal and Gidding and SCEV on March 2, 2000, PLB and PPSA, as
part of the sale of SCEV to Levant, entered into a contract of
guarantee that provided PLB and PPSA would provide for the legal
defense of SCEV as well as pay for any judgment Gidding and
Pivotal might obtain as against SCEV. However, defendants
fraudulently omitted  PPSA from the redacted Contract of
Guarantee attached to the September 20, 2001 Raulet declaration
because, on that date, PPSA was a thriving Paris concern with
more than sufficient funds to pay the Gidding/Pivotal judgment,
while PLB had been liquidated and had no money or assets.

40. This redacted Contract of Guarantee, on its face, shows
further evidence of being a forgery because in the first
paragraph, the document purports to be from at least two
signatories ("sousignes"), originally PLB and PPSA, but the
original word guarantors ("garants") to the right of the bottom

of the paragraph has been changed to the singular, guarantor ("garant"). Further, in the fourth paragraph of the document, it refers, once again to guarantors ("garants"), in the plural, as does the French verb "ont," and the applicable article, "les." The singular form for the applicable verb and article are, respectively, "est" and "le." This was because the original document referred to both guarantors, PLB and PPSA, but the redacted Contract of Guarantee omitted PPSA and purported to be on behalf of only PLB.

41.    Appendix E in support of Raulet's September 20, 2002 declaration is a redacted version of a purported letter from Anderson to Raulet dated September 28, 2001. In this letter, Anderson informs Raulet that (a) SCEV's lawyer "has just withdrawn"; and (b) in spite of Anderson's personal promise to Raulet to pay for SCEV's lawyer's, Anderson had run out of money. The letter does not mention any contract of guarantee. A copy of this Anderson Letter is attached as Exhibit 15. The letter was sent by facsimile from Anderson's San Francisco office to Raulet's office in Cedex, France.

42.    Appendix H in support of Raulet's September 20, 2002 declaration is redacted version of a purported letter from Raulet to Anderson dated January 7, 2002. In this letter, Raulet urges Anderson to settle, on behalf of SCEV with Pivotal and Gidding and cites a "contract" that he has with Anderson, but does not further describe the details of the "contract." A copy of the Raulet Letter is attached as Exhibit 16. A copy of SCEV's translation of the January 7, 2002 letter, filed in conjunction with the Raulet September 20, 2002 declaration is attached as

Exhibit 17.   These translations were served on Pivotal and Gidding's attorneys by mail.

43.   On November 15, 2002, Pivotal and Gidding filed an opposition to SCEV's motion to set aside the judgment.  A copy of the opposition is attached as Exhibit 18.  On November 22, 2002, SCEV filed a Reply to Pivotal and Gidding's Opposition.  A copy of the Reply is attached as Exhibit 19.   The Reply was served, by mail, by SCEV's attorneys Thelen, Reid & Priest on Pivotal and Gidding's attorneys Seebach and Seebach.  A copy of the proof of service by mail is attached as Exhibit 20.

44.   On November 27, 2002, the Superior Court for Los Angeles County held a hearing on SCEV's motion to set aside the judgment, and denied the motion.  A copy of the transcript of the hearing is attached as Exhibit 21.

45.   As of September 1, 2007, the judgment against SCEV, including pre-judgment and post-judgment interest amounted to approximately $2,370,000.00.

**THE FRENCH CIVIL SUIT TO COLLECT THE PIVOTAL AND GIDDING JUDGMENT AGAINST SCEV**

46.   Pivotal and Gidding hired a lawyer in France, Marie-Claud Simone located in Reims, France to collect the Los Angeles County Superior Court judgment against SCEV.

47.   In or about May, 2002, attorney Simone applied for sequesters against SCEV's property in the civil court of the Tribunal de Grande Instance de Chalons-en-Champagne, France. ("Chalons Court").

48.   In or about June, 2002, the Chalons Court issued three separate orders of sequester on SCEV's assets.  The first was for SCEV's buildings, the second was for SCEV's stocks of champagne,

and the third was for SCEV's business, including accounts receivable and good will, pending ratification of the California judgment in the same court.  A copy of these sequesters is attached as Exhibit 22.

49.  On September 5, 2002, Plaintiffs timely filed a motion in the Chalons Court to ratify the California Judgment.  A copy of this motion is attached as Exhibit 23.

50.  On February 3, 2003, SCEV entered a memoire in the Chalons Court contesting the Plaintiffs claim of the validity of the California Judgment.  The memoir contained the following language (translated herein): "*Under the terms of a Contract of Guarantee, PLB engaged themselves to defend SCEV in the California litigation .... The California verdict was made possible by the fraudulent collusion of Gidding, Pivotal, and PLB ...... The fraud consisted of settlement between Gidding, Pivotal, and PLB, kept secret from SCEV, for the sum of $150,000 paid by PLB's insurance company to Gidding and Pivotal. The fraudulent collusion between Gidding, Pivotal, and PLB deprived SCEV of a fair trial ..... The sole purpose of the settlement agreement was to deprive SCEV of a defense .... Once PLB engaged themselves in a secret agreement with Gidding and Pivotal they acted against SCEV .... The dishonesty of Gidding and Pivotal is clear, they secretly negotiated with PLB knowing full well that PLB was defending SCEV... The dishonesty of Gidding and Pivotal should be stigmatized and sanctioned ...*"  A copy of this memoire is attached as Exhibit 24.  The memoire included a number of exhibits.

