17/03 2008 20:31 FAX  ☒002/009

1

| | |
|---|---|
| Fax From: | Windstock & Importing Corp. |
| Fax To: | Simon & Perrard<br>34, rue des Moulins<br>51715 Reims, France |

Date: June 23, 2003
Pages: 3
From: Bordeaux, France



RE:   Champagne Ayala SA et Societe Generale de Champagne (AYALA) vs Windstock & Importing (W&I)

Dear Mr. Kroon,

I have read the lawsuit brought against Windstock & Importing Corp. by AYALA. I have taken advantage of my presence at Vinexpo to discuss this matter at length with John Cossart (the owner of Peter Cossart Ltd. and listed as a party to this lawsuit), and we both feel that our companies are victims of a fraud perpetrated by Ayala. Mr. Cossart will be addressing a similar letter to you.

Please represent Windstock & Importing Corp. at the Tribunal de Commerce de Reims, June 24, 2003.

Windstock & Importing Corp. will only contest the competence of this court to judge this case, we do not intend to argue this case before this court.

**For your better understanding of this mater:**

I.   Concerning the lawsuit brought before the Commercial Courts of Reims:

*I do not believe that the above court is competent to judge this case.*

A.
If this court considers our written contract as valid, this contract calls for arbitration in the USA.

B.
If this court does not consider our written contract as valid, then the nexus of our business relationship only concerns the USA and only a USA court would be competent.

II.   Was, or was not, John Gidding the Export Director of Ayala?

If John Gidding was the Export Director of Ayala, beginning July 15, 1998, then W&I is the victim of a fraud perpetuated by Ayala.

*Please ask the court to render a decision on this question. I have been told that the Reims Court has both John Gidding's and Ayala's statements and documents on this subject.*

Ayala's written testimony in Gidding vs. Ayala affirms that on July 15, 1998 John Gidding became the Export Director of Ayala.

*Please ask the court to render a decision on this question. The Reims Court has both John Gidding's and Ayala's statements and documents on this subject.*

                                                                              2

**III.  Any contract or agreement between Ayala and John Gidding only binds themselves, not W&I.**

Ayala's written testimony in Gidding vs. Ayala affirms that as Export Director he had a contract of service.

*Could you please demand that Ayala produce a copy of the contract.*

**IV.  It is W&I's assertion that John Gidding WAS the Export Director of Ayala.**

A.

W&I came to the head offices of Ayala on May 12,1998 accompanied by Pat Dewane of North Port Importing, and John Gidding, Ayala's agent and importer in the USA. W&I met with Mr. Alain Ducellier in his office accompanied by his export director, Mr. Jacque Delvinquiere. We all discussed a proposition for a sale of Champagne Montebello to Trader Joe's, the USA's largest and strongest retail customer. This sale had an introductory plan of 5 years in order to establish the brand with projected sales of over 100,000 cases, and a five year follow up plan with projected sales of 200,000 cases. W&I would not begin to make a profit until the 25,000 case annual sales level was attained.

B

On July 15, 1998 John Gidding announced to W&I that he had accepted the position of Export Director for Ayala and that he was now in their employ.

C

On September 23, 1998, during W&I visit to the headquarters of Ayala, Mr. Alain Ducellier introduced Mr. John Gidding as his export director. Mr. John Gidding gave us his business card marked "Champagne Ayala - Director Export." W&I reviewed their business plan in Mr. Gidding's office assisted by Mademoiselle Gé, his secretary, and Jacques Delvinquiere, his co-worker.

D

Over the next two years many of our clients visited Ayala and they were all met in a similar fashion. A Mister Boissel appeared in September 1999 and introduced Mr. Gidding in exactly the same fashion.

E

Ayala regularly sent press releases are to W&I. It was published to the trade and public that John Gidding was the Export Director of Champagne Ayala.

F

All of W&I's commercial correspondence, faxes, telephone calls, orders, freight details, commission statements, etc. were sent to the attention of John Gidding at the headquarters of Ayala. John Gidding always replied to us in his capacity of Export Director.

G

On March 24, 2000 Mr. Gidding informed us that he been abruptly fired by Ayala and he was no longer their export director. He also informed us that despite this Pivotal, Inc, his company, would continue to import Champagne Montebello until the end of the year 2000 so that W&I could adjust our business plans accordingly.

Subsequent to March 24, 2000 and until the lawsuit in question, Ayala has never informed W&I it John Gidding was not their export Director or that any problems had ever existed between them.

### W&I has been Ayala's agent since 1998.

If Ayala now wishes to state in their lawsuit that John Gidding's role at Ayala was only "to help lain Ducellier) promote/market the champagnes of AYALA and SOCIETE GENERALE DE IAMPAGNE to the export markets" and that "this intervention was not the subject of an employment ntract, or any written document authorizing Mr. GIDDING to contract in Ayala's or SGC's name not ir export director". W&I asserts that Ayala informed them that John Gidding was their export ector, and that John Gidding's and Ayala's subsequent actions confirmed that this was indeed true.

Ayala is therefore making such a false statement with the sole purpose of defrauding W&I. ala's motive is to escape from their obligations to W&I. These obligations have existed since W&I came Ayala's exclusive agent in 1998.

. Concerning the Written Contract

The terms of the contract represent exactly the conditions that W&I demanded and that Ayala cepted in September 1998. The sales of both Champagne Ayala and Champagne Montebello in the ;A would have been inexistent without W&I's expertise and investment. We were tremendously ccessful with this project until it was partially ruined by Ayala in the year 2001, and utterly ruined by ala in the year 2002.

### I. W&I's demand for damages for Fraud

W&I evaluates its prejudice stemming from this fraud as exactly the same amount that Ayala is empting to defraud W&I of: $1.800.000.

*Please inform me the best manner to proceed with a demand against Ayala for Fraud.*

W&I will seek to recover their commercial damages through arbitration or otherwise in the ;A as soon as the jurisdictional issues in France are resolved.

### II. Ayala's willful and deceitful Breach of Contract.

Should Ayala have really wished to question the existence or validity of this contract, they uld have easily done so without either destroying our agency or suing W&I with no cause.

. John Gidding has no relationship, financial or other, with W&I.

An examination of W&I's records show that Mr. Gidding has never been an officer, director, or ickholder of W&I. W&I have never paid a salary, commission, or expense to Mr. Gidding. John dding has no indirect ties with W&I.

4

X.   **W&I's can substantiate all of its claims with documentary and testimonial proof.**

My Best Regards,

*[signature]*

Windstock & Importing Corp.
Richard Genderson / Director