## By David Evans

≪ On a January afternoon in George Town, the capital of the Cayman Islands, the sun beats down on three cruise ships anchored at Hog Sty Bay. Along the waterfront on Church Street stands a green-trimmed, white, five-story office building called Ugland House. From the outside, there's no way to see it's the official address of 12,748 companies. Ugland and other office buildings in George Town are home to subsidiaries of more than 150 U.S. corporations, including Coca-Cola Co., Intel Corp. and 10 more of the 30 companies in the Dow Jones Industrial Average.

Parmalat Finanziaria SpA, the Italian food company that collapsed in December after telling investors it had lied about its finances, used three Cayman subsidiaries to misrepresent assets, according to Italian prosecutors. Enron Corp., the Houston-based energy company that went bankrupt in December 2001, used 441 Cayman affiliates to help hide $2.9 billion in losses, U.S. Senate investigators say.

Scores of the biggest U.S. companies use havens like the tax-free Cayman Islands, a British crown colony 150 miles southwest of Cuba, to escape billions of dollars in U.S. taxes, says Senator Byron Dorgan, a Democrat from North Dakota.

Twenty-four of the 100 largest contractors with the U.S. federal government—including Altria Group Inc., Oracle Corp. and Procter & Gamble Co.—have subsidiaries in the Caymans, according to a March report by the General Accounting Office, Congress's investigative arm. Those 24 companies received a total of $35 billion from the U.S. government in 2001, the GAO found. "They are shortchanging our country even as they profit from it," says Dorgan, 62, the top Democrat on the Competition, Foreign Commerce and Infrastructure Subcommittee of the Committee on Commerce, Science and Transportation.

Oracle spokeswoman Deborah Lilienthal says the database software maker's Cayman subsidiary owns a minority share of a foreign company she declined to disclose. Procter & Gamble spokesman Douglas Shelton says the household goods maker's Cayman subsidiary is an inactive holding company. "We're currently exploring dissolution of that entity so it doesn't raise questions in people's minds," he says. Altria spokesman Tim Kellogg says the food and cigarette maker's Cayman subsidiary is a holding company.

The 100 U.S. contractors own 464 subsidiaries in offshore tax havens, according to the GAO report. The offshore subsidiaries often serve the sole purpose of allowing companies to avoid paying U.S. taxes, says Senator Carl Levin, 68, a Democrat from Michigan. "Many are little more than a post office box set up to allow corporations to move profits to the low- or no-tax havens rather than reporting that income to the United States," he says.

J.P. Morgan Chase & Co. estimated in a June study that $650 billion of profit earned abroad by U.S. companies over decades had never been taxed by the U.S. That's up from a cumulative total of $500 billion cited by J.P. Morgan in a study a year ago. In 2001, almost half of the money U.S. companies earned outside the

**Coca-Cola Intel, subsidiaries in the Cayman Islands.**

# THE $150 BILLION
# SHELL GAME

PHOTOGRAPH BY BRIAN SMITH

62

U.S.—47 percent—was accounted for in offshore tax havens such as the Cayman Islands, which has no corporate income tax, says Martin Sullivan, 45, a former U.S. Treasury Department economist, citing Commerce Department data. As a result, companies didn't have to pay the 35 percent U.S. corporate income tax.

The tax haven units held only 12.6 percent of the companies' foreign plants and equipment and 9 percent of their foreign employees, says Sullivan, who now writes a column for *Tax Notes*, a weekly journal. In other words, U.S. companies were avoiding not only U.S. taxes but taxes in other countries where they made and sold products, Levin says. "When $250 billion of the $880 billion in foreign bank deposits within U.S. banks is attributed to the Cayman Islands, to connect the dots you've got to ask questions about the extent of tax dodging in that country and other tax havens," Levin says. Sullivan says his research shows the Caymans are being used for U.S. tax avoidance.

David James, vice president of research at James Investment Research Inc., which manages $650 million, says he has mixed feelings about companies that use the Cayman Islands to avoid U.S. taxes. "As an American, I hate to see it happen," he says. "As an economist, I see it as a sign U.S. taxes are too high. As a shareholder, I favor lowering taxes to boost the bottom line. If they can move to Mars and reduce taxes further, that would be fine."

James Investment, based in Beavercreek, Ohio, holds 24,000 shares of Seagate Technology Inc., the world's largest computer disk drive maker. Seagate, based in Scotts Valley, California, incorporated in the Cayman Islands in 2000. The company reduced its taxes in fiscal 2003 to an effective rate of 2.9 percent, or $19 million on profit of $660 million, according to its 2003 annual report. Seagate's taxes included foreign taxes paid of $40 million and a U.S. tax credit of $21 million, according to the report.



U.S. Senator            says too many companies abuse accounting rules to avoid taxes.

Spokesman Guy Cantwell says about 69 percent of the company's revenue comes from outside the U.S.

Coca-Cola, the world's largest soft-drink maker, manufactures syrup in two Irish plants owned by Coke's Cayman-based subsidiary, Atlantic Industries. Coke, based in Atlanta, saved $500 million in U.S. taxes last year by earning 63 percent of its income through foreign subsidiaries, according to its 2003 annual report. Coke used the Cayman subsidiary to sell syrup to customers in 75 countries and avoid paying U.S. taxes on earnings from more than $1 billion in revenue last year, according to a person familiar with Coke's finances. Coke spokesman Ben Deutsch says the company doesn't comment on tax strategies for competitive reasons.

"When companies, including great companies like Coca-Cola, decide they want to minimize their participation in the payment of taxes for that which we enjoy in this country, it bothers me," Dorgan says.

## 'We have to get on top of corporate accounting and manipulation of corporate books of reducing taxes,' Senator Charles Grassley says.

Seagate incorporated in the Caymans to reduce its taxes, spokesman Brian Ziel says. "The competitive benefits relate both to taxes saved on certain income earned outside of the United States and the ability to efficiently deploy assets around the globe to remain competitive," he says.

Other U.S.-based corporations incorporated in the Caymans include Fresh Del Monte Produce Inc., the world's third-largest banana producer, which is actually headquartered in Coral Gables, Florida, and Transocean Inc., a drilling company with an $8.2 billion market value, which is actually based in Houston. Del Monte spokeswoman Dana Weinstein declined to comment. Transocean wrote in a 1999 SEC filing that it had incorporated in the Caymans to lower its taxes.

Intel, the world's biggest computer chip maker, uses a Cayman subsidiary to run plants in Ireland, which has a 12.5 percent corporate income tax. Intel, using its offshore units, avoided $792.6 million in U.S. taxes from 2001 to 2003, according to SEC filings. Asked why Intel, based in Santa Clara, California, has a Cayman subsidiary, spokesman Chuck Mulloy says, "I can only assume it's for tax purposes." He adds, "Unless we absolutely need it onshore, we'll keep it offshore to avoid paying a 35 percent tax." Intel Chief Executive Officer Craig Barrett declines to comment, Mulloy says.

Intel is part of a group of U.S. companies called the Homeland Investment Coalition that supports Congressional proposals to allow the billions of dollars in overseas profits to be repatriated for one year in exchange for paying a 5.25 percent tax.

The coalition, which has hired PricewaterhouseCoopers

KATHERINE LAMBERT

LLP to lobby the U.S. Congress, presents the proposal as an idea that would benefit both the companies and the country's economy. It says the repatriated money would be used to create jobs, fund pension plans and pay off debt. Few of these dollars would ever be brought back to the U.S. and taxed if the one-time tax break isn't approved, the coalition said in an April 28, 2003, letter to Congress. J.P. Morgan estimates $425 billion would be repatriated. That would result in $22.3 billion in U.S. tax revenue, using the proposed 5.25 percent tax rate. That figure represents 17 percent of the $132 billion in U.S. corporate tax revenue in fiscal 2003, according to the Congressional Budget Office.

Forty-five percent of U.S. corporations with revenue exceeding $50 million or assets of more than $250 million paid no federal income tax in 2000, according to the GAO study. That has increased each year since 1996, when it was 33 percent, a GAO study found.

"There's no reliable data on how many offshore subsidiaries serve as tax dodges versus valid business outlets," Levin says. "But recent research does show that U.S. businesses are reporting more and more of their profits in tax havens while paying less and less in U.S. taxes."

Some of the research Levin refers to is by economist Sullivan, who analyzed Commerce Department data and found that profits for Cayman subsidiaries of U.S. companies are soaring. They earned $5.1 billion in 2001, up from $300 million in 1993, he found. Revenue for the Cayman units rose to $12.5 billion from $2 billion, while their assets increased to $141.8 billion from $9 billion eight years earlier, Sullivan found.

Companies focusing on tax avoidance by shifting income to tax havens don't impress all investors, says Lynn Yturri, who oversees $500 million at Columbus, Ohio–based Banc One Investment Advisors, which manages more than $150 billion. "Conservative tax strategies are what investors are looking for, not gimmicks," he says. "Investors are going to discount the stock of companies that don't pay their fair share of taxes." Yturri cites Stanley Works, the largest U.S. maker of hand tools, which in August 2002 abandoned plans to change its legal address to the tax-free island of Bermuda from New Britain, Connecticut. Stanley shares have risen 25 percent since that decision.

Presidential candidates John Kerry, a Democratic senator from Massachusetts, and Republican President George W. Bush disagree about how much tax U.S. corporations should pay the U.S. Kerry, 60, says he would require U.S. corporations to pay U.S. taxes on all exported products regardless of where they're made or sold. "American companies should pay taxes on their profits in the same way whether they earn them in Bangalore or Buffalo," says Kerry aide Jason Furman, 33,

who was a staff economist on President Bill Clinton's Council of Economic Advisers.

Kerry would also allow a one-time tax bonus for U.S. companies: If they bring previous foreign earnings into the U.S., corporations could pay a 10 percent tax rate on that money rather than the current 35 percent. In the future, he would use the new taxes on foreign income to help lower the U.S. tax rate to 33.25 percent—minus credits for taxes paid to other countries.

President Bush, 57, unlike Kerry, doesn't want U.S. companies' foreign subsidiaries to pay U.S. taxes if they already pay foreign taxes, says Tara Bradshaw, a U.S. Treasury Department spokeswoman. Bush opposes a tax break for repatriated profit because it would be unfair to U.S. companies that already paid the full 35 percent tax rate, she says. Imposing income taxes on foreign subsidiaries of U.S. companies would place them at a disadvantage with competitors that don't pay U.S. taxes, she says. "This would be a serious blow to U.S. businesses seeking to compete in the global marketplace."

A practice called transfer pricing may be the key to how U.S. corporations avoid taxes in the U.S. and other countries, Dorgan says. The accounting practice lets companies buy and sell products and services with their own offshore subsidiaries and set prices themselves. Companies abuse transfer pricing by shifting profits overseas to avoid U.S. taxes, Dorgan says. They set artificially high prices for imports and artificially low prices on exports, he says.

In a March report on financial crime and international law enforcement, the U.S. State Department cited examples of transfer pricing abuses, without naming companies. It said one company claimed to import dish towels from Pakistan for $153.72 each; another reported it had imported briefs and panties from Hungary for $739.25 a dozen; a third claimed it had paid $4,896 a unit for metal tweezers imported from Japan. The report also cited a company claiming to export toilet bowls to Hong Kong for $1.75 each. The State Department report called those prices absurd and ridiculous.

The fabricated high prices of imports let companies report artificially high expenses in IRS tax filings. The exaggerated low prices of exports allow companies to report smaller profits to the IRS. "Criminal individuals, corporations and other enterprises engage in abnormal international trade pricing that transfers value and/or reduces U.S. tax liability," the State Department report said.