51.  Piece (Exhibit 10) to the February 3, 2003 French

memoire filed by SCEV is a purported complete version of the redacted Contract of Guarantee previously attached as Appendix A to Raulet's September 20, 2002 declaration in support of SCEV's motion to set aside the judgment in the Superior Court of Los Angeles County, and attached as Exhibit 5 to this complaint.  The fax header on the Contract of Guarantee reads September 24, 2001. A copy of Piece (Exhibit) 10 to the February 3, 2003 memoire is attached as Exhibit 25.  The fax header appears to be of a French phone number and line.

52.  Piece (Exhibit 10) to the February 3, 2003 filing in the Chalons Court (the purported full Contract of Guarantee) contains the same evidence of forgery as in Appendix A to the September 20, 2001 Raulet Declaration, (the purported redacted Contract of Guarantee),  filed in the Superior Court for the County of Los Angeles, as described in paragraphs 39A and 39B, above.  In addition, Piece (Exhibit 10) contains the following additional evidence of it being a forgery: there are four additional occasions where the word guarantor (garant) appears in its plural form (garants), together with the plural form of the verb, "ont," rather than the singular, "est."  On each occasion, the applicable article also appears in its plural form "les," rather than the singular "le."

53.  The Contract of Guarantee also includes a covenant which contains fax headers from SCEV from May 5, 2001 and May 11, 2001, and from Plantagenet from May 9, 2001.  These fax headers all appear to be from European phone numbers and lines.  Piece (Exhibit 10) to the February 3, 2003 filing in the Chalons Court contains the same evidence of forgery as in Appendix A to the

September 20, 2002 Raulet Declaration, filed in the Superior Court for the County of Los Angeles, as described in paragraphs 39A and 39B, above. The covenant purports to reduce the price of the March 2, 2000 sale of SCEV from PLB and PPSA to Levant by one million francs. The Contract of Guarantee was signed on February 4, 2000 and the Covenant was signed on March 2, 2000. The Covenant contains additional evidence of forgery. The signatures of Raulet and Anderson are forgeries. Comparison of the signatures of Raulet and Anderson on the Contract of Guarantee (genuine signatures as evidenced by these signatures on numerous other documents obtained throughout the lawsuits described herein) and those on the covenant demonstrate that the signatures on the covenant are forgeries.

54. Piece (Exhibit 22) to the February 3, 2003 SCEV memoire is the September 28, 2001 letter from Anderson to Raulet which was also attached as Appendix E to the September 20, 2002 Raulet Declaration in support of SCEV's motion to set aside the Los Angeles County Superior Court judgment, and attached as Exhibit 15.

55. Piece (Exhibit 7) to the February 3, 2003 SCEV memoire was a complete version of the redacted Raulet letter attached as Appendix H to the September 20, 2002 Raulet Declaration in support of SCEV's motion to set aside the Los Angeles County Superior Court judgment, and attached as Exhibit 16.

56. On February 14, 2003, Levant, which then owned SCEV, placed 1,633,202 Euros (which, at the current rate of exchange, was approximately the same dollar amount) with the Bar Association of Chalone-en-Champage in exchange for two of the

three sequesters obtained by Gidding and Pivotal in June, 2002, those being the  sequesters on SCEV's stocks of champagne and buildings. A copy of this check  is attached as Exhibit 26.  As a result of the posting of this security with the Chalons Court, the two sequesters, by agreement of the parties, were duly released.  This guarantee remains posted with the Chalons court through the date of this complaint.  The third sequester, against SCEV's business, remained in place.

57.  In or about March, 2003, as is permissible in a French civil action, SCEV demanded that Gidding and Pivotal produce a copy of the settlement agreement in the Los Angeles County lawsuit between Gidding and Pivotal, as plaintiffs, and PLB.  The actual settlement agreement, attached as Exhibit 5, was between Gidding and Pivotal as plaintiffs and Plantagenet, PLB, PPSA, Anderson, and Zappatini, as defendants.  Gidding duly provided a copy of the authentic settlement agreement to his French lawyer, Mary-Claud Simone, on or about March 12, 2007, together with a letter indicating that it could not be turned over to SCEV without duly notifying Hartford's attorneys, as provided in paragraph 11 of the settlement agreement.

58.  On or about September 12, 2003, attorney Simone sent a fax from Reims to Seebach & Seebach's office in Los Angeles, attorneys for Pivotal and Gidding in the Los Angeles County Superior Court lawsuit, requesting that Hartford be duly notified prior to an anticipated filing of the Hartford settlement agreement by Simone in the Chalons Court.  A copy of this letter is attached as Exhibit 27.

59.  On or about September 14, 2003, attorney Alice Seebach,

17

Esq., sent a letter, by fax and United States mail, to Hartford's Fresno attorneys McCormick, Barstow, Sheppard, Wayte & Carruth, by telefax, duly notifying them, under paragraph 11 of the Hartford settlement agreement, that the Hartford settlement agreement was about to be filed in the Chalons Court. A copy of this letter is attached as Exhibit 28.

60. On or about September 14, 2003, Seebach & Seebach faxed, and mailed, by United States mail, a letter to attorney Simone in Reims advising Hartford's attorneys had been duly advised of the anticipated use of the settlement agreement in the Chalons Court, and further advising that it would be permissible for Simone to file the settlement agreement as part of the French civil process. A copy of this letter is attached as Exhibit 28.