Transfer pricing abuses by corporations cost the U.S. Treasury $53 billion a year, according to Professor John Zdanowicz of Florida International University in Miami. He says tracking a product used in transfer pricing transactions between U.S. companies and their subsidiaries in the Caymans



**Imbalance** The Caymans account for more than a quarter of U.S. foreign deposits.

Total foreign deposits in U.S. banks: $880 billion*

Cayman Islands: 27.8%†
Rest of the world: 72.1

*As of February. Figures do not add up to 100 due to rounding.
Source: U.S. Treasury

and elsewhere is difficult. "Where it really comes from and where it's really going, nobody knows, because of the secrecy," he says. The $53 billion in lost U.S. taxes results from more than $150 billion of profit from improper transfer pricing, Zdanowicz says. "It's a $150 billion shell game," he says. Zdanowicz and Simon Pak, now at Penn State University in Great Valley, Pennsylvania, were granted $2 million by Congress in

## 'I'd like to see just a small dose of patriotism

2001 to do a more complete study of transfer pricing abuses. The economists' earlier study was cited in the March State Department report. The professors say they expect to complete their research this year.

"We have to get on top of corporate accounting and manipulation of corporate books for the sole purpose of reducing taxes," says U.S. Senator Charles Grassley, 70, a Republican from Iowa and chairman of the Senate Finance Committee. "It's not any different than going overseas to set up a shell corporation. That is a shell game."

As long as U.S. companies are permitted to use loosely defined transfer pricing rules, massive tax evasion will continue, Dorgan says. "The IRS is staggering around in a fog here," Dorgan says. "They don't have a ghost of a chance of addressing these issues. And the growth in avoided taxes is scandalous."

Companies trading with their own foreign subsidiaries accounted for 46 percent of the $1.33 trillion in goods imported to the U.S. in 2001 and 31 percent of the $731 billion in exports that year, according to Commerce Department data. Under IRS rules in place since 1991, companies can negotiate with the IRS to determine transfer prices. Companies and the IRS sign contracts called Advance Pricing Agreements, which, like tax returns, are confidential.

"Transparency ought to be the name of the game," Grassley says. "There's got to be some check upon bureaucrats making decisions that lack oversight and the insight into public accounting. Obviously, it's not something that's very good the way it is."

The Caymans provide near-total financial secrecy for companies, banks and accounts. There are more than 500 banks and trust companies with deposits of more than $1 trillion in the Cayman Islands, according to the Cayman



The Cayman Islands have about 40,000 residents and the same number of companies.

Monetary Authority. That's more deposits than there are in New York City, says Manhattan District Attorney Robert Morgenthau. The Cayman Islands are about one-third the size of New York City. "While some of this money may be there for legitimate purposes, much of it has been put there to avoid taxes and responsible regulation in this country," Morgenthau, 84, says.

The Caymans and its financial services industry profit from U.S. corporate accounts even while the Caymans collect no taxes. Cayman banks and related companies provide more than 10 percent of the islands' jobs, according to the government. The Caymans are home to about 200 licensed mutual fund administrators, who manage fund offices in the Caymans, more than 3,000 hedge funds, the Cayman Islands Stock Exchange and offices of the four largest international accounting firms.

In the Cayman Islands, the names of company officers, directors and owners are, by law, secret. The Caymans are home to about 40,000 residents and an equal number of foreign-owned companies. The only public information available from the government's General Registry is a company's local address and date of incorporation. That information can be obtained for $18 through a personal visit to the agency's public information counter on North Church Street, across the road from the harbor in George Town.

U.S. citizens are required to pay U.S. income tax on their earnings above $80,000 around the world, even if they live and bank in the Cayman Islands. If they don't pay U.S. taxes, they can be prosecuted for criminal tax evasion. More than 20 U.S. citizens have been convicted of tax evasion since 1996 after hiding money from the IRS in Guardian Bank in the Cayman Islands. John Mathewson, 76, the owner of the bank and a U.S. citizen, pleaded guilty to money laundering in August 1997. As part of a plea agreement with U.S. prosecutors, he turned over the names of more than 1,000 U.S. citizens suspected of using his bank to evade U.S. income taxes.

The rules are different for U.S.-based multinational corporations; they don't have to pay any U.S. taxes on profits earned from sales by their Cayman subsidiaries unless the money is brought back to the U.S. Under U.S. law, U.S. companies can use Cayman subsidiaries and transfer pricing rules to shift sales and profits from other countries, thus reducing their overall tax burden.

Four companies alone have accumulated a combined total of more than $75 billion in earnings untaxed by the U.S.: Hewlett-Packard Co., Merck & Co., Pfizer Inc. and Coca-Cola, according to their most-recent annual reports. Pfizer spokesman Paul Fitzhenry

BRIAN SMITH

declined to comment. Merck spokesman Tony Polhoros says the company's decisions are in the best interests of U.S. employees and investors. "The earnings retained by our international subsidiaries include profits reinvested to expand our global sales," he says. Hewlett-Packard spokesman Brian Humphries declined to comment.

Atlantic Industries, the Cayman-based subsidiary of Coca-Cola that operates two factories in Ireland, exports more than $1 billion of its syrup annually, according to John Whelan, CEO of the Irish Exporters Association. Atlantic's profit, which isn't made public, is taxed in Ireland and not at all in the Caymans or the U.S.

# Cayman Contracts With Terrorist States

On April 13, 2003, President George W. Bush accused Syria of having weapons of mass destruction. "We believe there are chemical weapons in Syria," he said on the South Lawn of the White House. Secretary of Defense Donald Rumsfeld, appearing on CBS's *Face the Nation* the same day, said busloads of Syrians were sent to Iraq to kill Americans. "Reasonable people don't want to be associated with a state that's on a terrorist list," Rumsfeld said. "Who in the world would want to invest in Syria?"

Six weeks later, on May 31, Devon Energy Corp., an Oklahoma City–based oil and gas producer, entered a partnership with the Syrian government to spend $17 million to search for oil in Syria, according to company filings with the U.S. Securities and Exchange Commission. Theodore Kattouf, then U.S. ambassador to Syria, attended the contract signing in Damascus. Devon channeled the business through a Cayman Islands subsidiary.

Devon's work in Syria didn't mark the first time a U.S. company won a contract through a Cayman subsidiary in what the U.S.

called a terrorist state. A Halliburton Co. subsidiary sold $33.6 million in products and services to Iran in 2001, according to filings with the SEC. Vice President Dick Cheney was chief executive officer of Houston-based Halliburton, an energy services and engineering company, from 1995 to 2000.

Iran is blacklisted by the U.S. as a terrorist state, which means U.S. companies are forbidden from accepting contracts from Iran. The Halliburton unit that won the contract in Iran was incorporated in the Cayman Islands and therefore wasn't subject to U.S. law, Halliburton says.

"All of Halliburton's business is clearly permissible under applicable U.S. laws and regulations," says Wendy Hall, a Halliburton spokeswoman. "If Congress decides to change the laws and provisions, Halliburton will, of course, comply."

Cheney spokesman Kevin Kellems says that before he was vice president, Cheney usually opposed economic sanctions. "He believed they were rarely effective and they often discriminated against American companies," he says.

In February, the U.S. Senate Finance Committee, chaired by Republican Charles Grassley, sent a letter to the Treasury Department asking if Halliburton was being investigated for violating U.S. sanctions. The committee also wrote letters to ConocoPhillips and General Electric Co. asking about their revenue from terrorist states, including Iran and Syria.

"If these companies are going through the backdoor to invest in terrorist nations, Congress must take action to immediately close, lock and seal those doors," said Senator Max Baucus, 62, of Montana, the senior Democrat on the committee.

The Finance Committee didn't challenge Devon's contract with Syria. Congress and President Bush put restrictions on U.S. companies working in Syria—such as barring exports from the U.S. to Syria, except for food and medicine—without banning them from working in that country.

"We entered Syria with the support of the U.S. government," says Brian Jennings, 43, Devon's chief financial officer. Jennings says that by using a Cayman subsidiary in Syria, the

company can finance that operation with profit earned in China without first paying U.S. taxes on it.

Halliburton is the 30th-largest military contractor, with fiscal 2001 federal contracts of $534.2 million, according to a March study by the General Accounting Office, the auditing arm of Congress. Halliburton has 13 subsidiaries in the Caymans, two in Liechtenstein and two in Panama.

General Electric, the world's largest company by market value, has sold locomotives in Syria; in Iran, it sold medical equipment, provided oil and gas services and contracted to build hydroelectric generators, according to the Senate Finance Committee. ConocoPhillips, the largest U.S. oil refiner, runs a gas processing plant in Syria, the committee said. "We comply strictly with U.S. law in sales to Iran," says GE spokesman Gary Sheffer. "If Congress decides to change the law, we'll comply."

ConocoPhillips spokesman Sam Falcona says the company talks with U.S. officials to keep up with the rules. "We are in full compliance with the letter and spirit of U.S. laws," he says.
DAVID EVANS



Coke's Cayman subsidiary exports soft-drink concentrate to 75 countries on four continents, including China, Japan and Russia, according to Coke's annual report. By declaring its intent never to re-patriate $8.2 billion of foreign profit to the U.S., Coke has avoided paying any U.S. taxes on it. Instead, the company re-invests the profit overseas through such units as the Cayman subsidiary, accord-ing to its annual report.

Atlantic Industries' investments in-clude partial ownership of two of the world's largest independent Coca-Cola bottlers: Athens-based Coca-Cola Hellenic Bottling Co., which operates in 26 countries—including Greece, Italy, Nigeria and Russia—according to its annual report, and Mexico City-based Coca-Cola Femsa SA, which operates in eight Latin American nations—including Argentina, Brazil and Mexico—according to its annual report. The profit from those invest-ments isn't taxed in the U.S. because Atlantic is based in the Caymans, and the money isn't returned to the U.S.

With the offshore tax savings and other tax breaks such as losses on Latin American investments, the company's effec-tive U.S. tax rate was reduced to 20.9 percent for 2003, ac-cording to its annual report. Coke's tax savings came as the company's board of directors—which includes Warren Buf-fett, 73, the world's second-richest person—told shareholders in its annual report that it had scaled back work in high-tax nations, firing a total of 3,700 employees in the U.S. and Ger-many last year. Buffett declines to comment, his assistant Debbie Bosanek says.

Buffett's Berkshire Hathaway Inc., an insurance and invest-ment company, has no Cayman subsidiaries. Berkshire paid $3.8 billion in U.S. taxes in 2003, or 32 percent of its earnings,

## 'As an American, I hate to see it happen,' says one fund manager. 'As a shareholder, I favor lowering taxes.'

SEC filings show. In his annual letter to shareholders in March, Buffett said the Bush administration was wrong to let U.S. companies play accounting games with the tax code and avoid U.S. taxes. "Today, many large corporations—run by CEOs whose fiddle-playing talents make your chairman look like he is all thumbs—pay nothing close to the stated federal tax rate of 35 percent," Buffett wrote.

Berkshire Hathaway, Coca-Cola's largest shareholder, owns 200 million shares, or 8.2 percent, of Coke, valued at about $10 billion.

Citigroup Inc. says in SEC filings that it would have to pay $1.8 billion in U.S. taxes if it brought back $5.8 billion it keeps offshore. Oracle says it would have to pay $691 million



**Tax relief** Pfizer has amassed almost $40 billion in offshore profits.



$40 Pfizer's cumulative profits untaxed by the U.S., in billions

Source: Company SEC filings

in taxes if it brought home $3.1 billion that escaped U.S. taxes abroad. Other companies, such as Apple Computer Inc., drugmaker Schering-Plough Corp. and Intel, say they can't figure out how much they would owe.