61. On or about September 16, 2003, attorney Simone filed a purported French  translation of the Hartford settlement agreement with the Chalons Court.  This translation was prepared by Madame Bertrand, the translator used by SCEV's lawyers in the proceeding.  This translation was post-dated to September 30, 2003, and was a translation of a forged settlement agreement, not of the authentic settlement agreement.  A copy of this purported French translation of the Hartford settlement agreement is attached as Exhibit 29.

62. The translation was of a forged agreement because it incorrectly provided (a) that the settlement agreement was dated September 10, 2001, when the true settlement agreement was dated September 20, 2001; (b) that the settlement agreement was between Gidding and Pivotal as plaintiffs, and Plantagenet, PLB and Plantagenet, SA. (a non-existent company at that time, so far as

plaintiffs are aware) when the true settlement agreement was
between Gidding and Pivotal, as plaintiffs, and Plantagenet, PLB,
and PPSA; ©) paragraph 4 of the authentic settlement agreement
explicitly identifies the settling parties, and includes two
sentences and 18 lines of text, while paragraph 4 of the forged
translation contains only one sentence and 11 lines of text; and
(d) the forged French translation is dated September 30, 2003,
while it was filed two weeks earlier, on September 16, 2003. No
actual settlement agreement was filed with the Chalons Court on
September 16, 2003; the only document filed was the forged
English translation.

63.  On or about September 20, 2003, the parties to the
French civil action to ratify the Los Angeles County Superior
Court judgment agreed to an order from the Chalons Court
dismissing the third sequester against SCEV's business in
exchange for Levant, then owner of SCEV, posting, with the Bar
Association of Chalons for deposit with the Chalons Court as
security,  the than existing post-judgment interest of 258,552
Euros, together with a bond from Credit Agricole Bank
guaranteeing payment of future post-judgment interest at a rate
not to exceed 166,320 Euros on an annual basis. The check is
dated November 18, 2003, and the bond is dated October 31, 2003.
These are attached, respectively,  as Exhibits 32 and 33.

64.  On October 1, 2003, SCEV made a motion in  the Chalons
Court indicating  that SCEV had received Gidding and Pivotal's
September 16, 2003 filing of the Hartford settlement agreement
which had been filed in English, and asked for a certified French
translation.

65. Gidding repeatedly attempted, without success, to communicate with attorney Simone between September, 2003 and March 12, 2004, when Gidding, frustrated at the lack of communication, hired a new lawyer. At that time, Gidding was finally able to review his file. He discovered the original forged French translation, a copy of which was filed on September 16, 2003, the copy of the authentic Harford settlement agreement which Gidding provided to attorney Simone on March 12, 2003, and a copy of a forged English settlement agreement, which may have been the model for part of the forged French translation, although there are several discrepancies between the forged French translation and the forged English settlement agreement. A copy of the forged English Hartford settlement agreement is attached as Exhibit 36.

66. The forged English settlement agreement contains an additional forgery, over and above those contained in the apparent French translation of the document filed in the Chalons Court on September 16, 2003. The signature page containing Gidding's signatures is different in the forgery than the analogous signature page in the original agreement. [Compare page 5 of Exhibit 36 with Page 5 of Exhibit 5]. It appears, on information and belief, that this inauthentic English Hartford settlement agreement was created not from the authentic settlement agreement provided by Gidding to attorney Simone, but, instead, from copies of draft faxes sent between the parties in September, 2001, at the time the settlement agreement was being negotiated and signed. These drafts would have been in the possession of Anderson, Zappetini, PPSA or PLB. They were,

apparently, delivered to attorney Simone sometime in the year between March, 2003 and March 12, 2004. They would have had to have been delivered from the United States to Simone by United States mail, or by private courier. Further, in order for these drafts to have been identified and transmitted from the United States to Simone, it was necessary for defendants to have used the wires between the United States and France.

67. On September 22, 2004, SCEV filed a "citation to join" in the Chalons Court indicating that SCEV had sued PLB in Luxembourg in January, 2002 alleging that PLB, on the basis of a guarantee, owed any money that the Chalons Court might eventually ratify as being due from SCEV to Gidding and Pivotal. A copy of the "citation to join" is attached as Exhibit 37. The "citation to join" references the two fraudulent dates from the fraudulent Contract of Guarantee, attached as Appendix A to the September 20, 2002 Raulet Declaration in support of SCEV's motion to set aside the judgment in the Los Angeles County Superior Court, and as Exhibit (Piece) 10 to the February 3, 2003 memoire in opposition to Gidding and Pivotal's lawsuit in the Chalons Court to ratify the Los Angeles County Superior Court judgment. The two dates referenced are the "Contract of Guarantee dated February 4, 2000," which was fraudulently included in both the redacted Contract of Guarantee attached to the September 20, 2002 Raulet Declaration, and the full Contract of Guarantee filed together with the February 3, 2003 memoire; and the fraudulent covenant of March 2, 2000, which was attached to the February 3, 2003 memoire as part of Exhibit (Piece) 10. The reason these two dates and the documents referencing them were fraudulent is above