Intel runs its largest microchip manu-facturing site outside the U.S. in Leixlip, Ireland, on a former stud farm. The $5.5 billion plant is owned by Cayman subsidiary Intel Ireland, spokesman Mulloy says. The 360-acre site has 4,700 employees. Mulloy says 70 percent of In-tel's sales are made outside the U.S. He says the company is legally keeping its tax bill as low as it can. Intel had accumulated $7 billion in overseas earnings not taxed by the U.S. as of Dec. 31, 2003, SEC filings show. Mulloy says Intel's foreign earnings never taxed by the U.S. helped pay for the Ireland plant's construction. "Generally, we try to use the cash we generate offshore for offshore purposes," he says. By investing offshore earnings outside the U.S., Intel can legal-ly avoid paying U.S. taxes.

Intel's then vice president of tax, licensing and customs, Robert Perlman, 60, told the U.S. Senate Finance Committee in March 1999 that Intel would have been better off incorporating in the Cayman Islands when it was founded in 1968. "Our tax code competitively disadvantages multinationals simply be-cause the parent is a U.S. corporation," Perlman testified.

Dorgan says that perspective is unpatriotic. "Well, maybe he should just change the language and say if we can find ways to not support our country and our government through the paying of taxes, our company would like to do it," Dorgan says. "I'd like to see just a small dose of patriotism with some of these companies because they do well as American companies, they're protected by our military, they access all our transpor-tation, our education facilities and so on. They want all the benefits of American cit-izenship except that of paying taxes."

Parmalat, Italy's largest dairy company, filed for bankruptcy in December after say-ing one of its Cayman subsidiaries didn't actually have $4.9 billion Parmalat had previously told investors it did. Parmalat used the Cayman shell companies to create billions of dollars of nonexistent as-sets, Parmalat said in December. They included Epicurum, a hedge fund that supposedly held an investment from Parmalat valued at more than $600 million. In fact, the fund existed on paper only and was worthless, Italian prosecutors say. Also based at Ugland House was Bonlat Financing Corp. Parmalat said it had falsely told investors that subsidiary possessed bil-lions of dollars of certificates of deposit at Bank of America.

Enron, the world's largest energy trader until 2001, set up 441 companies in the Cayman Islands as part of a massive ac-counting fraud, according to Senate investigators. Former CEO Jeffrey Skilling was charged with federal criminal fraud

and is awaiting trial. Former Chief Financial Officer Andrew Fastow pleaded guilty in federal court to securities fraud in January and was sentenced to 10 years in prison.

Cindy Scotland, executive director of the Cayman Monetary Authority, the independent agency charged with policing financial institutions on the island, says the Caymans have stiffened regulations in the past three years. The government enacted tough anti–money laundering laws that include possible jail terms for lawyers and accountants who don't report money laundering, created an independent monetary authority to oversee financial institutions, mandated licensing for securities dealers and required more identity and background information from anyone opening a bank account, she says. Financial scams, such as those by Parmalat, rarely originate on the island, she says. "None of that fraud was actually created here," Scotland says. She says no jurisdiction could ever entirely prevent fraud.

Even so, the Caymans have agreed to provide information only upon request of U.S authorities. Strict Cayman secrecy laws remain in place, says Reuven Avi-Yonah, professor of international tax law at the University of Michigan Law School in Ann Arbor. "The likelihood U.S. officials would know what to ask for is very low," he says.

Maples and Calder, the largest law firm on the island, is headquartered in Ugland House. Law books on a shelf in the boardroom include the five-volume set *Money Laundering, Asset Forfeiture and International Financial Crimes* by Fletcher Baldwin Jr. (Oceana Publications, 1993). Litigation partner Andrew Jones, 54, says the firm set up five Parmalat-related entities at the law firm's address.

As for U.S. tax revenue, fraud isn't the culprit; abuse of the laws is, says Douglas Shackleford, a business professor at the University of North Carolina in Chapel Hill. U.S. multinational corporations will continue to legally stash profits overseas, out of the IRS's grasp, unless the U.S. changes the rules of the international tax game, he says.

"As long as there's a Cayman Islands, there'll always be some guys who'll give you secret banks and no taxes," Shackleford, 45, says. "They're the leak in the bucket."

Until the U.S. removes incentive for companies to shift income to low-tax or no-tax places, companies like Coca-Cola and Intel will have little reason to change their strategies. ≫

DAVID EVANS is a senior writer at Bloomberg News in Los Angeles.
davidevans@bloomberg.net

BLOOMBERG TOOLS

## A Closer Look at Offshore Subsidiaries

Twelve of the 30 companies in the Dow Jones Industrial Average have subsidiaries in the Cayman Islands, according to filings with the U.S. Securities and Exchange Commission. Type INDU <Index> MEMB <Go> for a list of the index's members, including their percentages of weight in the index, numbers of shares in the index and last price quotes. Click on a ticker, such as KO UN for Coca-Cola Co., and select DES from the pop-up menu for a description of the company. Type RELS <Go> for a menu of related securities, as shown below, and then type 3 <Go> for a listing of some major subsidiaries.

In addition to the Dow members, 24 of the 100 largest contractors with the U.S. federal government have subsidiaries in the Caymans, according to the General Accounting Office, the auditing arm of Congress. Type USLE <Go> and click on General Accounting Office's Web site for information on its reports and other publications. Type ITAX <Go> for a menu of Web sites related to U.S. income taxes, including the U.S. Internal Revenue Service and U.S. Department of Treasury sites.

Company filings with the SEC show that in addition to gaining tax benefits, incorporating in the Caymans can help a company avoid U.S. securities laws intended to protect investors. To access filings for a specific company, type the ticker followed by <Equity> CF <Go>. For example, type FDP US <Equity> CF <Go> to list Fresh Del Monte Produce's filings.

MARY K. WOOD

For a map of the Caribbean, type MAPS <Go> 14 <Go>.

# "Plantagenet Capital Fund II/L/P"

*Latest Filing:* 2/25/00 as Group Member

*As:* **Group Member** *(Non-Registrant Filer: Partner, Affiliate, etc.)*

### List All Filings as Group Member

### Search Recent Filings (as Group Member) for *"Plantagenet Capital Fund II/L/P"*

**"Plantagenet Capital Fund II/L/P" has been a Group Member with the following Registrant:**

- Plantagenet Capital Fund LP

**"Plantagenet Capital Fund II/L/P" has/had a Group Member interest in the following 2 Registrants:**

- Bonneville Pacific Corp
- Crown Vantage Inc

**"Plantagenet Capital Fund II/L/P" has been a Group Member with the following 7 Group Members:**

- *Anderson Capital Management/Inc*
- *C. Derek Anderson*
- *John J. Zappettini*
- *Patricia Love Anderson*
- *Plantagenet Capital Fund LP*
- *Plantagenet Capital Management L.L.C.*
- *Plantagenet Capital Partners, L.P.*

*Copyright © 2008 **Fran Finnegan & Company** All Rights Reserved.*
*www.secinfo.com - Sat, 22 Mar 2008 01:55:25.1 GMT - Help at SEC Info*

EXHIBIT B PAGE 1 OF 8

SEC Info   Home   Search   My Interests   Help   Sign In   Please Sign In

# "*Plantagenet Capital Fund II/L/P*"

### Filings as: **Group Member**

5 Filings · Click on a Filing-Type¹ to view it · List the Documents within these Filings

*Page:* 1 · **2** · All · Bottom

| Find | | in | the p.1 filings below ▾ | Show | filings with "hits" ▾ | and | every "hit". ▾ |

Help. *Wildcards:* ? (any letter). * (many)  *Logic:* for Docs: & (and). | (or); for Text: | (anywhere). "(&)" (near).

| As_Of | Filer | Filing¹ | As/For/On | Docs:Pgs | Issuer | Agent |
|---|---|---|---|---|---|---|
| 2/25/00 | Plantagenet Capital Fund LP<br>*C. Derek Anderson²*<br>*John J. Zappettini²*<br>**Plantagenet Capital Fund II/L/P²**<br>**Plantagenet Capital Fund LP²**<br>**Plantagenet Capital Fund/L/P²**<br>**Plantagenet Capital Management, L.L.C.²** | SC 13D/A | | 2:11 | Crown Vantage Inc | Howard Rice N. Rabkin/FA |
| 12/14/99 | Plantagenet Capital Fund LP<br>*Anderson Capital Management/Inc²*<br>*C. Derek Anderson²*<br>*John J. Zappettini²*<br>*Patricia Love Anderson²*<br>**Plantagenet Capital Fund II/L/P²**<br>**Plantagenet Capital Management LLC²**<br>**Plantagenet Capital Partners, L.P.²** | SC 13D/A | | 1:17 | Bonneville Pacific Corp | Merrill Corp/FA |
| 11/13/98 | Plantagenet Capital Fund LP<br>*Anderson Capital Management/Inc²*<br>*C Derek Anderson²*<br>*John J Zappettini²* | SC 13D/A | | 1:19 | Bonneville Pacific Corp | |

¹ Filing-Type descriptions:
   SC 13D    General Statement of Beneficial Ownership – Schedule 13D
   /A       Amendment to or Amended version of a previous filing of this type.
² Group Member: Registrant or non-Registrant party to a filing made by a group.

*Page:* 1 · **2** · All · Top

*Copyright © 2008 Fran Finnegan & Company All Rights Reserved.*
*www.secinfo.com - Sat, 22 Mar 2008 01:55:42 1 GMT - Help at SEC Info*



EXHIBIT **B** PAGE **2** OF **8**

# "Anderson Capital Management/Inc"

*Latest Filing:* 12/14/99 as Group Member

*As:* **Group Member**  *(Non-Registrant Filer: Partner, Affiliate, etc.)*

### List All Filings as Group Member

### Search Recent Filings (as Group Member) for "*Anderson Capital Management/Inc*"

"*Anderson Capital Management/Inc*" has been a Group Member with the following Registrant:

- Plantagenet Capital Fund LP

"*Anderson Capital Management/Inc*" has/had a Group Member interest in the following Registrant:

- Bonneville Pacific Corp

"*Anderson Capital Management/Inc*" has been a Group Member with the following 9 Group Members:

- *C. Derek Anderson*
- *John J. Zappettini*
- *John Zappettini*
- *Patricia Love Anderson*
- *Plantagenet Capital Fund II/L/P*
- *Plantagenet Capital Fund LP*
- *Plantagenet Capital Management L.L.C.*
- *Plantagenet Capital Partners II/L/P*
- *Plantagenet Capital Partners, L.P.*

*Copyright © 2008* **Fran Finnegan & Company** *All Rights Reserved.*
*www.secinfo.com - Sat, 22 Mar 2008 01:55:58.1 GMT - Help at SEC Info*

'

*SEC Info*     Home     Search     My Interests     Help     Sign In     *Please Sign In*

## "*Plantagenet Capital Fund/L/P*"

### *Filings as:* Group Member

**9 Filings** · <u>Documents containing "Plantagenet *and* Capital *and* Fund *and* L *and* P" with</u>
<u>Text matching "Plantagenet *or* Capital *or* Fund *near* L *near* P" *anywhere* in Selected Filings</u>

*Page:* 1  2  3  4 · All · Bottom

| Find | Plantagenet Capital Fund/ | in | the p.1 filings below. ▼ | Show | filings with "hits" ▼ | and | every "hit". ▼ |

Help... *Wildcards:* ? (any letter). * (many). *Logic:* for Docs: & (and). | (or): for Text: | (anywhere), "(&)" (near).

| As Of ▼ | Filer ▼ | Doc Filing¹ ▼ | As/For/On ▲ | Docs:Pgs ▲ | Issuer |
|---|---|---|---|---|---|
| 2/25/00 | Plantagenet Capital Fund LP | SC 13D/A | | 2:11 | Crown Vantage Inc |
| | C. Derek Anderson² | | | | |
| | John J. Zappettini² | | | | |
| | Plantagenet Capital Fund II/L/P² | | | | |
| | Plantagenet Capital Fund LP² | | | | |
| | Plantagenet Capital Fund/L/P² | | | | |
| | Plantagenet Capital Management, L.L.C.² | | | | |

        1: SC 13D/A............ Amendment No. 3 to Schedule 13d -

SC 13D/A · *1st Page* of 9             *Just 1st (New)*

          C. Derek Anderson
       Plantagenet Capital Management, L.L.C.
        456 Montgomery Street, Suite 200

SC 13D/A · *2nd Page* of 9            *Just 2nd (New)*

CUSIP NO. 228622106      13D       Page 2 of 9

1  NAME OF REPORTING PERSONS    Plantagenet Capital Fund II, L.P.

SC 13D/A · *3rd Page* of 9            *Just 3rd (New)*

CUSIP NO. 228622106      13D       Page 3 of 9

1  NAME OF REPORTING PERSONS     Plantagenet Capital Fund, L.P.

SC 13D/A · *4th Page* of 9            *Just 4th (New)*

CUSIP NO. 228622106      13D       Page 4 of 9

1  NAME OF REPORTING PERSONS      Plantagenet Capital
                   Management, L.L.C.

SC 13D/A · *9th Page* of 9            *Just 9th (New)*

Dated: February 25, 2000

      PLANTAGENET CAPITAL FUND II, L.P.