described.  Further, the "citation to join" further references
the fact that a purported December 3, 2001 judgment from the Los
Angeles County Superior Court was attached to the action in the
Luxembourg court on the fraudulent Contract of Guarantee.  This
was a fraudulent document because the authentic judgment in the
Los Angeles County Superior Court was dated March 22, 2002.  The
action by SCEV in the Luxembourg court was another effort to
present documents both to the Luxembourg court and to the Chalons
court fraudulently representing that PLB, which had been
liquidated on April 7, 2000, was responsible for guaranteeing the
California judgment in favor of Gidding and Pivotal, and
fraudulently avoiding the PPSA guarantee which was provided on
the authentic Contract of Guarantee and authentic attached
Covenant, both in the Luxembourg court and the Chalons Court,  at
a time when PPSA was a thriving Paris concern, capable of fully
paying the Gidding/Pivotal California judgment - in the event it
is ratified by the Chalons court.  On the basis of this "citation
to join," SCEV maintains to this day, in the civil action to
ratify the California judgment in the Chalons court, that in the
event the judgment is ratified, PLB, and not SCEV (or PPSA) would
actually owe the judgment.  SCEV was aware that PLB had been
liquidated because the Luxembourg action was filed against "PLB
in liquidation."  The Luxembourg court dismissed Raulet's lawsuit
on May 24, 2004 because Raulet had failed to prove the California
judgment was entered, and not appealed.  A copy of the May 24,
2004 dismissal is attached as Exhibit 38.  SCEV filed the
"citation to join" on September 22, 2004, based on three
fraudulent documents, well knowing that the "citation to join"

22

referenced a Luxembourg action which had already been dismissed. Gidding and Pivotal learned of and received the "citation to join" on September 27, 2004.

68.    On or about February 16, 2005,  Gidding and Pivotal made a motion requesting SCEV to produce a copy of the original Contract of Guarantee, a redacted copy of which is attached as Appendix A to the September 20, 2002 Raulet Declaration in support of SCEV's motion to set aside the Los Angeles County Superior Court judgment, and a full copy of which is attached as Exhibit (Piece) 10 to the February 3, 2003 SCEV memoire filed in the Chalons Court in opposition to Gidding and Pivotal's motion to ratify the Los Angeles County Superior Court judgment. (See Exhibits 5 and 25, herein).  SCEV responded that the originals were not in the possession of SCEV.  Gidding's and Pivotal's motions for relief in the Chalons Court, based upon the non-existence of this document, are pending.  This further supports plaintiffs' claim that the redacted copy of the Contract of Guarantee produced in the Los Angeles County Superior Court, and the full copy of the Contract of Guarantee produced in the Chalons Court, were forgeries.

69.    In numerous filings between the commencement of the ratification proceeding on September 5, 2002 and the date of the filing of this complaint, during which period the ratification proceeding has, at all times been pending, SCEV has continually filed documents with the Chalons court repeating the representations made in SCEV's initial memoire of February 3, 2003.

## THE FRENCH PENAL SUIT

70.  SCEV's defense memoire of February 3, 2003, accused Pivotal, Gidding, and PLB of fraudulent collusion.  On May 12, 2003, Raulet brought similar criminal charges before the penal court of the Tribunal de Grande Instance de Paris ("Paris Court").  Raulet's accusations contained the following language: "*The charge of Fraud applies as PLB, in the Guarantee, engaged themselves not only to represent SCEV in the California litigation, but also to pay any eventual awards or judgments.  It is obvious that due to fraudulent maneuvers of PLB, the California court ruled against SCEV.  Effectively, PLB: (1) in concluding a settlement with Pivotal & Gidding, while keeping SCEV ignorant of this fact, was released from the charges brought against them; and (2) deliberately concealed the Guarantee from the Superior Court of California, under the terms of which they had engaged to pay any judgments taken against SCEV.  In this regards, SCEV made a motion before the CA court to review the error in the judgment rendered on December 4, 2001.*"  These purported criminal charges closely track the lies and fraudulent statements alleged by SCEV in Gidding and Pivotal's civil action to ratify the Los Angeles Superior Court judgment in the Chalons Court.  A copy of the May 12, 2003 accusation in the Paris Court is attached as Exhibit 39.

71.  On November 25, 2003 Raulet amended his criminal accusation to specifically accuse Pivotal and Gidding of fraudulent collusion and forgery.  The accusation contained the following language: "*In reality, PLB and Plantagenet were probably engaged, in the deepest secrecy, with discussions with*

24

*Pivotal & Gidding so that they would desist in their action against Plantagenet; This dissimulation, thanks to which the California Court was kept in ignorance of the Guarantee, constitutes another fraudulent maneuver; The last maneuver of PLB was to organize its own bankruptcy; Since PLB's liquidation, it has been impossible for SCEV complete its procedures (T-Lux), because John Zappettini has completely disappeared ....... Concerning the fraudulent maneuvers of Pivotal and Gidding: SCEV and Levant intend to bring to your attention that fact that Pivotal and Gidding are equally guilty of fraud, in order to obtain a judgement against SCEV in California; Pivotal and Gidding founded the totality of their case against SCEV upon a pretended contract of exclusivity between themselves and SCEV, and from which they beneficiaries; In order to condemn SCEV, the CA court would have had to see this contract; Pivotal and Gidding have never shown this contract to either SCEV or Levant, and it can not be excluded that they submitted a forged contract to the court in order to deceive the judge.*"  A copy of the November 25, 2003 criminal accusation in the Paris Court is attached as Exhibit 40.

72.  Raulet's criminal accusations contained a list of the following exhibits:

    a)  A Contract of Guarantee dated February 4, 2000;

    b)  A Covenant dated March 2, 2000;

    c)  A California judgment dated December 3, 2000.