       By:PLANTAGENET CAPITAL PARTNERS, L.P.,
        its General Partner

       By:PLANTAGENET CAPITAL MANAGEMENT,
        L.L.C.,
        Title: Senior Managing Partner

      PLANTAGENET CAPITAL PARTNERS, L.P.

       By:PLANTAGENET CAPITAL MANAGEMENT,
        L.L.C.,

Title:  Senior Managing Partner

PLANTAGENET CAPITAL MANAGEMENT, L.L.C.

                          2: EX-1................  Exhibit 1 - Letter to Crown Vanta
                                                   -- 2 pages

12/14/99  Plantagenet Capital Fund LP     SC 13D/A        1:17   Bonneville Pacific Corp
          *Anderson Capital Management/Inc²*
          *C. Derek Anderson²*
          *John J. Zappettini²*
          *Patricia Love Anderson²*
          *Plantagenet Capital Fund II/L/P²*
          *Plantagenet Capital Fund LP²*
          *Plantagenet Capital Management LLC²*
          *Plantagenet Capital Partners, L.P.²*
                          1: SC 13D/A............  Amendment to General Statement of
                                                   Ownership -- 17 pages

     SC 13D/A · 1st Page of 17                              Just 1st  (New)

                         C. Derek Anderson
                      Plantagenet Capital Fund, L.P.
                      456 Montgomery Street, Suite 200

     SC 13D/A · 2nd Page of 17                              Just 2nd  (New)

          Persons

          Plantagenet Capital Fund, L.P.
     ------------------------------------------------------------------

     SC 13D/A · 3rd Page of 17                              Just 3rd  (New)

          Persons

          Plantagenet Capital Fund II, L.P.
     ------------------------------------------------------------------

     SC 13D/A · 4th Page of 17                              Just 4th  (New)

          Persons

          Plantagenet Capital Partners, L.P.
     ------------------------------------------------------------------

     SC 13D/A · 5th Page of 17                              Just 5th  (New)

          Persons

          Plantagenet Capital Management LLC
     ------------------------------------------------------------------

     SC 13D/A · 6th Page of 17                              Just 6th  (New)

          Persons

          Anderson Capital Management, Inc.
     ------------------------------------------------------------------

     SC 13D/A · 10th Page of 17                             Just 10th (New)

     Preliminary Note: In Amendment No. 5 it was noted that one of the
Reporting Persons, Plantagenet II, believed it should have received an
additional 1,533 Shares (on a post-reverse split basis) as part of the Plan
Shares issued by the Trustee on or shortly after the Effective Date with
respect to certain Class 9 Equity Claims held by Plantagenet II. Plantagenet
II has requested such Shares from the Trustee. Of the 1,533 additional Shares
requested by Plantagenet II, the Trustee ultimately issued 1,058 Shares, 583
of which were issued on December 9, 1998 and 475 of which were issued on
March 3, 1999. These additional Shares increased the beneficial ownership of
Plantagenet II, PCP, PCMLLC, Zappettini and Anderson by approximately 0.01%.

     SC 13D/A · 11th Page of 17                             Just 11th (New)

          Item 5 of the Schedule 13D is amended as follows:

          A. Plantagenet Capital Fund, L.P.

(a), (b) The information set forth in Rows 7, 8, 9, 10, 11 and 13 of the cover page hereto for Plantagenet is incorporated herein by reference.

(c) On October 7, 1999, Plantagenet purchased 956 Shares in an open market transaction for $10.75 a Share. The purpose of the purchase was to raise the aggregate holdings of Plantagenet and Plantagenet II to an even 450,000 Shares so that after the sales of Shares described herein, Plantagenet II would be left with an even 150,000 Shares. Plantagenet sold all of the Shares held by it, which sales were effected in open market

less than 5% of the Shares.

(d) PCP, as the general partner of Plantagenet, has the right to receive and the power to direct the receipt of dividends from, or the proceeds from the sale of, the Shares held by Plantagenet. PCMLLC is the general partner of PCP. Zappettini is Managing Partner of PCMLLC and

(e) Not applicable.

B. Plantagenet Capital Fund II, L.P.

(a), (b) The information set forth in Rows 7, 8, 9, 10, 11 and 13 of the cover page hereto for Plantagenet II is incorporated herein by reference.

(c) Since the filing of Schedule 13D, Plantagenet II sold the following Shares in open market transactions:

(d) PCP, as the general partner of Plantagenet II, has the right to receive and the power to direct the receipt of dividends from, or the proceeds from the sale of, the Shares held by Plantagenet II. PCMLLC is the general partner of PCP. Zappettini is Managing Partner of PCMLLC

(e) Not applicable.

C. Plantagenet Capital Partners, L.P.

(c) Not applicable.

(d) PCP, as the general partner of each of Plantagenet and Plantagenet II, has the right to receive and the power to direct the receipt of dividends from, or the proceeds from the sale of, the Shares held by Plantagenet and Plantagenet II. PCMLLC is the general partner of PCP. Zappettini is Managing Partner of PCMLLC and Anderson is

(e) Not applicable.

D. Plantagenet Capital Management LLC

(c) Not applicable.

(d) PCP, as the general partner of each of Plantagenet and Plantagenet II, has the right to receive and the power to direct the receipt of dividends from, or the proceeds from the sale of, the Shares held by Plantagenet and Plantagenet II. PCMLLC is the general partner of PCP. Zappettini is

E. Anderson Capital Management, Inc.

      (c)     Not applicable.

      (d)     PCP, as the general partner of each of Plantagenet and
Planagenet II, has the right to receive and the power to
direct the receipt of dividends from, or the proceeds
from the sale of, the Shares held by Plantagenet and
Plantagenet II. PCMLLC is the general partner of PCP.
Zappettini is Managing Partner of PCMLLC and Anderson is

SC 13D/A · 14th Page of 17                              Just 14th (New)

            ======

      (d)     PCP, as the general partner of each of Plantagenet and
Plantagent II, has the right to receive and the power to
direct the receipt of dividends from, or the proceeds
from the sale of, the Shares held by Plantagenet and
Plantagenet II. PCMLLC is the general partner of PCP.
Zappettini is Managing Partner of PCMLLC and Anderson is

      (e)     Not applicable.

    The Shares reported hereby for Plantagenet II are owned directly by it.
Both PCP, as the general partner of Plantagenet II, and PCMLLC, as the sole
general partner of PCP, may be deemed to be the beneficial owner of the
Shares held by Plantagenet II. Zappettini, as Managing Partner of PCMLLC, may
be deemed to be the beneficial owner of the Shares held by Plantagenet II.
The Shares reported hereby for P. Anderson are owned directly by her.
Anderson, as President and managing member of PCMLLC, may be deemed to be the
beneficial owner of the Shares held by Plantagenet II. P. Anderson hereby
disclaims any beneficial ownership of any

SC 13D/A · 16th Page of 17                              Just 16th (New)

Dated:  December 8, 1999

                            PLANTAGENET CAPITAL FUND, L.P.

                     By:  PLANTAGENET CAPITAL PARTNERS, L.P.,
                         its General Partner

                     By:  PLANTAGENET CAPITAL MANAGEMENT LLC,
                         its General Partner

                         Title:  Senior Managing Partner

                            PLANTAGENET CAPITAL FUND II, L.P.

                     By:  PLANTAGENET CAPITAL PARTNERS, L.P.,
                         its General Partner

                     By:  PLANTAGENET CAPITAL MANAGEMENT LLC,
                         its General Partner

                         Title:  Senior Managing Partner

                            PLANTAGENET CAPITAL PARTNERS, L.P.

                     By:  PLANTAGENET CAPITAL MANAGEMENT LLC,
                         its General Partner

SC 13D/A · 17th Page of 17                              Just 17th (New)

[Signatures continued from prior page]

                            PLANTAGENET CAPITAL MANAGEMENT LLC

                            Title:  Senior Managing Partner

                            ANDERSON CAPITAL MANAGEMENT, INC.

11/13/98  Plantagenet Capital Fund LP       SC 13D/A        1:19    Bonneville Pacific Corp
         Anderson Capital Management/Inc²
         C. Derek Anderson²
         John J. Zappettini²

*Find Words in Filings - "Plantagenet Capital Fund/L/P" - p. 1*

E       𝓑   PAGE 7 OF 8

Page 1's 2 filings (of 9 in this set) were scanned for every hit.

3 documents within the 2 filings were searched.

2 docs within 2 filings contained the words "Plantagenet *and* Capital *and* Fund *and* L *and* P".

Each doc matched "Plantagenet *or* Capital *or* Fund *near* L *near* P" *anywhere*.

86 text matches are highlighted above.

### End "Find Words in Filings" and just List the Filings

*Page:*   **1**   2   3   4   · **All** · Top

*Copyright © 2008 Fran **Finnegan & Company** All Rights Reserved.*
*www.secinfo.com - Sat, 22 Mar 2008 01:56:22.2 GMT - Help at SEC Info*

PLANTAGENET SARL
Société à responsabilité limitée au capital de 250.000 francs
Siège social : 39, avenue Pierre 1er de Serbie
75008 – Paris
R.C.S. : En cours de constitution

**LES SOUSSIGNES :**

- **Plantagenet Capital Management LLC**
  Société de droit américain à responsabilité limitée
  dont l'adresse est 220, Sansome Street, Suite 460
  San Francisco - Californie (94104) USA
  Représentée aux présentes par Monsieur Derek Anderson

- **Monsieur Ollivier Lemal**
  demeurant demeurant 137, rue Tahère
  92210 - Saint-Cloud

Agissant en qualité de seuls associés de la Société à Responsabilité Limitée **"PLANTAGENET SARL"** au capital de 250.000 francs, dont le siège social est 39, avenue Pierre 1er de Serbie (75008) Paris, ont procédé ainsi qu'il suit à la nomination du Gérant :

**NOMINATION DU GERANT**

Les associés décident de nommer en qualité de gérant pour une durée indéterminée :

- Monsieur Ollivier Lemal
  né le 17 septembre 1955 à Paris (75014)
  demeurant 137, rue Tahère
  92210 - Saint-Cloud

Monsieur Ollivier Lemal accepte lesdites fonctions et précise qu'il n'est frappé d'aucune mesure susceptible de lui interdire l'exercice des fonctions de gérant de la société.