These are, apparently, the same three fraudulent documents which were attached in the Luxembourg lawsuit filed by Raulet. The first document is, apparently, the same fraudulent document

filed by Raulet in his September 20, 2002 Declaration in the Los Angeles County Superior Court and the February 3, 2003 memoire in the Chalons Court.  The second document is, apparently, the same fraudulent document filed in the February 3, 2003 memoire in the Chalons Court.

73.  On September 22, 2004, Gidding and Pivotal submitted a defense memoir to the Prosecutor of the French Republic.  A copy of that memoire is attached as Exhibit 41.

74.  On October 8, 2004, the Paris Court rejected all of Raulet's charges.  A copy of this rejection is attached as Exhibit 42.

75.  On October 18, 2004, Raulet appealed.  A copy of this appeal is attached as Exhibit 43.

76.  These charges continue to threaten the Plaintiffs with potential fines and imprisonment because the appeal has not yet been resolved.

### DISCOVERY OF THE CRIMINAL SCHEME

77.  Gidding and Pivotal were unaware of the criminal scheme, the false and fraudulent documents, the false representations, and the forgeries until on or about March 10, 2004, the date that Gidding obtained his file in the Chalons Court civil action to ratify the California judgment from his new attorney - who had obtained the file from his previous attorney - Mary-Claude Simone.

78.  While Gidding had seen the redacted Contract of Guarantee, attached as Appendix A to the September 20, 2002 Raulet Declaration in support of SCEV's motion to set aside the Los Angeles Superior Court judgment, he did not, at that time,

26

suspect is as being a forgery because he had no knowledge that PLB had been liquidated.

79. When reviewing the file he received on March 12, 2004, from his French attorney, Gidding noticed that the Hartford Settlement Agreement, both the English version, and the French translation, were forgeries. He then, in attempting to explain the forgery, researched any information he could find relating to PLB. When he learned that it had been put into liquidation on or about April 7, 2000, he realized that the Contract of Guarantee and Covenant, as well as the related letters, produced in both SCEV's motion to set aside the Los Angeles County Superior Court judgment, and in SCEV's memoire opposing Gidding and Pivotal's lawsuit in the Chalons Court to ratify the Los Angeles County Superior Court judgment, were fraudulent.

80. Gidding learned the information sometime between March 12, 2004 and September 22, 2004, when he filed his response to Raulet's criminal complaint filed in the Paris Court on May 12, 2003. At that time, Gidding had not yet learned about the amended criminal suit filed by Raulet in the Paris Court on November 25, 2003.

81. On or about March 18, 2004, Gidding's new attorney in connection with the motion to ratify the judgement in the Chalons Court, Didier Schonberger, mailed to him, from France to the United States, using the United States mail, a copy of a number of documents which Schonberger obtained from the file of Gidding's previous attorney, Simone. Included in documents attached to the letter were the Contract of Sale between SCEV and PLB dated December 18, 1998, and the forged Hartford settlement

27

agreement and forged French translation of the Hartford settlement agreement. A copy of this letter with the two described attachments is attached as Exhibit 44.

## DEFENDANTS JEAN-FRANCOIS RAPENEAU, CHRISTOPHE RAPENEAU AND SA CHAMPS RENIER

82. On December 22, 2003, Jean-Francois Rapeneau and Christophe Rapeneau through SA Champs Renier, purchased the shares of SCEV. Thus, as of today, these defendants are responsible for SCEV's liabilities, and have been in control of SCEV's actions at least since December 22, 2003.

## THE PATTERN OF RACKETEERING ACTIVITY

83. During the relevant times, Defendants engaged in a pattern of racketeering activity, and conspired together to engage in such a pattern. They schemed to commit acts of mail fraud and wire fraud, in violation of 18 U.S.C Sections 1341, 1343. These acts of mail fraud and wire fraud were designed to, through misrepresentations a material omissions, deprive plaintiffs Gidding and Pivotal of money and property, that is, their duly obtained judgment against SCEV in the Los Angeles County Superior Court.

84. It was part of the scheme to defraud that defendants hid from Gidding and Pivotal that SCEV was not owned by PLB and PPSA, at the time that Anderson, Zappatini, PLB, PCM and the other Plantagenet defendants settled the Los Angeles County Superior Court suit, but, rather, was owned by Levant and Raulet. When Gidding and Pivotal amended the lawsuit to name PLB and PPSA as defendants, defendants were well aware that (a) PLB had been liquidated on April 7, 2000; (b) SCEV had been sold by PLB and PPSA to Levant and Raulet on March 2, 2000; and © ) at the time

of the March 2, 2000 sale, PLB and PPSA entered into a contract of guarantee with Levant and Raulet to provide for their defense at trial and to pay any judgment.

85.   It was part of the scheme to defraud that defendants Anderson, Zappatini, PCM, PLB, PPSA, and the other Plantagenet defendants settled with Gidding and Pivotal by using their insurance company, Hartford, to run up litigation costs and pressure Gidding and Pivotal into a settlement.   It was further part of the scheme to defraud to forge letters and documents where SCEV would be appear to be the holder of an indemnification agreement with an entity, PLB, that had already been liquidated - rather than with PPSA, a thriving concern that could pay Gidding and Pivotal's judgment against SCEV.

86.   It was a part of the scheme to defraud to allow Gidding and Pivotal to obtain a judgment against SCEV in the Los Angeles County Superior Court lawsuit, with the intention of evading and lying to avoid the judgment.