EXHIBIT C PAGE 1 OF 2

- 2 -

Monsieur Ollivier Lemal sera tenu de consacrer tout le temps nécessaire aux affaires sociales.

La rémunération de Monsieur Ollivier Lemal sera fixée ultérieurement, lors de la prochaine assemblée générale.

Monsieur Ollivier Lemal a, conformément à l'article  des statuts, les pouvoirs les plus étendus, dont il peut user pour représenter la Société dans ses rapports avec les tiers et notamment, pour contracter en son nom et l'engager pour tous les actes et opérations entrant dans l'objet social.

**Fait à Paris**
**Le**  *13 août 1998*

*Ollivier Lemal*

**Copie certifiée conforme**
**Le gérant**

C PAGE 2 OF 2

# PLANTAGENET SARL

Société à Responsabilité Limitée au Capital de 250.000 Francs
Siège social : 39 avenue Pierre 1ᵉʳ de Serbie – PARIS 8ème
R.C.S. PARIS B 420 021 768

*[tampon : Tal de COMMERCE de PARIS — N° dépôt — 3 DEC. 1999 — 66079]*

## PROCES-VERBAL DE L'ASSEMBLEE GENERALE MIXTE ORDINAIRE

### ET EXTRAORDINAIRE DU 23 NOVEMBRE 1999

L'an Mil neuf cent quatre vingt dix neuf, le vingt-trois novembre, à dix huit heures,

Les associés de la Société "PLANTAGENET SARL", Société à Responsabilité Limitée au capital de 250.000 Francs, divisé en 2.500 parts de 100 Francs chacune, se sont réunis en Assemblée Générale Mixte Ordinaire et Extraordinaire au siège social, sur convocation de la gérance.

La séance est ouverte sous la présidence de Monsieur Ollivier LEMAL, Gérant, demeurant à SAINT CLOUD (Hauts de Seine) 137 rue Tahère.

Après avoir déclaré qu'il possède personnellement MILLE DEUX CENT CINQUANTE parts, ci ............................................................... 1.250 parts

Le Président constate la présence de :

Monsieur C. Derek ANDERSON représentant la société "PLANTAGENET CAPITAL MANAGEMENT LLC" dont le siège social est à San Francisco – Californie (USA) 456 Montgomery Street, Suite 200, titulaire de MILLE DEUX CENT CINQUANTE parts sociales, ci ......... 1.250 parts

Le Président constate, en conséquence, que les membres de l'Assemblée représentent ensemble l'intégralité des parts composant le capital social.

Le Président rappelle que la date de réunion de la présente Assemblée Générale, initialement prévue le 22 Novembre 1999 a été repoussée d'un commun accord entre les deux associés au 23 Novembre 1999.

Le Président dépose sur le bureau et met à la disposition de l'Assemblée :

- Le rapport de la gérance,

- Le texte des résolutions qui seront proposées au vote de l'Assemblée,

- Les statuts de la société.

EXHIBIT D   PAGE 1 OF 10

C.D.A.    C.D.A.    J.S.?    O.L.    M.B.    J-R.LE M.    G.D.

2.

Le Président rappelle que la présente Assemblée a été réunie à l'effet de délibérer sur l'ordre du jour suivant :

- Augmentation de capital de 1.550.000 Francs par l'émission au pair de 15.500 parts nouvelles de 100 F chacune à libérer intégralement en numéraire lors de la souscription réservée à six personnes physiques et une personne morale nommément désignées

- Agrément des souscripteurs non associés

- Modification de l'objet social

- Modification de la dénomination sociale

- Présentation du rapport du Commissaire à la Transformation sur l'évaluation des biens composant l'actif social et sur la situation de la société

- Transformation de la société en Société Anonyme

- Adoption des nouveaux statuts

- Nomination des premiers Administrateurs

- Nomination des Commissaires aux Comptes titulaire et suppléant

- Pouvoirs pour dépôt et formalités

Le Président donne ensuite lecture du rapport de la gérance.

Il est ensuite donné lecture du rapport du Commissaire à la Transformation.

Ces lectures terminées, le Président ouvre la discussion.

La discussion close et personne ne demandant plus la parole, le Président met aux voix les résolutions suivantes :

## PREMIERE RESOLUTION

L'Assemblée Générale décide d'augmenter le capital social de 1.550.000 F pour le porter de 250.000 F à 1.800.000 F, par l'émission au pair de 15.500 parts nouvelles de 100 F chacune, à libérer en espèces ou par compensation.

C.D.A.    C.D.A.        O.L.    M.B.    J-R.LE M.    G.D.

EXHIBIT D PAGE 2 OF 10

3.

Les associés décident de réserver la souscription aux 15.500 parts nouvelles au profit exclusivement de :

| | |
|---|---|
| - la Société "PLANTAGENET CAPITAL MANAGEMENT" à concurrence de | 7.746 parts |
| - Monsieur Carl Derek ANDERSON à concurrence de ...................................... | 3 parts |
| - Monsieur John Joseph ZAPPETTINI à concurrence de ................................... | 1 part |
| - Monsieur Ollivier LEMAL à concurrence de ............................................... | 7.747 parts |
| - Monsieur Marc BUCAILLE à concurrence de ............................................... | 1 part |
| - Monsieur Jean-Renaud LE MILON à concurrence de ...................................... | 1 part |
| - Madame Gabrielle DELAUGEAS à concurrence de ......................................... | 1 part |

Les 15.500 parts nouvelles seront soumises à toutes les dispositions statutaires.

Elles seront assimilées aux parts anciennes et porteront jouissance à compter de leur création.

*Cette résolution est adoptée à l'unanimité.*

A la demande du Président, il est alors procédé à une interruption de séance, permettant aux souscripteurs non associés de participer à l'Assemblée.

Les bénéficiaires de la souscription aux 15.500 parts nouvelles déclarent alors souscrire à l'augmentation de capital qui leur est réservée et libérer intégralement leur souscription par compensation avec les créances liquides et exigibles qu'ils détiennent sur la société.

Le Président procède alors à l'arrêté des créances détenues par la société "PLANTAGENET CAPITAL MANAGEMENT", Messieurs ANDERSON, ZAPPETTINI, LEMAL, BUCAILLE, LE MILON et Madame DELAUGEAS à l'encontre de la société.

Le Président propose ensuite de reprendre la séance et de passer au vote des résolutions suivantes :

## DEUXIEME RESOLUTION

L'Assemblée Générale, après examen de l'arrêté des créances des souscripteurs à l'augmentation de capital décidée à la précédente résolution faisant ressortir que :

- la Société "PLANTAGENET CAPITAL MANAGEMENT" détient sur la société une créance liquide et exigible d'au moins 774.600 F

- Monsieur Carl Derek ANDERSON détient sur la société une créance liquide et exigible de ............................................................... 300 F

- Monsieur John Joseph ZAPPETTINI détient sur la société une créance liquide et exigible de ............................................................... 100 F

C.D.A.        C.D.A.        J.J.Z.        O.L.        M.B.        J-R.LE M.        G.D.

PIT  D  PAGE 3 OF 10

4.

- Monsieur Ollivier LEMAL détient sur la société une créance liquide et exigible de ................................................................. 774.700 F

- Monsieur Marc BUCAILLE détient sur la société une créance liquide et exigible de ................................. ............................... 100 F

- Monsieur Jean-Renaud LE MILON détient sur la société une créance liquide et exigible de ................................................................. 100 F

- Madame Gabrielle DELAUGEAS détient sur la société une créance liquide et exigible de ................................................................. 100 F

constate que les souscripteurs à l'augmentation de capital ont intégralement libéré leur souscription et qu'en conséquence ladite augmentation de capital se trouve définitivement réalisée.

En conséquence, l'Assemblée Générale agrée comme nouveaux associés Messieurs Carl Derek ANDERSON, John Joseph ZAPPETTINI, Marc BUCAILLE, Jean-Renaud LE MILON et Madame Gabrielle DELAUGEAS.

*Cette résolution est adoptée à l'unanimité.*

## TROISIEME RESOLUTION

L'Assemblée Générale, en conséquence des résolutions qui précèdent, décide de modifier comme suit les articles 6 et 7 des statuts :

### Article 6 – Apport (nouveau)

"1) - Lors de la constitution de la société, il a été fait apport d'une somme de 250.000 F en numéraire.

2) - Suivant Assemblée Générale du 22 Novembre 1999, le capital social a été augmenté de 1.550.000 F par apports en numéraire."

### Article 7 – Capital social (nouveau)

"Le capital social est fixé à la somme de Un Million Huit Cent Mille Francs (1.800.000 F). Il est divisé en Dix Huit Mille (18.000) parts de Cent Francs (100 F) chacune de nominal, intégralement libérée, réparties comme suit entre les associés :

| | |
|---|---|
| - Société "PLANTAGENET CAPITAL MANAGEMENT" ........... | 8.996 parts |
| - Monsieur Carl Derek ANDERSON ........................................ | 3 parts |
| - Monsieur John Joseph ZAPPETTINI ..................................... | 1 parts |
| - Monsieur Ollivier LEMAL ................................................... | 8.997 parts |
| - Monsieur Marc BUCAILLE .................................................. | 1 part |
| - Monsieur Jean-Renaud LE MILON ....................................... | 1 part |
| - Madame Gabrielle DELAUGEAS .......................................... | 1 part |
| Total égal à ............................................................................... | 18.000 parts |

C.D.A.    C.D.A.          O.L.    M.B.    J-R.LE M.    G.D.

EXHIBIT D    PAGE 4 OF 10

Les associés déclarent expressément que les parts représentant le capital social sont réparties entre eux dans les proportions sus-indiquées et qu'elles sont intégralement libérées."

*Cette résolution est adoptée à l'unanimité.*

## QUATRIEME RESOLUTION

L'Assemblée Générale décide, sous la condition suspensive de la transformation de la société en Société Anonyme, de modifier l'objet de la société et en conséquence l'article 2 des statuts comme suit :

### Article 2 – Objet social (nouveau)

"La société a pour objet, en France et à l'étranger :

- la constitution, la promotion et la gestion, directe ou par délégation, de Fonds Communs de Placements à Risque,

- et, plus généralement, l'exercice de la gestion de portefeuille pour le compte de tiers, principalement composé de titres non cotés, au sens de la loi n° 96-597 du 2 Juillet 1996 de modernisation des activités financières,

- ainsi que la fourniture de services connexes ou complémentaires aux services d'investissements, le conseil aux entreprises en matière de structure de capital, de stratégie industrielle et de questions connexes ainsi que la fourniture de services concernant les fusions et le rachat d'entreprises, la recherche de financements bancaires ou de partenaires financiers, le conseil en acquisition ou cession et en ingénierie financière,

- et, encore plus généralement, toutes opérations de quelque nature qu'elles soient, financières, industrielles, commerciales, mobilières ou immobilières, pouvant se rattacher, directement ou indirectement, aux objets ci-dessus relatés ou à tous objets similaires, connexes ou complémentaires, ou susceptibles d'en favoriser la réalisation, ou encore qui seraient de nature à faciliter, favoriser ou développer son commerce et son industrie."

*Cette résolution est adoptée à l'unanimité.*

## CINQUIEME RESOLUTION

L'Assemblée Générale décide, sous la condition suspensive de la transformation de la société en Société Anonyme, de modifier la dénomination sociale qui sera désormais :

"PLANTAGENET PARTNERS SA".

| C.D.A. | C.D.A. | | O.L. | M.B. | J-R.LE'M. | G.D. |

En conséquence, l'Assemblée Générale décide de modifier comme suit l'article 3 des statuts :

**Article 3 – Dénomination** (nouveau)

"La dénomination de la société est : PLANTAGENET PARTNERS SA.