87.   It was a part of the scheme to defraud that defendants moved to set aside the judgment on September 20, 2002, relying upon a forged a contract of guarantee between PLB and SCEV, where the genuine contract of guarantee was between PLB, PPSA and SCEV, and attaching the forged contract of guarantee to the declaration of Patrick Raulet.   It was further part of the scheme to defraud that Raulet attached two letters to his September 20, 2002 declaration, which were created by defendants as part of their scheme.   The first letter, from Anderson to Raulet, is dated September 28, 2001, one week after the settlement between Gidding and Pivotal and all defendants except for SCEV in the Los Angeles

County Superior Court Suit, and refers to a promise to pay or indemnify Raulet for the cost of the litigation. The second letter, dated January 7, 2002, from Raulet to Anderson, refers to a contract, asks for relief, and asks Anderson to settle the matter.

88. It was a part of the scheme to defraud that, when Gidding and Pivotal sought to enforce the judgment against SCEV in the Chalons Court in France, defendants filed the same forged contract of guarantee together with legal filings perpetrating the lie before the Chalons Court that Gidding and Pivotal fraudulently colluded with PLB in the Superior Court of Los Angeles County to obtain a judgment against SCEV. The alleged collusion was as follows: PLB entered into a contract of guarantee with SCEV, and Gidding and Pivotal colluded with PLB to have it liquidated, thereby causing SCEV to be liable. This claim of fraud in the Chalons Court, if upheld, would defeat ratification of the judgment. If the Chalons Court were made aware of the true fact that the contract of guarantee also included PPSA, a thriving concern, the claim of fraud would have no merit, and the California judgment would be ratified in due course.

89. It was further part of the scheme to defraud that defendants filed, or caused to be filed, before the Chalons Court, a forged Hartford settlement agreement from the Los Angeles County Superior Court lawsuit, purporting to show that Gidding and Pivotal settled only with PLB and not with PPSA. This document was filed with the fraudulent intent to convince that Chalons Court that the judgment should not be ratified

30

because it was obtained by fraud, and to hide from the Chalons Court the true fact that a non-liquidated entity, PPSA, was perfectly able to honor the indemnification agreement with SCEV. If the defendants presented the genuine Hartford Settlement Agreement, the Chalons Court would be aware that PPSA settled with Gidding and Pivotal, that the settlement was consistent with the fact that PPSA and PLB sold SCEV to Levant and Raulet, and that the sale and settlement was consistent with the true contract of guarantee - between PLB <u>and</u> PPSA, on the one hand, and SCEV on the other hand.

90.   It was further part of the scheme to defraud that defendants filed, in the Luxembourg courts, an action against PLB which attached the same forged contract of guarantee, with the intent of using the Luxembourg court action as support in the Chalons Court, through a "citation of joinder," to cause any judgment against SCEV to be entered against the liquidated PLB, thereby depriving Gidding and Pivotal of money and property.

91.   It was further part of the scheme to defraud that defendants caused to be filed, in the Paris criminal courts, a criminal action against Gidding and Pivotal using the same forged and fraudulent documents, including the forged Hartford settlement agreement and the forged contract of guarantee, to further pressure Gidding and Pivotal to abandon their action to ratify the California judgment.

92.   It was further part of the scheme to defraud that defendants caused the Paris criminal filings, which included the above-described forgeries, to be filed in the Chalons Court with the specific intent of depriving Gidding and Pivotal of their

money and property by seeking to cause the Chalons Court to fail to ratify the California judgment.

93. The defendants, through a pattern of racketeering activity, that is, multiple acts of mail fraud and wire fraud, used the courts of the United States, France, and Luxembourg, to further their scheme to steal the amount of the California judgment, held by Gidding and Pivotal against SCEV, together with interest.

94. Defendants used the mails and the wires, or, by their scheme, caused them to be used, on a repeated basis, as part of their pattern of racketeering activity and multiple acts of mail and wire fraud.

95. In particular, the mails were used, among other times, on the following occasions: (a) January 7, 2002 letter from Raulet (in France) to Anderson (in San Francisco); (b) September 20, 2002 motion to set aside the California judgment (from SCEV's attorney's in San Francisco to Gidding and Pivotal's attorneys in San Francisco); (c) November 14, 2002 reply to Gadding and Pivotal's response to set aside the judgment (From SKIVE's attorneys in San Francisco to Gadding's attorneys in San Francisco); (d) letter from attorney Sawbuck to attorney Simon to Hartford's attorneys dated September 14, 2003 (from San Francisco to Fresno, and San Francisco to France); March 10, 2004 letter from Gadding's attorney Schonberger to Pivotal (from France to Glen Ellen, Sonoma County).

96. In particular, the wires were used, among other times, on the following occasions: (a) May 5, 2001, May 9, 2001 and May 11, 2001 exchange of faxes between Anderson and Raulet in

connection with the forging of the covenant to the Contract of Guarantee between PPSA, PLB and SKIVE (between San Francisco and France); (b) Anderson's September 28, 2001 faxed letter to Raulet (San Francisco to France); (c) September 12, 2003 faxed letter from Simone to attorney Sawbuck in Los Angeles (France to Los Angeles).

97.  As set forth above, the Defendants have engaged in a "pattern of racketeering activity," as defined in Section 1961(5) of RICO, by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above, within the past ten years.  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims.

98.  The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by Defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. Section 1961(5).