Tous les actes et documents, émanant de la société et destinés aux tiers doivent indiquer la dénomination sociale précédée ou suivie immédiatement et lisiblement des mots "société anonyme" ou des initiales "S.A." et de l'énonciation du montant du capital social."

*Cette résolution est adoptée à l'unanimité.*

## SIXIEME RESOLUTION

L'Assemblée Générale, après avoir entendu la lecture du rapport du Commissaire à la transformation sur, d'une part l'évaluation des biens composant l'actif social et, d'autre par sur la situation de la société :

- prend acte de l'attestation du Commissaire à la transformation que le montant des capitaux propres de la société est au moins égal au capital social,

- approuve expressément l'évaluation des biens composant l'actif social,

- prend acte que ledit rapport mentionne l'absence de tout avantage particulier,

et faisant l'application des dispositions de l'article 69 de la loi du 24 Juillet 1966, après avoir constaté que toutes les conditions légales se trouvent remplies, décide la transformation de la société en Société Anonyme sans création d'un être moral nouveau. Ladite transformation prendra effet à compter de ce jour.

Sous sa forme nouvelle, la société sera régie par les dispositions légales et réglementaires en vigueur concernant les sociétés anonymes et par les nouveaux statuts ci-après établis.

L'objet et la dénomination tels que fixés ci-dessus ainsi que la durée de la société ne sont pas modifiés.

Compte tenu de la situation de la société, telle qu'elle ressort du rapport du Commissaire à la transformation, le capital social n'est pas modifié et reste fixé à Un Million Huit Cent Mille Francs (1.800.000 F).

Il est désormais divisé en Dix Huit Mille (18.000) actions de Cent Francs (100 F) chacune de valeur nominale, entièrement libérées, qui seront réparties entre les propriétaires actuels des parts sociales, proportionnellement au nombre de leurs parts, soit à raison d'Une (1) action pour Une (1) part.

C.D.A.        C.D.A.                    O.L.    M.B.    J-R.LE M.    G.D.

Les fonctions de la Gérance, assumées par Monsieur Ollivier LEMAL prennent fin ce jour et la société sera désormais gérée et administrée par un Conseil d'Administration.

La durée de l'exercice social ne sera pas modifiée.

*Cette résolution est adoptée à l'unanimité.*

## SEPTIEME RESOLUTION

Comme conséquence de la transformation de la Société en Société Anonyme, et du changement d'objet et de dénomination, l'Assemblée Générale décide de remplacer les statuts qui ont régi la société sous la forme antérieure par les dispositions dont le texte est approuvé par l'ensemble des associés, avec effet à compter de ce jour.

*Cette résolution est adoptée à l'unanimité.*

## HUITIEME RESOLUTION

L'Assemblée Générale désigne comme premiers Administrateurs de la société, sous sa forme nouvelle, pour une durée qui prendra fin à l'issue de l'Assemblée Générale appelée à statuer sur les comptes de l'exercice clos le 31 Décembre 2004.

- Monsieur Ollivier LEMAL
  demeurant 137 rue Tahère, 92210 SAINT CLOUD

- Monsieur Carl Derek ANDERSON
  demeurant 20 Kite Hill Lane, Mill Valley, California 94941, USA

- Monsieur John Joseph ZAPPETTINI
  demeurant 2 Maple avenue, Atherton, California 91027, USA

- Monsieur Marc BUCAILLE
  demeurant 2 Avenue du Colonel Bonnet, 75016 PARIS

L'Assemblée Générale décide de maintenir le contrat de travail liant Monsieur Marc BUCAILLE à la société.

*Cette résolution est adoptée à l'unanimité.*

Messieurs Ollivier LEMAL, Carl Derek ANDERSON, John Joseph ZAPPETTINI et Marc BUCAILLE déclarent accepter les fonctions qui leur sont conférées et n'être frappés d'aucune mesure susceptible de leur interdire d'exercer lesdites fonctions.

C.D.A.    C.D.A.    O.L.    M.B.    J-R.LEM.    G.D.

8.

### NEUVIEME RESOLUTION

L'Assemblée Générale décide de nommer aux fonctions de Commissaire aux Comptes titulaire, pour une durée de six exercices :

> - la société "MAZARS ET GUERARD"
> dont le siège social est Tour Framatome – PARIS LA DEFENSE (Hauts de Seine)

Ses fonctions viendront à l'expiration à l'issue de l'Assemblée Générale appelée à statuer sur les comptes de l'exercice clos le 31 Décembre 2004.

*Cette résolution est adoptée à l'unanimité.*

### DIXIEME RESOLUTION

L'Assemblée Générale décide de nommer aux fonctions de Commissaire aux Comptes suppléant, pour une durée de six exercices :

> - Monsieur Patrick de CAMBOURG
> demeurant Tour Framatome – PARIS LA DEFENSE (Hauts de Seine)

Ses fonctions viendront à l'expiration à l'issue de l'Assemblée Générale appelée à statuer sur les comptes de l'exercice clos le 31 Décembre 2004.

*Cette résolution est adoptée à l'unanimité.*

### ONZIEME RESOLUTION

L'Assemblée Générale décide que les comptes de l'exercice clos le 31 Décembre 1999 seront établis, présentés et contrôlés dans les conditions fixées par les nouveaux statuts et les lois régissant les sociétés anonymes.

Les résultats de l'exercice seront affectés et répartis suivant les dispositions de la société sous sa forme anonyme.

L'Assemblée Générale chargée de statuer sur les comptes de l'exercice 1998/1999, délibérera également sur le quitus à donner à la gérance de la société pour la période écoulée entre le 2 Septembre 1998 et ce jour.

*Cette résolution est adoptée à l'unanimité.*

C.D.A.   C.D.A.   O.L.   M.B.   J-R.LE M.   G.D.

EXHIBIT D PAGE 8 OF 10

9.

## DOUZIEME RESOLUTION

L'Assemblée Générale décide de donner tous pouvoirs au porteur d'un original, d'un extrait ou d'une copie certifiée conforme du présent procès-verbal, à l'effet d'accomplir toutes formalités légales de dépôt et de publicité.

*Cette résolution est adoptée à l'unanimité.*

L'ordre du jour étant épuisé, la séance est levée à dix neuf heures.

De tout ce qui précède, il a été dressé le présent procès-verbal qui a été signé après lecture.

*Pour la société*
*"PLANTAGENET CAPITAL*
*MANAGEMENT"*

**C.D. ANDERSON**          **C.D. ANDERSON**          p/c **J.J. ZAPPETTINI**

**O. LEMAL**          **M. BUCAILLE**          **J-R. LE MILON**          **G. DELAUGEAS**

Pour la société
"PLANTAGENET CAPITAL
MANAGEMENT"

"Bon pour souscription de          "Bon pour souscription de          "Bon pour souscription de
Huit Mille Neuf Cent Quatre Vingt          Trois parts"          Une part"
Seize parts"

**C.D. ANDERSON**          **C.D. ANDERSON**          p/o **J.J. ZAPPETTINI**

EXHIBIT D PAGE 9 OF 10

10.

"Bon pour souscription de          "Bon pour souscription de     "Bon pour souscription de      "Bon pour souscription de
      Huit Mille Neuf Cent                      Une part"                         Une part"                          Une part"
      Quatre Vingt Dix
         Sept parts"

**O. LEMAL**                    **M. BUCAILLE**          **J-R. LE MILON**          **G. DELAUGEAS**


*Bon pour acceptation*                                      *Bon pour acceptation*
*des fonctions d'Administrateur,*                           *des fonctions d'Administrateur,*


**O. LEMAL**                                               **C.D. ANDERSON**


*Bon pour acceptation*                                      *Bon pour acceptation*
*des fonctions d'Administrateur,*                           *des fonctions d'Administrateur,*


**J.V. ZAPPETTINI**                                        **M. BUCAILLE**

EXHIBIT D   PAGE 16 OF 10



www.usatoday.com

USA TODAY

# Money

THURSDAY, MARCH 11, 1999

## Champagne deal uncorks French quirks

PARIS — Last year, Derek Anderson took a deep breath and decided to do the once unthinkable: invest in France.

The senior managing partner of San Francisco-based private equity firm Plantagenet, decided to part with almost $10 million to buy a small family-owned champagne maker, Albert LeBrune, that had been passed down from generation to generation since it started producing bubbly back in 1840.

The only problem: Thanks to a peculiar French law that ensures bequeathed assets are split evenly among all siblings, Anderson found himself trying to close a deal with five brothers who seemed incapable of agreeing on anything.

"It was not easy, particularly for a Yankee," Anderson recalls. "Luckily we have a good French partner. I'm not sure someone riding in on a big white horse with saddlebags over-

flowing with money would have pulled it off. It takes sensitivity and local knowledge."

For Anderson, the struggle to turn around his newly bought champagne company in time for the millenium appears to be paying off.

Plantagenet, with a $100 million war chest, soon hopes to close on two other French deals, both involving subsidiaries of large industrial firms.

There is no turning back for France and its euro partners, Anderson says.

"They've got to compete globally. To turn back would be economic suicide."

But he has no illusions. To avoid heavy French corporate taxes, Anderson does his deals through a company incorporated in Luxembourg.

By Thor Valdmanis

EXHIBIT ___F___ PAGE _1_ OF _1_

**Page 203**

1  Q. So therefore I must get the evidence from
2  you.
3  A. I want to also tell you about the word
4  "anonyme" in French. It means "anonymous." It means
5  the same thing in the United States it does here.
6  Q. Yes, I understand.
7  A. What's in the public domain, it's the board of
8  directors.
9  Q. Now, were you -- you personally -- involved in
10 the negotiations for the sale in 1998?
11 MS. GIRAL: 19--
12 MR. WIITA: 1998.
13 THE WITNESS: In some agreements. In some of the
14 agreements, but not in all. In some, but not all.
15 BY MR. WIITA:
16 Q. Uh-huh. Were you personally involved in the
17 discussions regarding the sale?
18 A. What sort of -- what discussions?
19 Q. The negotiations.
20 A. What negotiations?
21 Q. For the sale of the --
22 A. In 1990 -- yes, I said -- concerning the sale
23 in 1998, I said that I was partially involved.
24 Q. All right. I'm going to ask you questions
25 about those negotiations.

**Page 204**

1  A. What negotiations are you talking about?
2  Q. The negotiations in which you were involved
3  regarding the sale in 1998.
4  A. Which were those?
5  Q. I'm going to ask you. What is the first --
6  A. Now you --
7  Q. I don't understand.
8  THE INTERPRETER: He's going crazy.
9  MR. WIITA: I can't hear.
10 THE INTERPRETER: He says that he's going crazy.
11 He says you are making me lose my memory..
12 MR. WIITA: Would you like a few minutes to think
13 about it?
14 THE INTERPRETER: I'm not talking about myself.
15 THE WITNESS: In 1998 -- you are making me totally
16 confused. I was involved in 1998. I have problems -- I
17 don't know when I sold. You are confusing me. So yes,
18 I had decisions to make in 1998. I was involved.
19 Considering that the business hadn't been sold, it was
20 sold in 1999, January 1999.
21 BY MR. WIITA:
22 Q. Okay.
23 A. That was what was said, I believe.
24 Q. All right.
25 A. So at the time I was involved, but I have

**Page 205**

1  blanks in my memory since you are confusing me.
2  Q. Well, do I not mean to confuse you.
3  A. Your badgering questions are troubling me.
4  When it's important for -- it's disturbing. I feel I'm
5  badgered. Anyway --
6  Q. It's not my intent to badger you.
7  A. No, I know that you don't have that
8  intention.
9  Q. Okay. And if you wish me to speak slow --
10 more slowly or to -- I'd be happy to.
11 A. No. It's all right.
12 Q. So the sale occurred either -- occurred in
13 1999, January of 1999?
14 A. If my memory is right, subject to my --
15 subject to my memory being all right, considering that
16 I'm --
17 Q. I understand that memory is not perfect.
18 A. It's not that -- it's not the mind. It's the
19 confusion of the questions.
20 Q. Well, all I'm asking for is your best
21 recollection. Okay. What is the first negotiation for
22 that sale that you recall?
23 MR. HERMAN: I want to object to the term
24 "negotiation." I think it's unclear.
25 MR. WIITA: She's going to translate that.