## ENTERPRISE

99.  Defendants carried out their pattern of racketeering activity through an enterprise engaged in interstate commerce and foreign commerce, that is, either (a) the court systems of Los Angeles County, Chalon, France, and Luxenbourg; or (b) an association-in-fact of the defendants who marketed, produced and soldd LeBrun Champagne.  These alternative enterprises are

separate and distinct from the pattern of racketeering activity alleged herein.

### USE OF THE MAILS AND WIRES

100. As alleged herein, in furtherance of and for the purpose of executing the scheme and artifice to defraud, and through a pattern of racketeering activity, defendants, on numerous occasions used and caused to be used mail depositories of the United States postal service by both placing and causing to be placed mailable matter in said depositories and by removing and causing to be removed mailable matter from said depositories, each such use of the mails in connection with the scheme and artifice to defraud and to obtain money by means of false pretenses, constituting the offense of mail fraud as proscribed and prohibited by 18 U.S.C. Section 1341.

101. During the relevant times, and in furtherance of and for the purpose of executing the scheme and artifice to defraud, and through a pattern of racketeering activity, defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce, by both making and causing to be made telephone calls, transmission of faxes, and other wire communications, as proscribed and prohibited by 18 U.S.C. Section 1343.

### FIRST CLAIM FOR RELIEF

### (VIOLATION OF 18 U.S.C. SECTION 1962(c))

102. Plaintiffs incorporate and re-allege paragraphs 1 through 101, as though fully set out herein.

103. Gidding and Pivotal are "persons" within the meaning of 18 U.S.C. Sections 1961(3) and 1964(c).

104. The Defendants, Anderson, Zappettini, Lemal, Plantagenet Capital Management LLC, Plantagenet Capital America LLC, Plantagenet Capital Fund LP, Plantagenet Capital Fund LP II, PLB Holdings SA, Plantagenet Partners SA, SA Societe Champenoise D'Exploitation Vinicole, Hauchart, Raulet, Jean-Francois Rapeneau, Christophe Rapeneau, SA Compagnie Des Vins Due Levant, Sa Champs Renier, Simon and DOES 1 through 100 inclusive are each a "person" within the meaning of 18 U.S.C. Sections 1961(3) and 1964(c).

105. The Superior Court of Los Angeles County, the Chalons Court and the Luxenbourg Court are an enterprise "enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate and foreign commerce during the relevant times; alternatively, the defendants were an assocation-in-fact marketers, producers and sellers of LeBrun Champagne, which enterprise was engaged in and the activities of which affected, interstate and foreign commerce.

106. The Defendants Anderson, Zappettini, Lemal, Plantagenet Capital Management LLC, Plantagenet Capital America LLC, Plantagenet Capital Fund LP, Plantagenet Capital Fund LP II, PLB Holdings SA, Plantagenet Partners SA, SA Societe Champenoise D'Exploitation Vinicole, Hauchart, Raulet, Jean-Francois Rapeneau, Christophe Rapeneau, SA Compagnie Des Vins Due Levant, Sa Champs Renier, Simon and DOES 1 through 100 inclusive were each associated with an enterprise, that is, either (a) the courts of Los Angeles County, Chalons, France and Luxenbourg; or (b) an association-in-fact of the defendants who sold, marketed,

and produced LeBrun Champagne, and did conduct or participate, directly or indirectly, in the conduct of the affairs of either of these enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. Sections 1961(1)(B) and 1961(E) and 1961(5) and 1962(c), to wit:

(a)   Multiple instances of mail fraud in violation of 18 U.S.C. Section 1341; and

(b)   Multiple instances of wire fraud in violation of 18 U.S.C. Section 1343.

107. By reason of the violation of 18 U.S.C. Section 1962(c) committed by Defendants Anderson, Zappettini, Lemal, Plantagenet Capital Management LLC, Plantagenet Capital America LLC, Plantagenet Capital Fund LP, Plantagenet Capital Fund LP II, PLB Holdings SA, Plantagenet Partners SA, SA Societe Champenoise D'Exploitation Vinicole, Hauchart, Raulet, Jean-Francois Rapeneau, Christophe Rapeneau, SA Compagnie Des Vins Due Levant, Sa Champs Renier, Simon and DOES 1 through 100 inclusive, Gidding and Pivotal were injured in a yet undetermined amount, believed to be not less than approximately $7,000,000 within the meaning of 18 U.S.C. Section 1964(c).

## SECOND CLAIM FOR RELIEF

### (Violation of 18 U.S.C. Section 1962(d) by Conspiracy to Violate Section 1962©))

108. Plaintiffs incorporate and re-allege the preceding paragraphs 1 through 107, as if fully set out herein.

109. Gidding and Pivotal are "persons" within the meaning of 18 U.S.C. Sections 1961(3) and 1964(c).

110. The Defendants, Anderson, Zappettini, Lemal, Plantagenet Capital Management LLC, Plantagenet Capital America

36

LLC, Plantagenet Capital Fund LP, Plantagenet Capital Fund LP II, PLB Holdings SA, Plantagenet Partners SA, SA Societe Champenoise D'Exploitation Vinicole, Hauchart, Raulet, Jean-Francois Rapeneau, Christophe Rapeneau, SA Compagnie Des Vins Due Levant, Sa Champs Renier, Simon and DOES 1 through 100 inclusive are each a "person" within the meaning of 18 U.S.C. Sections 1961(3) and 1964(c).

111. The Superior Court of Los Angeles County, the Chalons Court and the Luxenbourg Court are an enterprise "enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate and foreign commerce during the relevant times; alternatively, the defendants were an assocation-in-fact marketers, producers and sellers of LeBrun Champagne, which enterprise was engaged in and the activities of which affected, interstate and foreign commerce.