**Page 206**

1  Q. You may answer the question.
2  A. I would like to listen to the question again.
3  Q. Okay.
4  A. There is so many people talking here.
5  Q. I'll ask it differently.
6  Just say I will ask it differently.
7  What is the first discussion that you recall
8  regarding the -- regarding the 1999 sale?
9  MS. GIRAL: 19--
10 MR. WIITA: '99. January 1999 sale.
11 THE WITNESS: I don't remember.
12 BY MR. WIITA:
13 Q. Well, what is the first one you do remember?
14 A. I don't know. We have many brothers, and all
15 my brothers took part in various interventions. It's
16 complicated.
17 Q. I'm only asking about your memory,
18 Mr. Le Brun.
19 A. I don't remember when the first took place.
20 Q. Okay. What is -- I'm not asking when. I'm
21 asking you what -- the first discussion you recall?
22 A. I don't understand the question.
23 MR. HERMAN: I also want to state for the record I
24 think there was an inaccurate translation. The last
25 question Mr. Wiita asked did not have a number in it --

**Page 207**

1  THE INTERPRETER: I beg your pardon?
2  MR. HERMAN: -- and the translation clearly did,
3  the translation from English to French.
4  MR. WIITA: Would you for me -- would you read
5  back the last question. Let's go off the record.
6  (Discussion held off the record.)
7  (Record read.)
8  MR. WIITA: Okay. Let's go back on the record.
9  Q. What is the first discussion that you recall
10 regarding the -- the January 1999 sale?
11 A. Several months before.
12 Q. Uh-huh. And what was that discussion?
13 A. I don't see -- what is going to break -- what
14 the details of that is going to add to this case. The
15 transactions of the shareholders are free, they are not
16 subject to any badgering or inquisition. And that's my
17 opinion. I must ask my brothers if I can say anything,
18 and I think that they will say no, that it's not -- it
19 doesn't concern this. It doesn't concern anybody. It's
20 our property.
21 Q. Actually, the terms of the sale are the -- or
22 the event of the sale is very important to the claims
23 that are in this lawsuit.
24 A. It was -- it was sold and it was paid. It's
25 my problem, not yours.

**Page 208**

1  Q. That's, unfortunately, not the case --
2  MR. HERMAN: And for the record, disclosure of
3  some of the terms has been objected to already in this
4  case.
5  MR. WIITA: I'm entitled to ask my questions.
6  Everybody can make their objections.
7  MR. HERMAN: But I'd like the witness to know that
8  there has already been an objection to disclosure of
9  certain of the terms.
10 BY MR. WIITA:
11 Q. Are you refusing to answer my question?
12 A. Repeat the question.
13 MR. WIITA: Would you read the question back,
14 please.
15 (Record read.)
16 THE WITNESS: The negotiations for the sale with
17 the people in charge of negotiating. That's all.
18 BY MR. WIITA:
19 Q. Who were the people in charge of negotiating?
20 A. I can't -- I can't answer about the private
21 sale. I can say to who it was sold. You'll ask me
22 details next about my private life.
23 Q. Do you refuse -- excuse me. Do you refuse to
24 answer the question?
25 A. I am not refusing. It's too complicated. I

EXHIBIT G PAGE 1 OF 3

PIVOTAL VS. SCEV      CondenseIt™      DEPO OF FRANCOIS LE BRUN, VOL. I

**Page 55**

1   MR. WIITA: Yes.
2   THE WITNESS: I am -- I'm no longer the chairman.
3   I've no longer been the chairman since the sale of my
4   company.
5   BY MR. WIITA:
6   Q. And when did you cease being the chairman?
7   A. On the day my company was sold.
8   Q. And what was the date -- what was the date of
9   that?
10   A. I don't -- I think it was mid January -- mid
11   January 1999.
12   MR. HERMAN: I'm sorry. Did you translate the
13   first part of his answer? He said "I'm not sure" --
14   THE INTERPRETER: He said, "I'm not sure of the
15   exact date. I believe it was mid January 1999."
16   MR. HERMAN: Okay. Thank you.
17   BY MR. WIITA:
18   Q. Okay. And who became the chairman of -- when
19   you resigned?
20   A. If I remember correctly, Mr. Hauchart,
21   Mr. Hauchart.
22   Q. Is that Serge Hauchart?
23   A. Yes.
24   (Witness and counsel confer.)
25   THE WITNESS: If you want all the correct answers

**Page 56**

1   concerning the rest of the other questions that you are
2   going to ask me concerning the board of directors, it's
3   advisable that you look at the KBIS extract in France.
4   BY MR. WIITA:
5   Q. The what extract?
6   THE INTERPRETER: It's called the K-B-I-S extract,
7   from trade -- yeah, in English, KBIS extract from the
8   trading company's register.
9   MS. GIRAL: It has all the legal information.
10   THE WITNESS: It gives all the information
11   concerning the management and the directors --
12   directives.
13   BY MR. WIITA:
14   Q. I understand that, but still I'm entitled to
15   ask you your recollection and you -- all -- all I am
16   entitled to is your best recollection.
17   MR. HERMAN: And that's what you've already
18   given.
19   MR. WIITA: Well, that was the statement.
20   Q. And that's what you've already given?
21   A. I seem to think so. To be -- to be sure of
22   it, check with the KBIS in case of any flaw of memory.
23   Q. I understand.
24   A. You have -- they have a thing called
25   "minitel," (phonetic) and you consult it and find

**Page 57**

1   things out.
2   Q. Is Mr. Hauchart still the director -- what are
3   we calling him? The chairman?
4   THE INTERPRETER: Chairman.
5   THE WITNESS: No.
6   BY MR. WIITA:
7   Q. Who is the chairman now?
8   A. In the new company, I'm a mere employee. I am
9   not in secrets about -- but I don't know about the board
10   of directors. I'm not answering. I'm not answering.
11   Q. You do not know who the board of directors is;
12   is that correct?
13   A. About the board of directors, check with the
14   KBIS.
15   Q. Okay. Because you do not know?
16   A. He's not -- I'm not sure that I will give you
17   the correct answer.
18   Q. Okay. So -- and what is your current title,
19   then, if you are still employed?
20   A. My present position is a paid position as I'm
21   paid for -- as a commercial director.
22   Q. And what are your responsibilities as a
23   commercial director?
24   A. Those of commercial director.
25   Q. What are the duties of a commercial director?

**Page 58**

1   MS. GIRAL: Duties? Duties?
2   MR. WIITA: Responsibilities.
3   MR. HERMAN: Objection. Calls for speculation,
4   for what it's worth. Calls for improper opinion.
5   THE INTERPRETER: He doesn't know. Just a
6   commercial director.
7   BY MR. WIITA:
8   Q. What does a commercial director do?
9   MR. HERMAN: Objection. Calls for speculation,
10   calls for improper opinion.
11   MR. WIITA: He's objecting because it calls for
12   speculation. He said he has the duties or
13   responsibilities of a commercial director. It's not --
14   I don't think it's vague and ambiguous to then ask him
15   what those duties and responsibilities are.
16   MR. HERMAN: Mr. Wiita, I just want to make a
17   statement. I'm not trying to -- I try to get my
18   objections out as quickly and as concisely as possible.
19   If we have editorial back and forth, it's going to slow
20   the process even more than it is. My objection is what
21   it is. You don't have to agree. My objection is it
22   calls for speculation, calls for an improper opinion.
23   MR. WIITA: Well --
24   MR. HERMAN: You can disagree later in court, but
25   now let's proceed. You are wasting time.

**Page 59**

1   MR. WIITA: Now I'm entitled to state my response
2   to the objections.
3   Q. So what are the responsibilities?
4   A. The duties of a commercial director.
5   Q. And what are those?
6   MR. HERMAN: Objection. Same objection.
7   (Witness and counsel confer.)
8   THE WITNESS: Well, whatever has been the category
9   in which it takes place, a commercial director is a
10   commercial director. My present duties are reduced
11   because there is another commercial director who is --
12   whom I work with. I'm his -- I work with him.
13   BY MR. WIITA:
14   Q. Well, then what are -- what do you do? What
15   are your responsibilities?
16   MR. HERMAN: Objection. Compound.
17   THE WITNESS: I have nothing to do but just take
18   care of current matters.
19   BY MR. WIITA:
20   Q. I'm sorry. What do you mean by take care of
21   current matters?
22   (Witness and counsel confer.)
23   THE WITNESS: It means just that. I told -- I've
24   just mentioned that there was another commercial
25   director brought in by the new owner, and all I have to

**Page 60**

1   do is take care of the current affairs, current
2   matters.
3   BY MR. WIITA:
4   Q. I'm going to keep asking. What does it mean
5   to take care of current affairs?
6   A. Very explicit. The current matters.
7   Q. I'm sorry. It is not. What --
8   MR. HERMAN: Objection. Argumentative. Don't
9   argue with the witness. Ask your questions.
10   MR. WIITA: Don't tell me what to do.
11   MR. HERMAN: I will. Proceed.
12   MR. WIITA: I'm not going to take direction from
13   you.
14   Q. Now, would you please explain to me what it
15   means to take care of current matters? What is it that
16   you are responsible for doing?
17   A. I make no decision at the moment. I consult
18   the new commercial director about anything, about it,
19   and I give him my opinion, and he makes the decisions.
20   Q. So do you act as an advisor to the
21   commercial --
22   A. Not necessarily. Not necessarily an advisor.
23   I give him my point of view.
24   Q. Uh-huh. Well, what does the other commercial
25   director do. What is his job?