112. The Defendants Anderson, Zappettini, Lemal, Plantagenet Capital Management LLC, Plantagenet Capital America LLC, Plantagenet Capital Fund LP, Plantagenet Capital Fund LP II, PLB Holdings SA, Plantagenet Partners SA, SA Societe Champenoise D'Exploitation Vinicole, Hauchart, Raulet, Jean-Francois Rapeneau, Christophe Rapeneau, SA Compagnie Des Vins Due Levant, Sa Champs Renier, Simon and DOES 1 through 100 inclusive were each associated with an enterprise, that is, either (a) the courts of Los Angeles County, Chalons, France and Luxenbourg; or (b) an association-in-fact of the defendants who marketed, produced and sold LeBrun Champagne, and did conspire within the meaning of 18 U.S.C. Section 1962(d) to violate Section 1962( c),

that is, they conspired to conduct or participate, directly or indirectly, the conduct of the affairs of either of these enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. Sections 1961(1)(B) and 1961(E) and 1961(5) and 1962(c), to wit:

   (a)  Multiple instances of mail fraud in violation of 18 U.S.C. Section 1341; and

   (b)  Multiple instances of wire fraud in violation of 18 U.S.C. Section 1343.

113. By reason of the violation of 18 U.S.C. Section 1962(c) committed by Defendants Anderson, Zappettini, Lemal, Plantagenet Capital Management LLC, Plantagenet Capital America LLC, Plantagenet Capital Fund LP, Plantagenet Capital Fund LP II, PLB Holdings SA, Plantagenet Partners SA, SA Societe Champenoise D'Exploitation Vinicole, Hauchart, Raulet, Jean-Francois Rapeneau, Christophe Rapeneau, SA Compagnie Des Vins Due Levant, Sa Champs Renier, Simon and DOES 1 through 100 inclusive, Gidding and Pivotal were injured in a yet undetermined amount, believed to be not less than approximately $7,000,000 within the meaning of 18 U.S.C. Section 1964(c).

114. Defendants entered into an agreement with each other to join in the conspiracy to violate 18 U.S.C. Section 1962©). Each defendant entered into an agreement to join the conspiracy, and took acts in the furtherance of the conspiracy and knowingly participated in the conspiracy. The purpose of the conspiracy was to the economic benefit of the defendants, and damage to the plaintiffs was a natural consequence of this conspiracy. The conspirators carried out the scheme and each conspirator was put

on notice of the general nature of the conspiracy, that the conspiracy extended beyond the individual role of any single member, and that the conspiratorial venture functioned as a continuing unit for a common purpose. The defendants adopted the goal of furthering and facilitating the criminal endeavor. Their stake in the criminal venture was in making profits which they knew could come only from their informed and interested cooperation with each other, and their active assistance, stimulation, and instigation of legal proceedings designed to place their frauds before the Courts of the United States and France.

115. Defendants, together with each member of the conspiracy, agreed and conspired to violate 18 U.S.C. Section 1962(c) by participating, directly and indirectly, in the operation and management of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

**PRAYER FOR RELIEF**

WHEREFORE, Gidding and Pivotal prays:

116. That judgment be entered against Defendants Anderson, Zappettini, Lemal, Plantagenet Capital Management LLC, Plantagenet Capital America LLC, Plantagenet Capital Fund LP, Plantagenet Capital Fund LP II, PLB Holdings SA, Plantagenet Partners SA, SA Societe Champenoise D'Exploitation Vinicole, Hauchart, Raulet, Jean-Francois Rapeneau, Christophe Rapeneau, SA

Compagnie Des Vins Due Levant, Sa Champs Renier, Simon and DOES 1 through 100 inclusive, each of them jointly and severally:

(a)  In an undetermined amount not less than Seven Million Dollars ($7,000,000) upon the First Claim for Relief, for violation of 18 U.S.C. Section 1962(c), the sum duly trebled in accordance with 18 U.S.C. Section 1964(c).

(b)  In an undetermined amount not less than Seven Million Dollars ($7,000,000) upon the Second Claim for Relief, for violation of 18 U.S.C. Section 1962(d) by conspiracy to violate 18 U.S.C. Section 1962(c), the sum duly trebled in accordance with 18 U.S.C. Section 1964(c).

(c)  For the costs of suit including reasonable attorney's fees in accordance with 18 U.S.C. Section 1964(c).

(d)  In addition, Gidding and Pivotal prays for equitable relief against Defendants in the form of such injunctive and related relief as might be appropriate in accordance with 18 U.S.C. Section 1964(a) including:

(i)  Reasonable restrictions on the future activities and investments of Defendants.

(ii)  An equitable accounting for all benefits, consideration and profits received directly or indirectly or underlying, including but not limited to, the imposition of a constructive trust with tracing.

(iii)  The imposition and execution of equitable liens.

(iv)  Indemnification for any and all sums and losses that may be judged to be due or payable from Gidding and

40

Pivotal as a consequence of the defendant's conduct alleged herein.

(v)    Any restrictions which may be appropriate on future conduct or activities.

(vi) For such other damages, relief and pre and post-judgment interest as the Court may deem just and proper.

GIDDING AND PIVOTAL HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

Dated: September 14, 2007    **COHEN & PAIK LLP**

By:_____
    DAVID J. COHEN, ESQ.

Attorneys for Plaintiff
**John Gidding**