EXHIBIT G PAGE 2 OF 3

PIVOTAL VS. SCEV     CondenseIt™     DEPO OF FRANCOIS LE BRUN, VOL. 2

**Page 221**

1 the beginning that Plantagenet -- that Plantagenet
2 France was sending a "shantinal" to Plantagenet
3 California.
4     MR. HERMAN: What is "shantinal"?
5     THE INTERPRETER: Samples. Plantagenet France was
6 asking him to send samples to Plantagenet from
7 California.
8     MR. HERMAN: Okay. Thanks.
9 BY MR. WIITA:
10     Q. And to the best of your recollection, those
11 were sent to Derek Anderson?
12     A. Seems to me, but I'm not sure. You have seen
13 the paper, the delivery slip. And signed the note.
14     Q. And you replaced those -- gave replacement
15 wine to Mr. Gidding for those --
16     A. Mr. Gidding recovered the
17 equivalent or more of these samples subsequently, and
18 correspondent to miscellaneous costs.
19     Q. Okay. Other than the samples that we have
20 just discussed and other than the documents that were
21 given to Plantagenet regarding customers, do you
22 remember anything else that you told Mr. Lemal about
23 Mr. Gidding?
24     A. I don't remember.
25     Q. I believe you -- you said there were

**Page 222**

1 pre-negotiations and then negotiations and then the
2 sale; is that correct?
3     A. Yes. I'm not the owner anymore. It's logical
4 there was a sale -- sold. I wasn't the owner. I was a
5 fraction.
6     MR. WIITA: Yes. Okay. I want to take a
7 two-minute break because I think I can save us ten
8 minutes if I -- if I speak to John for a minute. Okay.
9     (Recess taken.)
10 BY MR. WIITA:
11     Q. Okay. We've discussed the conversations that
12 you had with Mr. Lemal.
13     THE INTERPRETER: I translate it.
14     MR. WIITA: Actually, I'm going to start it over.
15     THE INTERPRETER: All right.
16 BY MR. WIITA:
17     Q. Okay. There were documents that were signed
18 for this sale; is that correct?
19     A. I'm surprised at this question. Obviously.
20     Q. Obviously. Now, were those documents signed
21 in December of '98?
22     MR. HERMAN: Objection. I mean, it's vague.
23 Assumes they all signed at the same time.
24     THE WITNESS: I don't know when they were signed.
25 I don't see the point of the answer. I know that the

**Page 223**

1 legal sale was in -- in mid January.
2 BY MR. WIITA:
3     Q. Okay. Was there a period between the signing
4 of agreements and the payment of the money?
5     A. That's my problem. I was paid. I have the
6 right to sell as I want. The owners have a right to
7 sell; to negotiate as we wish, and to have it paid. And
8 it's logical. Everything is okay.
9     MS. GIRAL: Sellers have a right to sell as they
10 wish.
11     THE INTERPRETER: Yes, but -- no; no.
12     THE WITNESS: When I talk in the name of the
13 owners, I talk in their name.
14     MR. WIITA: In their name?
15     THE INTERPRETER: Yes.
16 BY MR. WIITA:
17     Q. Okay. Prior to January of 1999, when the sale
18 was completed, did you discuss Mr. Gidding with
19 Mr. Zappettini?
20     A. I don't remember. You ask me questions for
21 which I don't remember the answer.
22     Q. That's okay if you don't remember.
23     Was Mr. Zappettini given access to the -- the
24 same documents and customers that Mr. Lemal was?
25     A. I don't remember that he asked -- I don't

**Page 224**

1 remember that he asked?
2     Q. You don't remember if he asked?
3     THE INTERPRETER: That he asked.
4     MR. WIITA: That he asked.
5     THE WITNESS: When two people know about
6 something, everybody knows. So if Plantagenet knows,
7 everybody can know.
8 BY MR. WIITA:
9     Q. All right. One more question on this line.
10 Prior to the completion of the sale in January of 1999,
11 did you discuss Mr. Gidding with Mr. Anderson?
12     A. Probably no. In all likelihood I did not.
13 No. In all likelihood, no. It seems hard.
14     Q. There was -- you mentioned there was a
15 Plantagenet France and a Plantagenet California.
16     THE INTERPRETER: To whom did he say this to?
17     MS. GIRAL: It's not the question.
18     MR. WIITA: No, it's not the question. I was only
19 starting the question. I'm sorry. Please.
20     THE WITNESS: Yeah.
21     MR. WIITA: Okay.
22     MS. GIRAL: I just repeat what you said.
23     MR. WIITA: Oh, okay.
24     Q. You spoke to me earlier about a Plantagenet
25 France and a Plantagenet California. Okay. Which of

**Page 225**

1 those two, if you know, was the buyer?
2     A. None of them.
3     Q. Okay. Who was the buyer?
4     A. PLB Holding.
5     Q. And who were the persons or -- person or
6 persons who spoke on behalf -- during the negotiations
7 on behalf of PLB Holdings?
8     MR. GIDDING: You said it right.
9     MS. GIRAL: Okay.
10     MR. HERMAN: Did you get that?
11     THE REPORTER: Yes.
12     THE WITNESS: During the negotiation?
13 BY MR. WIITA:
14     Q. Yes.
15     A. I don't know.
16     Q. Did you, Mr. Le Brun, during negotiations
17 speak to anyone who represented PLB Holdings?
18     A. PLB Holdings was the party who paid.
19     Q. Uh-huh.
20     MR. HERMAN: Before this goes any further --
21     THE WITNESS: And who bought.
22     MR. HERMAN: I just want to, for the record --
23     THE WITNESS: It was a deal of sale.
24     MR. WIITA: Uh-huh.
25     MR. HERMAN: When Mr. Gidding indicated, "You said

**Page 226**

1 it correctly," he was pointing to Caroline-Marie Giral,
2 G-I-R-A-L.
3     MR. WIITA: Off the record a second.
4     (Discussion held off the record.)
5     MR. HERMAN: Put this on the record.
6     It was what happens frequently, I think, in an
7 effort for people to be clear here is the interpreter
8 would interpret what you asked, Mr. Wiita, to
9 Mr. Le Brun, and then the interpretation would be
10 refined or corrected by counsel for SCEV, and I just --
11 and Mr. Gidding acknowledged that, and I wanted to have
12 the record reflect what was going on. And it now does.
13     THE INTERPRETER: Actually, you did not say
14 "during the negotiations." And since I was asked to
15 translate word-for-word, that was what I did.
16 BY MR. WIITA:
17     Q. Okay. Who signed the agreements for sale on
18 behalf of PLB Holdings?
19     A. I don't remember.
20     Q. Was there a meeting at which everybody signed
21 these documents?
22     A. Yes.
23     Q. Okay. Who was at that meeting?
24     A. The sale -- the vendor and the buyer.
25     Q. Who were the people at the meeting?

& When was the "illegal" sale. G   PAGE 3 OF 3



**PLANTAGENET**

Plantagenet Capital Management LLC
220 Sansome Street, Suite 460
San Francisco CA, 94104
Tel. 415-433-6536
Fax 415 433-6153
www.plantagenetcapital.com

## FOR IMMEDIATE RELEASE

Contact:
Suzanne Bronski
Miller DeMartine Group
212-420-0920
sbronski@mdgpr.com

## PLANTAGENET CAPITAL NAMES GEOFFROY SURBLED AS MANAGING DIRECTOR IN ITS FRENCH OFFICE

### Focus on European Buyouts

San Francisco, September 23, 1999 – Plantagenet Capital Management LLC today announced that it has named Geoffroy Surbled, 46, to the position of Managing Director in the firm's Paris office, where he will be involved in sourcing European deal flow opportunities and managing Plantagenet's portfolio companies.

Mr. Surbled comes to Plantagenet, which specializes in buyouts, financial restructurings and industry consolidations in the U.S. and in Europe, with broad expertise in European financial markets and corporate finance, focusing on mergers, acquisitions and company valuation.

C. Derek Anderson, Senior Managing Partner of Plantagenet, said, "For more than 17 years, Geoffroy Surbled has been advising European companies – from large multinationals to small family-owned firms – on the benefits of growth by acquisition and consolidation. He comes to Plantagenet well prepared to take advantage of the increased cross-border acquisition and buyout activity within Europe."

Before joining Plantagenet, Mr. Surbled was a Partner with Translink, an international corporate finance advisory firm with offices in seven European countries and the U.S. At Translink, Mr. Surbled focused on cross-border transactions of $10 to $100 million involving small to medium companies. He also advised corporate clients on multinational transactions in the agribusiness, distribution and engineering industries. He was the exclusive advisor to the German food distributor Spar in its sale to Intermarche of France in a transaction worth more than $1 billion.

From 1989 to 1996, Mr. Surbled was Chairman and CEO of Financiere des Glenan, an M&A advisory firm in western France that specializes in mergers, buyouts, and financial engineering for medium-sized companies. As founder and lead broker, Mr. Surbled was closely involved in



Plantagenet Capital Management LLC

all phases of the business transaction, including sourcing, valuation, negotiation, legal and financial due diligence, and strategic planning.  He developed special expertise in leveraged management buyouts and led a number of these transactions for clients in a variety of industries.

Earlier, Mr. Surbled worked in M&A and corporate finance for Credit Commercial de France (CCF), becoming Managing Director of the CCF-Interfinanz joint venture in Germany, where he managed cross-border M&A activity.

Mr. Surbled lectures on corporate finance for schools including the French business school ESSEC.  He holds a Masters in Business Administration from New York University and a degree from the Ecole Superieure de Commerce in Rouen, France.   Mr. Surbled is a licensed financial analyst with the Societe Francaise des Analystes Financiers.

Plantagenet Capital Management LLC is a San Francisco-based private equity firm with satellite offices in Paris, France and Houston, Texas. Plantagenet specializes in strategic buyouts and turnaround situations and currently has investments in both the United States and Europe.

# # #

*For more information, please contact John Zappettini  at 415-433-6536 or email at*
*zappettini@plantagenetcapital.com*

Je, soussigné, Geoffroy SURBLED, agissant ès qualité de mandataire de la société PLB Holdings en vertu d'un pouvoir reçu de Monsieur Derek Anderson le 1er mars 2000,

Reconnais avoir reçu ce jour deux chèques tirés sur la Banque de Gestion Privée Indosuez et représentant le prix global de cession des actions de la société SCEV Champagne Albert Le Brun. Les deux chèques se répartissent ainsi :

    -chèque n° 9 651 656 d'un montant de 26 millions de francs,
    -chèque n° 9 651 657 d'un montant de 3 millions de francs.

Le second chèque, représentatif de la garantie concédée par le cédant, fera l'objet d'un séquestre jusqu'à la présentation au cessionnaire d'une caution bancaire d'égal montant.

Fait à Paris, le 2 mars 2000

EXHIBIT 1    PAGE 1 OF 1



PLANTAGENET Sarl
39 avenue Pierre 1er de Serbie
75001 Paris
Téléphone : 00 33 1 53 23 04 36
Télécopie : 00 33 1 53 23 04 31

# MEMO

→ Agent in California

A:      Serge Hauchart - /
cc:     John Zappettini - Erica Valentine - Jean Chauvel -
        └ Dominion Wines

De:     Olivier Lemal / Derek Anderson

Date:   25/02/99

Objet:  Le Brun              2 p.

Please make sure to answer straight away and in writing the attached fax.
As far as I know, there is no contract with Pivotal, nor with John Gidding, and of course no exclusive rights to import Albert Le Brun Champagne in the States.

The present price for Vieille France should be at least $12.5 per bottle against $ 11.4 until today.

This new price should concern orders sent by Pivotal in December and which have not been confirmed yet. A decision concerning the distribution in the U.S. should take place in the coming weeks as soon as we have compared the offers of Dominion Wines with that of Pivotal.

Lastly, why do we need to sell in a US market through an agent and not directly to the U.S. distributor.?

My position is that we should not pay any intermediary.

Olivier Lemal

Because this is
the LAW in France!

226

PNET 000920
CONFIDENTIAL

EXHIBIT ___J___  PAGE ___1___ OF ___1___

 PLANTAGENET

Mr.John Gidding
Associated Brokers
1765 La Loma Road
PASADENA, Ca 91105
U.S.A

May 26, 1999

Mr. Gidding,

I am puzzled by your recent communication to me in as much as you were informed during our meeting recently in my San Francisco office that all matters concerning Lebrun were being handled by Mr. Ollivier Lemal of our Paris office.

What's particularly bizarre, however, is that you appear to be trying to imply that you have some sort of exclusive on imports of Champagne Lebrun to the U.S. You and I both know this is not the case - nor ever has been - and you were also informed of this fact at our recent meeting.

Mr. Marc Bucaille of our Paris office is now overseeing the day-to-day operations of Lebrun and should be contacted if you wish to place any orders. Also, you might want to order new stationery with your phone and fax numbers on it.

Sincerely,

C. Derek Anderson,
Plantagenet

CC. Mr. Marc Bucaille

EXHIBIT __K__ PAGE _1_ OF _1_

PLANTAGENET · 39, avenue Pierre 1ᵉʳ de Serbie - 75008 Paris - Tél. : 33 (0)1 56 89 39 39 - Fax : 33 (0)1 56 89 39 30
SARL au capital de 250 000 F - RCS Paris B 420 001 765