1  **BIRNBERG & ASSOCIATES**
   **CORY A. BIRNBERG (SBN 105468)**

2
   **BIRNBERG & ASSOCIATES**
3  **703 Market Street, Suite 600**
   **San Francisco, CA 94103**
4  **Telephone: (415) 398-1040**
   **Facsimile: (415) 398-2001**
5
   **Attorneys for Plaintiffs**
6  **JOHN GIDDING, PIVOTAL, INC.**

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**
                **SAN FRANCISCO DIVISION**

10

11  **JOHN GIDDING, PIVOTAL, INC.**        )   **Case No. C-7-04755-JW**
                                           )
12           **Plaintiffs,**              )   **VERIFIED SECOND AMENDED**
                                           )   **COMPLAINT FOR DAMAGES**
13  **v.**                                )   **FOR: (1) RICO (U.S.C. 18 1962(c));**
                                           )   **AND (2) CONSPIRACY TO**
14  **DEREK ANDERSON, an individual; JOHN** )  **COMMIT RICO (U.S.C. 18 1962(d))**
    **ZAPPETTINI, an individual; OLIVIER** )
15  **LEMAL, and individual; PLANTAGENET** )
    **CAPITAL MANAGEMENT LLC, a**          )
16  **purported California corporation;**   )
    **PLANTAGENET CAPITAL AMERICA**        )
17  **LLC, a purported Delaware corporation;** )
    **PLANTAGENET CAPITAL FUND LP, a**     )
18  **purported Cayman Island corporation;** )
    **PLANTAGENET CAPITAL FUND LP II, a** )
19  **purported Cayman Island corporation; PLB** )
    **HOLDINGS SA, a purported Luxembourg** )
20  **corporation; PLANTAGENET PARTNERS** )
    **SA, a purported French corporation;** )
21  **SERGE HAUCHART, an individual; SCEA** )
    **CHATEAU LA LAGUNE; and DOES 1**      )
22  **through 100, inclusive,**            )
            **Defendants.**                )
23  _____ )

24  ///

25  ///

26  ///

27  ///

28  ///

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

1 **INTRODUCTION**

1.    This Complaint alleges violations under the Racketeer Influenced and Corrupt

Organizations Act of 1970, Title IX of the Organized Crime Control Act of 1970, as

amended, 18 U.S.C. Section 1962(c) and Section 1962(d) ("RICO"), and is brought by

Plaintiffs Pivotal Inc. and John Gidding in connection with a scheme devised and conducted

by defendants: Derek Anderson, John Zappettini, Plantagenet Capital Fund LP, Plantagenet

Capital Fund LP II, Plantagenet Capital Management LLC, and Plantagenet Capital

America LLC, (collectively "Plantagenet"); Serge Hauchart, Olivier Lemal, Plantagenet

Partners SA, PLB Holdings SA, and SCEA Chateau La Lagune; each of whom participated,

either directly or indirectly, in the management of enterprise consisting of an association-in-

fact of venturers in an international money laundering scheme, through a series of predicate

acts including, mail fraud and wire fraud, under U.S.C. Section 1341, 1343, forgery,

perjury, fraud upon court, extortion, and violations of a US Treaty, to obtain money and

property, and to conspire to do so, all to the detriment of the plaintiffs.  The predicate acts,

at least two of them within the last ten years, amounted to a pattern of racketeering activity

involving relativeness and continuity of the predicate acts.  The relief sought includes treble

damages arising from the fraud set forth herein, prejudgment interest, cost of investigation

and suit, and attorneys fees.

**JURISDICTION**

2.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. Sections 1331, 1337,

1349 because this matter involves allegations of illegal behavior arising under the laws of

the United States, including violations of RICO, the practice of frauds upon the courts of

California, and violations of a Treaty of the United States.  Furthermore, jurisdiction in this

Court is proper pursuant to 18 U.S.C. Sections 1964(a), 1964(c).

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

**PERSONAL JURISDICTION AND VENUE**

3.    Personal jurisdiction and venue are predicated upon 18 U.S.C. §1965(a),

because certain defendants reside, are found, have an agent, and transact affairs in Marin

County and San Francisco, and the ends of justice require that other parties residing in other

districts be brought before this Court.  Venue is also proper in this Court pursuant to 18

U.S.C. §1965(b) because, to the extent any defendant may reside outside of this District, the

ends of justice require such defendant or defendants to be brought before the Court.  Venue

is proper under 28 U.S.C. §1391(3) because a defendant may be found in this district.

Venue is also proper in this Court pursuant to 28 U.S.C. §1391(d) because a foreign

corporation may be sued in any district, and under 28 U.S.C. §1391(a) because a California

corporation may be sued in any district within the state.  Further, personal jurisdiction is

predicated on the fact that the acts and occurrences in furtherance of the claims herein arose

in, arise in and affect the State of California and commence within the State of California.

**NEW FACTS AND EVIDENCE**

4.    At all relevant times, during the week of February 11, 2008, the Plaintiffs

cooperated with a French criminal investigation in France seeking to indict the Defendants

and their accomplices for money laundering and corruption.  During this time period the

French government and Plaintiffs put together more pieces of the money laundering

scheme.

**RELEVANT TIMES**

5.    In light of new facts and evidence, the Plaintiffs have moved to amend their first

amended complaint.  The relevant times in this second amended complaint are from

October 28, 1998, through the filing of this complaint.

**THE PARTIES**

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

6.     Plaintiff Pivotal Inc. ("Pivotal") is a corporation organized and existing under the laws of the State of California.  During relevant times, Pivotal had its principal place of business in North Hollywood, Glen Ellen, and San Francisco, California.

7.     Plaintiff John Gidding ("Gidding"), during relevant times, has been a resident of Pasadena and San Francisco, California,  Gidding is a commissioned agent for French wineries and a director and shareholder of plaintiff Pivotal Inc.

8.     Defendant SCEA Chateau Le Lagune ("Lagune") was or is a corporation organized and existing under the laws of France. During relevant times, Lagune owned the wineries that produced Champagne Ayala and Champagne Montebello, and had its principal place of business in Ludon-Medoc and Ay, France.  Prior to the relevant times, Lagune was controlled by the Ducellier and Rapeneau families.

9.     Defendant Serge Hauchart ("Hauchart"), during relevant times, was or is a resident of Paris, France. Prior to the relevant times, Hauchart was a high-ranking official in the French Treasury Department and the Treasurer of the Republican Party of France.

10.     Defendant Olivier Lemal ("Lemal"), during relevant times, was or is a resident of Saint Cloud, France.  Prior to relevant times, Lemal was a business associate of Hauchart.

11.     Defendant Derek Anderson ("Anderson"), during relevant times, was or is a resident of Mill Valley, California.  Prior to relevant times, Anderson founded the "Plantagenet Group".

12.     Defendant John Zappettini ("Zappettini"), during some of the relative times, was or is a resident of Atherton, California.  Prior to relevant times, Zappettini was a business associate of Anderson.

13.     Defendant Plantagenet Capital Fund LP (PCF-1), was or is a corporation

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

organized and existing under the laws of the Cayman Islands.  During relevant times, PCF-1 had its principal place of business in San Francisco and Mill Valley California.  PCF-1 was managed and controlled by Anderson and/or Patricia Love Anderson.

14.    Defendant Plantagenet Capital Fund LP II ("PCF-2"), was or is a corporation organized and existing under the laws of the Cayman Islands. During relevant times, PCF-2 had its principal place of business in San Francisco and Mill Valley California.  PCF-2 was managed and controlled by Anderson and/or Patricia Love Anderson.

15.    Defendant Plantagenet Capital America LLC ("PCA") was or is a corporation organized and existing under the laws of Delaware. During relevant times, PCA had its principal place of business in San Francisco and Mill Valley, California.  PCA was managed and controlled by Anderson.

16.    Defendant Plantagenet Capital Management LLC ("PCM") was or is a corporation organized and existing under the laws of Delaware. During relevant times, PCM had its principal places of business in San Francisco and Mill Valley, California. PCM was managed and controlled by Anderson.

17.    Defendant PLB Holdings SA ("PLB"), was or is a corporation organized and existing under the laws of Luxembourg. During relevant times, PLB had its principal place of business in San Francisco and Mill Valley, California.  PLB was controlled and managed by Anderson.

18.    Defendant Plantagenet Partners SA ("PPSA") was or is a corporation organized and existing under the laws of France.  During relevant times, PPSA had its principal places of business in Paris, France, San Francisco, and Mill Valley, California.  PPSA was managed and controlled by Anderson and Olivier Lemal.

19.    Plaintiffs do not know the true names of Does 1 through 100, inclusive, and

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

thereby sues them by such fictitious names.  Plaintiffs are informed and believe, that in doing the acts and things alleged in this complaint, the named defendants Does 1 through Does 100, inclusive, each of them, acted as the agents, joint venturers, or coconspirators, of each of the other defendants.

## WRONGDOERS

20    Plaintiffs are informed and believe, that in doing the acts and things alleged in this complaint, the named Wrongdoers, inclusive, each of them, acted as the agents, joint venturers, or coconspirators, of each of the other defendants.

21.    Wrongdoer SA Societe Champenoise d'Exploitation Vinicole ("SCEV") was or is a corporation organized and existing under the laws of France.  During relevant times, SCEV was the producer of Champagne LeBrun and had its principal place of business in Chalons and Reims, France.  Prior to the relevant times, SCEV was controlled by the LeBrun family.

22.    Wrongdoer Patrick Raulet ("Raulet"), during relevant times, was or is a resident of Dole, France.  Prior to relevant times, Raulet founded SA Raulet, an industrial bakery.

23.    Wrongdoer SA Compagnie des Vins du Levant ("Levant") was or is a corporation organized and existing under the laws of France.  During relevant times, Levant had its principal place of business in Paris, France.  Levant was owned and directed by Raulet.

24.    Wrongdoer Jean-Francois Rapeneau, during relevant times, was or is a resident of Bouzy, France.

25.    Wrongdoer Christophe Rapeneau, during relevant times, was or is a resident of Blesmes, France.

26.    Wrongdoer SAS Les Champs Reniers ("Renier") was or is a corporation

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

1    organized and existing under the laws of France.  During relevant times, Renier was

2    managed by Christophe Rapeneau.

3        27.    Wrongdoer Marie-Claude Simon ("Simon") was or is a resident of Reims,

4    France.  During the relevant times Simon was a practicing lawyer in Reims France, who

5    represented the Plaintiff's against SCEV (September 2001 to September 2003) and Serge

6    Hauchart against Champagne Bricout (November 2002 to December 2003).

7

8                    **PRELIMINARY ALLEGATIONS**

9        28.    Plaintiffs Pivotal and Gidding were the importers and agents for Champagne

10   Ayala, Champagne Montebello, and Champagne LeBrun.  For over a decade the Plaintiffs

11   and their employees visited these wineries in France and the owners of these wineries came

12   to the United States to promote their products.  As such the plaintiff's, their employees, and

13   their clients all knew the various members of the Ducellier, Rapeneau, and LeBrun families.

14       29.    In 1998, the Plaintiffs had contracts for the future delivery of Champagne Ayala

15   and Champagne Montebello and they placed these orders in advance.  The anticipated

16   profits on the Champagne Ayala and Montebello delivery contracts for the years 1999 and

17   2000 exceeded $1.3M annually.  As a result of the importance of the US business, the

18   owners of Defendant Ch. La Lagune, itself a winery in Bordeaux, confided their global

19   export market to Gidding.  Attached as Exhibit A to this complaint and incorporated herein

20   by reference is a true and correct copy of an article published in Figaro Magazine: "The

21   Marriage of Bordeaux & Champagne - an American in Chateau d'Ay."  Attached as Exhibit

22   A-1 to this complaint and incorporated herein by reference is a translation of relevant

23   portions of this article.

24       30.    When the Plaintiffs sales of Champagne Ayala and Montebello outstripped the

25   available supply, Gidding gave an important part of the delivery contracts to SCEV.  The

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

anticipated profits on the Champagne LeBrun delivery contracts for the years 1999 and 2000 exceeded $500,000 annually.

31.    "Plantagenet" is funded from the Cayman Islands, controlled from California, and composed of Defendants Anderson, Zappettini, PCF-1, PCF-2, PCA, and PCM. Plantagenet's "French" operations consisted of hiring Defendants Serge Hauchart, a convicted money launderer, and Olivier Lemal, and setting up Plantagenet Partners SA in Paris to manage and distribute the profits generated by the money laundering activity. PPSA's start-up was funded by the usurpation of the Plaintiff's commerce in Champagne LeBrun.  When investigations in Paris on the money laundering threatened Plantagenet, Plantagenet closed up shop in Paris and went back to the Cayman Islands.  Attached as Exhibit B to this complaint and incorporated herein by reference is a true and correct copy of an article published in International News: "Former French minister indicted for Money Laundering".  Attached as Exhibit C to this complaint and incorporated herein by reference is a true and correct copy of a Plantagenet news release: "French Advisory Board Will Guide Investment Strategy".

32.    Lemal, an "expert in company assessment and valuation", was assisting Raulet in the sale of his industrial bakery, SA Raulet, to a US baking conglomerate, Earthgrains. Raulet was a native of Champagne and knew Jean-Francois and Christophe Rapeneau ("Rapeneaux").  The Rapeneaux controlled 40% of Lagune, and have known the LeBrun family for generations.  Thus, by the summer of 1998, Plantagenet knew about the Plaintiff's commerce in Champagne LeBrun, Ayala, and Montebello.  Attached as Exhibit D to this complaint and incorporated herein by reference is a true and correct copy of an article published in Eurofood: "Earthgrains acquires SA Raulet.  Attached as Exhibit E to this complaint and incorporated herein by reference is a true and correct copy of an article

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

published in <u>Union of Champagne</u>: "Raulet acquires SCEV". Attached as Exhibit E-1 to this complaint and incorporated herein by reference is a translation of relevant portions of this article.

33.    After the bakery sale was finalized (for an estimated $35,000,000), Raulet intended to (1) own SCEV with the Rapeneaux as his silent partners, and (2) to be PPSA's silent partner in another industrial bakery, SA Pain et Force. Attached as Exhibit F to this complaint and incorporated herein by reference is a true and correct copy of Anderson's interview published in <u>USA Today</u>": "Avoiding French Taxes". Attached as Exhibit G to this complaint and incorporated herein by reference is a true and correct copy of a <u>Plantagenet</u> news release: "Pain et Force is first investment for New European Fund".

34.    The Defendants' criminal schemes relied upon three factors: Hauchart had cash to launder, Raulet could get an offshore kickback on the bakery sale, and Plantagenet was set up in the Cayman Islands. When, in August 1998, the LeBrun family, under the guidance and supervision of the Raulet and Rapeneaux families, ceded control of SCEV to Lemal and Hauchart, the Plaintiff's commerce in Champagnes Ayala, Montebello, and LeBrun, came under the control of the Defendants.

35.    The scheme to repatriate Raulet's kickback and launder Hauchart's cash required Anderson to set up a Luxembourg shell company, Defendant PLB Holdings SA (PLB is an acronym for "Plantagenet Le Brun"). The "kickback" shares, 80% of PLB's stock, were held by the Plantagenet Cayman entities, PCF-1 and PCF-2; and the "cash" shares, 20% of PLB's stock, were held by PCA, the Plantagenet Delaware entity that did not have an interest in PPSA. For the money launderer's purposes of "breaking the paper trial", PPSA and PLB could not be subsidiaries of each other or subsidiaries of a parent company, as PPSA would sell what PLB had purchased. Attached as Exhibit H to this

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

complaint and incorporated herein by reference is a true and correct copy of a <u>Plantagenet</u> news release: "Plantagenet (PPSA) sells leading French Champagne producer to Levant".

36.    The CHAMPAGNE Scheme:  Plantagenet would use the cash and the kickback to capitalize and finance PLB.  PLB would purchase SCEV and then transfer 20% of SCEV shares to Lemal to be held for the Rapeneaux.  After Raulet had used the proceeds of the bakery sale to set up and capitalize Compagnie des Vins du Levant, PLB would transfer 80% of the shares to Levant.  Levant would pay PPSA, not PLB, the double for what PLB had paid for the shares of SCEV, and Lemal would transfer his 20% of SCEV to the Rapeneaux.

a)    The Defendants would cover up the money laundering by framing the Plaintiffs for tax evasion of amounts that exactly corresponded to the sums of money being laundered. Further, the Defendants would reply upon corrupted Treasury officials to steal the documents that could reveal their criminal activity.  Attached as Exhibit I to this complaint and incorporated herein by reference is a true and correct copy of attorney Alice Seebach's letter to the French Fiscal Brigade.

b)    Wrongdoer Marie-Claude Simon's blatant betrayal of her US clients gave the Prosecutor of the French Republic cause to join two criminal actions, the first for money laundering and corruption, and the second for fraud and receiving stolen goods.  Attached as Exhibit J to this complaint and incorporated herein by reference is a true and correct copy of the "Order to Join" issued by the French criminal court of Paris. Attached as Exhibit J-1 to this complaint and incorporated herein by reference is a translation of the "Order to Join"..

37.    The BAKERY Scheme: PPSA would use Levant's override to purchase SA Pain et Force and go into business with SA Raulet.  Afterwards, by one means or another, PPSA

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 905
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

1    and/or SA Pain et Force, would return the laundered money to its French owners.

2        38.    The Conspiracy to Launder Money: Sometime before August 1998, the

3    Defendants, knowingly and intentionally, entered into an agreement to pursue a money

4    laundering scheme and conspired to use the wires and mails in the furtherance of said

5    scheme.  The distances separating the sundry co-conspirators (ie. between California,

6    Delaware, Cayman Islands, France, and Luxembourg) made face–to-face contact inefficient

7    and the use of the wires and mails, in furtherance of their criminal schemes, was part and

8    parcel of the Defendants' plan.  The purpose of the conspiracy was to the economic benefit

9    of the Defendants, and the usurpation of the Plaintiffs commerce in Champagne LeBrun

10   was necessary to fuel and perpetuate the Defendant's money laundering activity.  While, the

11   Defendants money laundering took place outside the United States, it was the use of the US

12   mails and wires in furtherance of these schemes that proximately damaged the Plaintiffs.

13                                    **ENTERPRISE**

14       39.    At all times material to this complaint the association-in-fact of the parties

15   involved in the CHAMPAGNE and BAKERY money laundering schemes, collectively,

16   constitute an "enterprise".  This enterprise has been, and continues to be, the beneficiary of

17   the aforementioned schemes, and was engaged in, and the activities of which affected,

18   interstate and foreign commerce.  During the relevant times, the enterprise acted as a

19   continuous unit, with a distinct chain of command, and constitutes an entity separate and

20   apart from the alleged pattern of racketeering.  The conduct of the enterprise's affairs has

21   been, and continues to be, managed and controlled by the Defendants in the manner and

22   means which are described herein.

23       40.    The enterprise adapted and its activities expanded to emerging threats.  In the

24   events leading up to Hauchart's trial, and eventual conviction for money laundering, the

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

Defendants bribed the Plaintiff's lawyer, Marie-Claude Simon, and accused them of crimes. The Plaintiffs' fight to keep out of jail and to untangle the forged exhibits introduced by Simon ultimately revealed the Defendants' money laundering schemes to the Prosecutor of the French Republic.

### THE CHAMPAGNE SCHEME

41.   The CHAMPAGNE Scheme was divided into three parts: (1) a scheme to launder 18MF through the purchase and sale of the shares of SCEV; (2) a scheme to fund the money laundering operations with the proceeds of the Plaintiff's commerce in Champagne LeBrun; and (3) a scheme to frame the Plaintiffs for 18MF in back taxes by having Lagune issue fictitious tax exempt invoices in Gidding's name.

42.   The French Penal Code, Articles 324-1 and 324-1, makes no distinction between money laundered by criminals, politicians, or tax evaders, it is sufficient that the origin of the money is "unknown" for the act to be criminalized.  The steps of the Defendant's scheme to launder 18MF are described by the Patriot Act, and can be visualized with the diagram attached to this complaint as Exhibit K.  Attached as Exhibit K to this complaint and incorporated herein by reference is a true and correct copy of this diagram.

(a)   *Placement*: *The aims of the launderer are to remove the cash or funds from the location of acquisition so as to avoid detection from the authorities and to transform it into other asset forms*.  Hauchart acquired the shares of SCEV with cash and the promise of a 15MF payment.  PLB was capitalized with 3MF in cash and financed with a deposit of 15MF.

(b)   *Layering*: *The concealment or disguise of the ownership of the funds by creating complex layers of financial transactions designed to disguise the audit trail and*

SECOND AMENDED COMPLAINT

-12-                    Case No. C-7-04755-JW

*then to transform it into other asset forms.*  PLB used the 18MF to acquire the shares of SCEV, transferred 3MF of SCEV's shares (20%) to Lemal and 15MF of SCEV's shares (80%) to Levant.

(c)     ***Integration***: *The money is integrated into the legitimate economic and financial system and is assimilated with the other assets in the system.*  Levant paid PPSA 29MF for the 80% of shares of SCEV.  PPSA used the override to purchase SA Pain et Force, and went into the bakery business with SA Raulet.  PLB was liquidated and Levant and Lemal transferred their shares of SCEV to the Rapeneaux.

43.     There are no authentic documents in a money laundering scheme and the Defendants produced three forged contracts to "legitimize" the laundering of 18MF.

(a)     "Contract of Sale": showing that the LeBrun family sold 100% of the shares of SCEV to PLB and PPSA. This document removes Hauchart from the transaction.

(b)     "Contract of Guaranty": showing that PLB and PPSA were the Guarantors of the sale of 100% of SCEV to Levant.  This document removes PLB's transfer of 20% of the shares of SCEV to Lemal.

(c)     "Covenant": showing that PPSA, as the seller of 100% of SCEV, was entitled to receive 29MF from Levant.  This document removes PLB from the transaction.

## A.   Scheme to Launder 18MF

### Placement

44.     On or about August 19, 1998, PCM and Lemal incorporated PPSA in Paris.

45.     On or about December 18, 1998, Hauchart acquired control of the shares of SCEV.

46.     On or after December 28, 1999, Anderson placed 3MF with the ABN AMRO Bank of Luxembourg to capitalize PLB.  The shareholders of PLB were PCF-1, PCF-2 and

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

PCA; Anderson and Zappettini were the directors.

47.   On or after December 28, 1998, Raulet deposited 15MF ($2,564,484) in the ABN AMRO Bank of Luxembourg to finance the purchase of SCEV.

48.   On January 19, 1999, PLB was incorporated, opened an account at the ABN AMRO Bank, and gained access to the 18MF.

**Layering**

49.   On or after January 19, 1999, Hauchart transferred 100% of the shares of SCEV to PLB, and kept one share for himself.

50.   On or around February 22, 1999, PLB paid for the shares of SCEV.  Francois Le Brun, announced to Gidding that he no longer owned SCEV and that Anderson did.

51.   On or around March 15, 1999, PLB transferred 10% of the shares of SCEV to Lemal, and another 10% on April 13, 1999 for a "sellers credit" bringing the total value of the shares to 3.1805MF.  Anderson faxed the second transfer to PLB's lawyers in Marin County California.

52.   On or around March 2, 2000, PLB transferred its remaining 80% of SCEV to Levant.

**Integration**

53.   On or around March 2, 2000, Levant paid 29MF to PPSA.

54.   On or around March 2, 2000, PPSA purchased the shares of SA Pain et Force and went into business with SA Raulet (the BAKERY Scheme).

55.   On or about April 7, 2000, Zappettini liquidated PLB.  PLB's assets and liabilities were distributed to its shareholders PCF-1, PCF-2, and PCA.

56.   On or about July 23, 2003, SA Financier ER, a Rapeneaux company,  acquired Levants 80%, Lemals 20%, and Hauchart's one share on SCEV.

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

57.    On or around December 23, 2003, SA Financier ER transferred 100% of the shares of SCEV to Reniers.

## B. Scheme to Fund the Enterprise

58.    On October 28, 1998, Zappettini telephoned Pivotal to acquire samples for the agents who were replacing the Plaintiffs and to learn about Pivotal's commerce in Champagne.

59.    On or after October 28, 1998, Zappettini faxed the commercial information he had gleaned from Pivotal to Anderson and Lemal.

60.    On or before December 21, 1998, Zapettini appointed Erica Valentine to replace Gidding. Erica Valentine searched for an importer to replace Pivotal and mailed her findings to Zappetini.

61.    On or about February 22, 1999, SCEV signed a contract with PPSA, giving PPSA control over the distribution of Champagne LeBrun in the United States.

62.    On or about February 25, 1999, Lemal sent Hauchart a memo with instructions to breach Gidding's agency with SCEV. Lemal faxed this memo to Zappettini and to Dominion Wines and Erica Valentine, the agents who were replacing Pivotal.

63.    On or about March 15, 1999, Erica Valentine faxed Pivotal the increased prices and reduced quantities of their orders of Champagne LeBrun and, in so doing, breached SCEV's delivery contracts.

64.    On or about May 25, 1999, Anderson mailed a letter to Gidding that confirmed SCEV's breach of their delivery contracts.

65.    On or about June 9, 1999, Anderson mailed a letter to Gidding stating: "while it is true that Plantagenet has made an investment in Champagne LeBrun, under the arrangement we have with our French partners who originally identified the opportunity and

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

1    performed the necessary due diligence and term sheet in order for us to invest, we have

2    assigned operational responsibility to them".

3        66.    On July 1, 1999, Plaintiff's filed suit in the Superior Court of California, County

4    of Los Angeles ("Los Angeles Court") against PCM and SCEV.  The suit sought

5    $1,327,243 in lost profits and prejudgment interest.

6

7        67.    On or about April 7, 2000, Zappettini liquidated PLB for the benefit of its

8    shareholders PCF-1, PCF-2, and PCA.

9        68.    On or about June 28, 2000, PCM produced a forged "Contract of Sale" as

10   exhibit "PNET 00131" before the Los Angeles Court.

11       69.    On or around February 26, 2001, Anderson faxed Lemal and asked him to

12   secure a power of attorney from Raulet giving Anderson control of SCEV for the Los

13

14   Angeles litigation.

15       70.    On or around February 27, 2001, Raulet faxed a power of attorney to Anderson

16   that gave Anderson control of SCEV's interests in the Los Angeles litigation.

17       71.    On April 24, 2001, the Los Angeles court rejected PCM's and SCEV's motions

18   for summary judgment.

19

20       72.    On May 2, 2001, the Plaintiffs moved to amend the Los Angeles complaint to

21   add PPSA and PLB as Does of PCM.  At this moment, the litigation threatened PPSA.

22       73.    On or about June 4, 2001, Anderson used Raulet's powers of attorney to replace

23   SCEV's lawyer with himself.  Anderson is not a lawyer in any state and had no intention of

24   finding a new lawyer for SCEV.

25

26       74.    As previously stated, the Defendants and Wrongdoers produced three forged

27   contracts to legitimize PLB's purchase and PPSA's sale of the shares of SCEV. **(¶43)**.  In

28   order to shield PPSA, the repository of the proceeds of the money laundering activity, the

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

1    Defendants removed all mention of PPSA from the previously forged contracts.

2         (a)    The forged "Contract of Sale" showing that the LeBrun family sold SCEV

3    to PLB and PPSA was replaced by the "analysis of SCEV's share register" with no mention

4    of PPSA.

5         (b)    The forged "Contract of Guaranty" showing that PLB and PPSA were the

6    Guarantors of the sale of SCEV to Levant was altered, PPSA was cut out leaving only PLB.

7

8         (c)    The forged "Covenant" showing that PPSA was entitled to receive 29MF

9    from Levant was altered, PPSA was cut out and PLB was pasted in.

10        75.    Between May 5-11, 2001, a copy of the forged Covenant was faxed back and

11   forth between the offices of PPSA and SCEV.  PPSA was cut out of the Covenant, PLB was

12   put in, and the signatures of Anderson and Raulet were forged.  Plaintiffs allege that

13   telephone calls between Anderson and Raulet were necessary to coordinate the altering of

14   Covenant.

15

16        76.    Plantagenet needed to settle PPSA out of the Los Angeles litigation and, at the

17   same time, needed to gather the signed drafts necessary to forge a settlement agreement

18   without PPSA.  Hartford, Plantagenet's insurer, was able to accomplish this by:

19

20        (a) On or around September 10, 2001, Hartford faxed the Plaintiffs an offer to

21   settle for PCM.  The Plaintiffs accepted, signed and returned the initial offer.

22        (b)    On or around September 15, 2001, Hartford faxed the Plaintiffs an offer to

23   settle for PLB and PCM.  The Plaintiffs accepted, signed and returned the second offer.

24        (c)    On or around September 20, 2001, Hartford faxed the Plaintiffs an offer to

25   settle for PPSA, PLB, PCM, Anderson and Zappettini.  After the Plaintiffs accepted, signed

26   and returned the third offer, Hartford accepted and signed their own agreement.  The

27   authentic Hartford Settlement agreement is dated September 20, and was signed by Hartford

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

28

1    and Gidding on September 21, 2001.

2        77.    On or about September 12, 2001, Anderson notified the court that he had

3    substituted himself for SCEV's lawyer on June 4, 2001 (**¶72**).   The Plaintiff's, in order to

4    defend themselves against frauds on the parts of Anderson and Hartford, chose a French

5    attorney, Marie-Claude Simon.  The plaintiffs had Simon alert SCEV that they were no

6    longer represented in the Los Angeles litigation.  What the Plaintiffs did not know was that

7    Simon worked closely with FIDAL, the law firm that represented SCEV and Lagune.

8        78.    On or about September 24, 2001, a Contract of Guaranty was altered to remove

9    PPSA and faxed to Raulet.  Plaintiffs allege that telephone calls between Anderson and

10   Raulet were necessary to coordinate the altering of Contract of Guaranty.

11       79.    On or about September 28, 2001, Anderson faxed Raulet to inform him that the

12   only Contract of Guaranty was his personal one.

13       80.    On December 6, 2001, it was the courts decision to condemn SCEV to pay the

14   Plaintiffs $1,536,543 with 10% annual interest.  SCEV did not appear in Court on

15   December 3, 2001, the trial was postponed for a day and, as SCEV had previously waived a

16   trial by jury, a three day court trial, with witnesses and expert testimony, has held.

17   Anderson, SCEV's attorney of record, did not appear.

18       81.    On or about January 7, 2002,  Raulet mailed a letter to Anderson that confirmed

19   Anderson's personal Contract of Guaranty.

20       82.    On or before January 30, 2002, Raulet sued PLB in Luxembourg to disguise his

21   15MF deposit as PLB's indemnification as stipulated in the altered Contract of Guaranty.

22   The Luxembourg judgment indicates that Raulet based his claims upon a California

23   judgment entered on December 3, 2001.  There is no such judgment. The Plaintiffs allege

24   that Anderson faxed a forged "December 3, 2001 Judgment" to Raulet.

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

83.    On or around March 2002, Raulet conveyed SCEV's stocks of champagne to SA Charles de Cazanove (Cazanove-A), a firm next to the Rapeneaux winery and owned by Thierry Lombard.

84.    On or around September 5, 2002, Simon, representing the Plaintiffs, filed a demand in the Tribunal de Grande Instance de Chalons-en-Champagne ("Chalons Court") to have the California judgment validated in France.  SCEV was represented by FIDAL.

85.    On or about September 20, 2002, SCEV moved to retry the Los Angeles litigation.  In support of SCEV's motion, Raulet made a false declaration to the Superior Court of California.

86.    On or about October 1, 2002, Deniza Kudish mailed copies of Raulet's Declaration, a redacted copy of the altered Contract of Guaranty, Anderson's letter of September 200, and Raulet's letter of January 2002, to the Plaintiff's U.S. attorney, Alice Seebach ("Seebach").

87.    On or about May 12, 2003, Raulet, Levant, and SCEV, brought criminal charges against the Plaintiffs, accusing them of signing a secret settlement agreement with PLB that was the proximate cause of SCEV not being represented at the close of the Los Angeles litigation.

88.    On or about March 12, 2003, Simon's partner, Raphael Kroon, telephoned Gidding and pretended that the Chalons Court was compelling the Plaintiffs to produce a copy of the settlement agreement.  Gidding faxed the settlement agreement to Kroon.

89.    On or about July 23, 2003, Simon and Hauchart arranged for 100% of the shares of SCEV (80% from Levant, 20% from Lemal, and one share from Hauchart) to be transferred to Financier ER, a company belonging to the Rapeneaux.

90.    On or before September 7, 2003, FIDAL (SCEV's lawyers) had a Marie-Claude

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

Bertrand create a French translation of a settlement agreement without PPSA ("Bertrand Translation"), post date her work to September 30, 2003, and give the translation to Simon. The artifice of postdating the Bertrand Translation allowed Simon the time to introduce the phony exhibit instead of the authentic exhibit.

91.    On Friday, September 12, 2003, Simon faxed Seebach a request that copies of the settlement agreement were required to meet a court ordered "September 16" deadline. There was no court order or deadline.  Further, Simon asked Seebach to fax and mail her copies of the settlement agreement "dated September 20, 2001".  Gidding had already provided such on March 12, 2003 (¶87).

92.    On or after September 14, 2003, Seebach, as stipulated in paragraph 11 of the settlement agreement, faxed Hartford's attorneys and informed them that the settlement agreement would be produced before the Chalons Court.  Seebach then mailed and faxed copies of the settlement agreement to Simon's offices in France.

93.    On or before September 16, 2003, Simon stamped the Bertrand Translation, "Simon Exhibit #18", and filed it with the Chalons Court.  From this moment on, Simon openly ceased to represent the plaintiffs.

94.    On or about November 25, 2003, Raulet used the Bertrand Translation to bring additional criminal charges against the Plaintiffs.

95.    On or after December 23, 2003, Financier ER transferred its shares of SCEV to Renier.  Raulet elected the Rapeneaux as the new officers and directors of SCEV.  The Rapeneaux changed the name of SCEV to SA Charles de Cazanove ("Cazanove-B") and moved Cazanove-B to their headquarters in Reims.

96.    On or around January 1, 2004, Rapeneaux elected Thierry Lombard, the owner of Cazanove-A, as a director of Cazanove-B.  From this moment on "SCEV" ceased to exist

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

and could not be found at its Chalons headquarters.  There were two "Cazanoves", neither of which was in Chalons, and the Plaintiffs had no lawyer or adversary in the Chalons court.

97.    On or about June 28, 2004, Thierry Lombard, acting as the president of Cazanove-A, mailed a letter to Pivotal and informed them that Cazanove-A had "no relationship to SCEV or the Rapeneaux."

98.    On or around September 22, 2004, "SCEV Chalons" moved to join PLB as a party to the Chalons suit. The Plaintiffs were not informed and the motion passed unopposed.

99.    On or about February 14, 2005, "SCEV Chalons" mailed the Plaintiffs the notification of a September 2000 Judgment, four years to late for the judgment to have any effect.  The judgment condemned Pivotal to sequester 115,000€in France.

100.    On or about March 23, 2006, Cazanove-B used the US mails to serve Pivotal with a default Judgment condemning Pivotal to sequester 115,000€in France or pay 750€day for every day they refused to honor the Judgment.

101.    On or about November 22, 2006, Cazanove-B moved to have PLB pay the plaintiffs should the Chalons court validate the California judgment.  As the Plaintiff's had not opposed PLB's becoming a party to the complaint, there was little room to argue.  The Plaintiff's abandoned their attempt to validate the California Judgment and sued for RICO.

## C.  Scheme to Frame

102.    Gidding had two functions for Lagune, he was their commissioned agent for sales of Champagne Ayala and Montebello, and he had a consulting contract to direct their export activities.  Further, Mrs. Gidding's companies, Axis Bordeaux SARL and Vinesmith SA, bought and sold both champagnes.  The wines of Chateau La Lagune, a Bordeaux winery, were sold through a complicated system of tax-exempt contracts for future delivery

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

known as "Bordeaux Futures".

103.  On or around November 15, 1998, Lagune issued two sets of tax exempt invoices in Gidding's name: one set totaling 3MF and the other set totaling 15MF.  Alain Ducellier asked Gidding to accept the transaction but, as Gidding did not have the commercial licenses to accept tax exempt invoices in his own name, he refused.  The originals and copies of these invoices were subsequently stolen from Mrs. Gidding's home in France by Treasury officials.

104.  On or around December 7, 1998, Lagune issued similar sets of tax-exempt invoices, this time offering more wine for the same amount.  Gidding refused to accept unless the goods were correctly invoiced to the eventual buyer.  The originals and copies of these invoices were stolen at the same time as the previous set, however copies of two if these invoices were attached to an earlier report and saved.

105.  On or around December 18, 1998, Alain Ducellier attempted to pressure Gidding to accept the 18MF of tax exempt invoices, offering advantageous terms and more such deals in the future. When Gidding refused to accept, Alain Ducellier wrote out what he thought was the Rapeneaux's plan to use the Lagune invoices to finance his pending divorce from their sister.

106.  On or around December 21, 1998, Alain Ducellier publicly denounced the Rapeneaux for manipulating the finances of Lagune and had circular letters distributed to this effect.  These letters were mailed to Lagune and Gidding.  Three days later, Alain Ducellier was replaced by a court appointed administrator, Jean-Luc Mercier ("Mercier"), who entered the tax exempt invoices on Lagune's books as real sales to Gidding, and ordered Lagune to ship the first lot of wines to Gidding.

107.  On or before April 13, 1999, Mercier, after having failed to make Gidding

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

accept the Lagune invoices, and not being able to retake the wines without revealing the fraud, doubled the amount of wine on the 3MF set of invoices, increased the price by 5.186% and issued the invoices in the name of Axis Bordeaux SARL. (A court appointed administrator receives a 5% commission on all sales and there is an 18.6% value added tax on commissions.) The Lagune invoices totaled 3.1805MF. Lagune mailed copies of the invoices to Gidding.

108. While Mercier was reissuing the Lagune invoices, Anderson increased Lemal's holdings of shares of SCEV to 20.012% bring the value of these shares to 3.1805MF (¶**50**). The probability of a coincidence that the French Franc amount generated by Anderson's transfers of shares of SCEV to Lemal equaled the French Franc amount generated by Lagune's invoices to Gidding is too close to zero to be measured. Otherwise stated, it is certain that the similar amounts were coordinated by telephone calls between Anderson, Lemal, and the Rapeneaux, and that Plantagenet was involved in all three facets of the CHAMPAGNE Scheme.

109. On or about April 22, 2000, Gidding wrote to Mercier and told him to stop the invoicing schemes and to retake the wines. Mercier refused to retake the wines and withheld Gidding's commissions and consulting fees.

110. On or around July 29, 1999, Champagne Montebello faxed Pivotal asking that Vinesmith be given permission to pay Pivotal's invoices.

111. On or before August 8, 1999, Mercier had an Export Report drawn up that implicated Gidding, Pivotal, and Vinesmith, in a Fiscal Fraud and faxed the report to Pivotal.

112. On or about November 19, 1999, Mercier sent Gidding a tax exempt 200,000F check for Gidding's consulting fees in 1999. Gidding cannot accept a tax exempt check and

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

1    sent it back.

2        113.  On or about January 17, 2000, Gidding sent Champagne Ayala's lawyer a

3    summary of his 1998-1999 commission accounting, totaling 1,750,410.14F, and consulting

4    fees, totaling 540,000F.

5        114.  On or about March 21, 2000, Champagne Ayala refused to pay Gidding his

6    commissions or consulting fees, and accused him of tampering with Lagune's invoices.  On

7    April 1, 2000, SA Group Frey acquired he Ducellier interest in Lagune, sold off the

8    Champagne companies, and refused to pay Gidding's commissions or consulting fees.

9        115.  On November 15, 2000, Treasury officials raided Madeleine Gidding's home

10   and stole the originals and copies of the Lagune invoices and Gidding's "AYALA - SCEV"

11   dossiers. When the Gidding's refused to sign false reports that would dissimulate the theft,

12   the Treasury officials resorted to outrage, violence, and threats of retaliation, to compel the

13   Gidding's to sign.  Madeleine Gidding broke down and signed, John Gidding refused.

14        116.  On or about October 18, 2001, Treasury officials accused Gidding, Pivotal,

15   Madeleine Gidding and Vinesmith of fiscal fraud and invoked Article 15 of the French

16   American Tax Treaty in order to receive assistance from the IRS.  The denunciation was

17   mailed to the Embassy of the United States and forward to the IRS in California.

18        117.  On or about December 18, 2001, Treasury officials mailed a summons to

19   Gidding asking him to come to France for an examination of his French taxes.

20        118.  On or about October 9, 2002, Albert Bront, an International Examiner for the

21   IRS in California, complied with the French demands, mailed Gidding a list of questions,

22   and had Gidding and Pivotal audited.

23        119.  On or about November 15, 2002, Gidding replied to the IRS's demands.

24        120.  On or about November 19, 2002, the IRS subpoenaed Gidding's bank records at

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

the Wells Fargo Bank, and Wells Fargo mailed the request to Gidding.

121.  On or about January 7, 2003, Gidding retained the services of attorney Harvey Gilbert ("Gilbert") to defend him against the French demands.

122.  On of about January 31, 2003, Gilbert wrote to Albert Bront of the IRS and invoked Gidding's rights under the French American Tax Treaty.  As the French Government had invoked the same Treaty, the Treaties conditions relative to double taxation apply to all disputes.

123.  On of about January 31, 2003, Gilbert wrote to Albert Bront of the IRS and invoked Pivotal's rights as guaranteed by the French American Tax Treaty.  As the French Government invoked the same Treaty, the Treaties conditions relative to double taxation apply to all disputes.

124.  On or about June 30, 2003, Treasury officials sent "Pivotal SARL" a "French corporation headquarter in Champagne", a demand for 48,486€in back French Taxes.  The demand was sent to Mrs. Gidding in France.

125.  On September 25, 2003, Gilbert wrote to the French Treasury officials and informed them that Gidding was protected from double taxation by the French American Tax Treaty.

126.  By the close of 2003, the French Treasury Department had obtained a copy of Mercier's "Export Report" (¶111) and used it to accuse Gidding, Pivotal, and Vinesmith, of evading French taxes.  The total of Gidding's and Pivotal's back taxes were equal to the December 7, 1998 Lagune invoices, and the total of Vinesmith's back taxes were equal to Raulet's deposit of $2,564,484 in the ABN AMRO Bank.

127.  On or about December 18, 2003, Treasury officials attached to the French Embassy in Washington DC mailed Gidding a notice to pay 308,970€in French Taxes for

BIRNBERG & ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

-25-                                        Case No. C-7-04755-JW

the years 1998-1999-2000.  This demand is a Violation of a US Treaty.

128.  On or about January 16, 2004, Gidding wrote to the French Treasury officials and summed up the Defendants involvement in money laundering and corruption.

129.  On January 21, 2004, Gidding demanded the French Treasury officials to produce "a copy of the judgment you feel gives you the right to forcibly collect 308,970€ (as) any such tax judgment would have to have been obtained without my knowledge and therefore by fraud."

130.  On or about April 20, 2004, French Treasury officials mailed "Pivotal SARL", a summons to pay 48,485€ in back French Taxes.  The demand included the threat to have Pivotal's assets liquidated should they not pay in eight days.  This demand is a Violation of a US Treaty.

131.  On or about December 13, 2004, the IRS mailed Pivotal a "FIRST NOTICE - requesting that Pivotal pay their income tax liability to the Government of France as described in the enclosed Foreign Tax Assessment Certificate 98-MCA-11691."

132.  On or about May 2, 2005, the Plaintiffs sent the IRS the complete dossier detailing the money laundering, fraud, corruption, and the French Treasury official's use of forged judgments.

133.  On or about May 4, 2005, the IRS closed the file on the French Treasury's demands against the Plaintiffs and ended their assistance to collect any French claims.

134.  On or around September 29, 2005, French Treasury officials mailed an inquiry to Gidding asking if he had received "something bearing the reference number 8497". Gidding replied that he had received nothing.

135.  On or about February 7, 2007, the French Treasury department mailed Gidding a demand to pay 314,089€ in back French taxes, accompanied by orders to pay or be

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

imprisoned for debt.  This demand is a Violation of a US Treaty.

136.  On or before April 23, 2007, Mr. Demangeat, a Treasury official attached to the French Embassy in Washington DC, telephoned Gidding and told him to pay 314,089€to the French government or risk imprisonment.

## VIII.  THE PATTERN OF RACKETEERING ACTIVITY

137.  The Defendants relied on the use of the wires and US mails to coordinate the laundering of 18MF, to distribute the proceeds of unlawful activity, and to ruin and frame the Plaintiff's for crimes they did not commit. [All theories and definitions of fraud exclude the case where the primary act is legal.]  With this reasoning, Plaintiffs allege damages based on theories of RICO are a result of the manipulations of enterprises in furtherance of criminal schemes.  Further, Plaintiffs allege that the Defendants were involved in at least two predicate acts, occurring between October 28, 1998 and continuing through the filing of this complaint, all of which had the same or similar purposes, results, participants, victims, and methods of commission, all of which constitute a "pattern" of racketeering.

138.  During the relevant times, Defendants engaged in a pattern of racketeering activity, and conspired together to engage in such a pattern.  They schemed to commit acts of mail fraud and wire fraud, in violation of 18 U.S.C Sections 1341, 1343.  These acts of mail fraud and wire fraud were designed to, through misrepresentations and material omissions, deprive plaintiffs Gidding and Pivotal of money and property, that is, their duly obtained judgment against SCEV in the Los Angeles County Superior Court and their duly earned commissions and consulting fees owed by Lagune.  Further, these acts of mail fraud and wire fraud were designed to damage, scare, silence, and intimidate, Mr. and Mrs. Gidding by threatening them with fines and incarceration.

139.  It was part of the Scheme to Launder 18MF that the Defendants intentionally

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

and knowingly forged contracts that concealed the origins of the moneys PLB used to purchase the shares of SCEV and concealed the fact PPSA was paid for the shares they did not purchase.  Further, it was part of the Scheme to Launder 18MF that the Defendants intentionally and knowingly used the wires and US mails to execute their scheme.  Without the use of the wires and US mails it would have been impossible for the Defendants to coordinate a money laundering operation between individuals and corporations located in California, Delaware, the Cayman Islands, Luxembourg and France.

140.  It was part of the Scheme to Fund the Criminal Enterprise that the Defendants intentionally and knowingly usurped the Plaintiff's commerce in Champagne LeBrun, evaded the California Judgment, bribed Simon, and rendered SCEV judgment proof in France.  Further, it was part of the Scheme to Fund the Criminal Enterprise that the Defendants intentionally and knowingly used the wires and US mails to execute their scheme.  Without the use of the wires and US mails it would have been impossible for the Defendants to have altered the forged contracts, conveyed such frauds to the Plaintiff's and their attorneys, and served default judgments upon the Plaintiffs; all of which nullified the Plaintiffs attempts to validate the California Judgment in France.

141.  It was part of the Scheme to Frame that the Defendants intentionally and knowingly caused Lagune to repeatedly issue 18MF of fictitious invoices in the Plaintiffs names, bribed Mercier, and caused officials of the French Government to tax the Plaintiffs for sums they knew to be false.  Further, it was part of the Scheme to Frame that the Defendants intentionally and knowingly used the wires and US mails to execute their scheme.  Without the use of the wires and US mails it would have been impossible for the Defendants to have involved the IRS in their attempts to silence and ruin the Plaintiffs.

142.  Defendants used the wires and mails or, by their scheme, caused them to be

SECOND AMENDED COMPLAINT

-28-    Case No. C-7-04755-JW

used, on a repeated basis, as part of their racketeering activity and multiple acts of mail and wire fraud.

(a)    In particular the US mails were used, among other times, on the following occasions:

i)    December 21, 1998 - Erica Valentine (Napa, CA) mailed a letter to Zappettini (San Francisco, CA);

ii)    December 24, 1998 - Alain Ducellier (Mutigny, France) mailed a letter to Gidding (Pasadena, CA);

iii)    April 16, 1999 -  Lagune (Ludon-Medoc, France) mailed an invoice to Gidding (Pasadena, CA);

iv)    May 25, 1999 -  Anderson (Paris, France) mailed a letter to Gidding (Pasadena, CA);

v)    June 9, 1999 - Anderson (San Francisco, CA) mailed a letter to Gidding (Pasadena CA)

vi)    October 18, 2001 - the Fiscal attaché to the American Embassy (Paris France) mailed a letter to the IRS (Fresno, CA)

vii)    December 18, 2001 - Treasury officials (Amiens, France) mailed a summons to Gidding (Pasadena, CA);

viii)    January 7, 2002 - Raulet (Paris, France) mailed a letter to Anderson (San Francisco, CA);

ix)    October 1, 2002 - Deniza Kudish (Los Angeles, CA) mailed a letter to Plaintiffs attorney Alice Seebach (Los Angeles, CA);

x)    October 9, 2002 - the IRS (Sacramento, CA) mailed a demand to Gidding (Pasadena, CA);

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

xi)    November 19, 2002 - Wells Fargo Bank (Pasadena, CA) mailed a summons to Gidding (Pasadena, CA);

xii)    September 14, 2003 - Alice Seebach (Los Angeles, CA) mailed a letter to Simon (Reims, France);

xiii)    December 18, 2003 - the French Fiscal attaché (Washington DC) mailed a demand to Gidding (Pasadena, CA);

xiv)    April 20, 2004 - French Treasury officials (Soissons, France) mailed a demand to Pivotal (North Hollywood CA);

xv)    June 28, 2004 - Thiery Lombard (Epernay, France) mailed a letter to Pivotal (Glen Ellen, CA);

xvi)    December 13, 2004 - the IRS (Washington DC) mailed a demand to Pivotal (North Hollywood, CA);

xvii)    February 14, 2005 - SCEV's attorneys (Reims, France) mailed a Judgment to Pivotal (Glen Ellen, CA);

xviii)    September 29, 2005 - the French Post (Soissons, France) mailed a request to Gidding (San Francisco, CA);

xix)    March 23, 2006 - SCEV's attorneys (Reims, France) mailed a Judgment to Pivotal (Glen Ellen, CA);

xx)    February 7, 2007 - the French Treasury Department (Soissons, France) mailed a demand to Pivotal (Glen Ellen, CA)

(b)    In particular the wires were used, among other times, on the following occasions:

i)    October 28, 1998 - Zappettini (San Francisco, CA) telephoned Pivotal (North Hollywood, CA);

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

ii)    October 28, 1998 - Zappettini (San Francisco CA) faxed Lemal (Paris, France);

iii)   February 25, 1999 - Lemal (Paris France) faxed Zappettini (San Francisco, CA);

iv)    March 15, 1999 - Erica Valentine (Napa, CA) faxed Pivotal (North Hollywood, CA);

v)     April 13, 1999 - Anderson (San Francisco, CA) faxed PLB's lawyer (Marin County, CA);

vi)     April 16, 1999 - Lemal (Paris, France) telephoned Anderson (San Francisco, CA);

vii)   July 29, 1999 - Champagne Montebello (Ay, France) faxed Pivotal (North Hollywood, CA);

viii)  August 8, 1999 - Champagne Montebello (Ay, France) faxed Pivotal (North Hollywood, CA);

ix)    February 26, 2001 - Anderson (San Francisco, CA) faxed Lemal (Paris, France);

x)     February 27, 2001 - Raulet (Chalons-en-Champagne, France) faxed Anderson (San Francisco, CA);

xi)    May 5-11, 2001 - Anderson (San Francisco, CA) telephoned Raulet (France);

xii)   September 10, 2001 - Hartford (Fresno, CA) faxed Seebach (Los Angeles, CA);

xiii)  September 15, 2001 - Hartford (Fresno, CA) faxed Seebach (Los Angeles, CA);

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

xiv)  September 20, 2001- Hartford (Fresno, CA) faxed Seebach (Los Angeles, CA);

xv)  September 24, 2001 - Anderson (San Francisco, CA) telephoned Raulet (France);

xvi)  September 28, 2001 Anderson (San Francisco, CA) faxed Raulet (Chalons-en-Champagne, France);

xvii)  January 2002 - Anderson (San Francisco, CA) faxed Raulet (Chalons-en-Champagne, France);

xviii) March 12, 2003 - Raphael Kroon, (Reims, France) telephoned Gidding (North Hollywood, CA);

xix)  September 12, 2003 - Simon (Reims, France) faxed Seebach (Los Angeles, CA);

xx)  September 14, 2003 Seebach (Los Angeles, CA) faxed Simon (Reims, France);

xxi)  April 23, 2007 a French Treasury official (Washington DC) telephoned Gidding (San Francisco, CA).

143.  As set forth above, the Defendants have engaged in a "pattern of racketeering activity", as defined in Section 1961(5) of RICO, by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above, within the past ten years.  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims.

144.  The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by Defendants, as described above, were related to each other and amount

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

1    to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern

2    of racketeering activity", as defined in 18 U.S.C. Section 1961(5).

3                                    **ENTERPRISE**

4

5        145.  Defendants carried out their pattern of racketeering activity through the

6    management of an enterprise consisting of an association-in-fact of venturers in a money

7    laundering scheme.  The Defendant's scheme affected foreign and interstate commerce.

8    This enterprise is separate and distinct from the pattern of racketeering activity alleged

9    herein.

10

11                          **USE OF THE MAILS AND WIRES**

12       146.  As alleged herein, in furtherance of and for the purpose of executing the scheme

13   and artifice to defraud, and through a pattern of racketeering activity, defendants, on

14   numerous occasions used and caused to be used mail depositories of the United States

15   postal service by both placing and causing to be placed mailable matter in said depositories

16   and by removing and causing to be removed mailable matter from said depositories, each

17   such use of the mails in connection with the scheme and artifice to defraud and to obtain

18   money by means of false pretenses, constituting the offense of mail fraud as proscribed and

19   prohibited by 18 U.S.C. Section 1341.

20

21       147.  During the relevant times, and in furtherance of and for the purpose of executing

22   the scheme and artifice to defraud, and through a pattern of racketeering activity,

23   defendants, on numerous occasions, used and caused to be used wire communications in

24   interstate and foreign commerce, by both making and causing to be made telephone calls,

25   transmission of faxes, and other wire communications, as proscribed and prohibited by 18

26   U.S.C. Section 1343.

27                              **FIRST CLAIM FOR RELIEF**

28

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

1

**(VIOLATION OF 18 U.S.C. SECTION 1962(c))**

2

148.  Plaintiffs incorporate and re-allege paragraphs 1 through 147, as though fully set

3

out herein.

4

149.  Gidding and Pivotal are "persons" within the meaning of 18 U.S.C. Sections

5

1961(3) and 1964(c).

6

150.  Defendants, Anderson, Zappettini, PCF-1, PCF-2, PCA, PCM, PLB, PPSA,

7

Lagune, Hauchart, Lemal, and DOES 1 through 100 inclusive are each a "person" within

8

the meaning of 18 U.S.C. Sections 1961(3) and 1964(c).

9

151.  An association-in-fact of venturers in a money laundering scheme. are an

10

"enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962(c), which

11

enterprise was engaged in and the activities of which affected interstate and foreign

12

commerce during the relevant times.

13

152.  Defendants Anderson, Zappettini, PCF-1, PCF-2, PCA, PCM, PLB, PPSA,

14

Lagune, Hauchart, Lemal, and DOES 1 through 100 inclusive were each associated with an

15

enterprise, that is an association-in-fact of venturers in a money laundering scheme, and did

16

conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise

17

through a pattern of racketeering activity within the meaning of 18 U.S.C. Sections

18

1961(1)(B) and 1961(E) and 1961(5) and 1962(c), to wit:

19

(a)    Multiple instances of mail fraud in violation of 18 U.S.C. Section

20

1341;

21

(b)    Multiple instances of wire fraud in violation of 18 U.S.C. Section

22

1343;

23

(c)    Multiple instances of forgery, perjury, and intentional

24

misrepresentations;

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

25

26

27

28

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

and

    (d)    Multiple instances of violation of a US Treaty.

153.  By reason of the violation of 18 U.S.C. Section 1962(c) committed by Defendants Anderson, Zappettini, PCF-1, PCF-2, PCA, PCM, PLB, PPSA, Lagune, Hauchart, Lemal, and DOES 1 through 100 inclusive, Gidding and Pivotal have suffered and are continuing to suffer in a yet to be determined amount, believed to be not less than approximately $8,000,000 within the meaning of 18 U.S.C. Section 1964(c).

### SECOND CLAIM FOR RELIEF

**(Violation of 18 U.S.C. Section 1962(d) by Conspiracy to Violate Section 1962(c))**

154.  Plaintiffs incorporate and re-allege the preceding paragraphs 1 through 153, as if fully set out herein.

155.  Gidding and Pivotal are "persons" within the meaning of 18 U.S.C. Sections 1961(3) and 1964(c).

156.  Defendants Anderson, Zappettini, PCF-1, PCF-2, PCA, PCM, PLB, PPSA, Lagune, Hauchart, Lemal, and DOES 1 through 100 inclusive are each a "person" within the meaning of 18 U.S.C. Sections 1961(3) and 1964(c).

157.  An association-in-fact of venturers in a money laundering scheme are an "enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate and foreign commerce during the relevant times.

158.  Defendants Anderson, Zappettini, PCF-1, PCF-2, PCA, PCM, PLB, PPSA, Lagune, Hauchart, Lemal, and DOES 1 through 100 inclusive were each associated with an enterprise, that is an association-in-fact of venturers in a money laundering scheme and did conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise

BIRNBERG & ASSOCIATES
703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

through a pattern of racketeering activity within the meaning of 18 U.S.C. Sections

1961(1)(B) and 1961(E) and 1961(5) and 1962(c), to wit:

        (a)     Multiple instances of mail fraud in violation of 18 U.S.C. Section

        1341;

        (b)     Multiple instances of wire fraud in violation of 18 U.S.C. Section

        1343;

        (c)     Multiple instances of forgery, perjury, and intentional

        misrepresentations;

        and

        (d)     Multiple instances of violation of a US Treaty.

159.  By reason of the violation of 18 U.S.C. Section 1962(c) committed by

Defendants Anderson, Zappettini, PCF-1, PCF-2, PCA, PCM, PLB, PPSA, Lagune,

Hauchart, Lemal, and DOES 1 through 100 inclusive, Gidding and Pivotal have suffered

and are continuing to suffer in a yet to be determined amount, believed to be not less than

approximately $8,000,000 within the meaning of 18 U.S.C. Section 1964(c).

160.  Defendants entered into an agreement with each other to join in the conspiracy

to violate 18 U.S.C. Section 1962(c).  Each defendant entered into an agreement to join the

conspiracy, and took acts in the furtherance of the conspiracy and knowingly participated in

the conspiracy.  The purpose of the conspiracy was to the economic benefit of the

defendants, and damage to the plaintiffs was a natural consequence of this conspiracy.  The

conspirators carried out the scheme and each conspirator was put on notice of the general

nature of the conspiracy, that the conspiracy extended beyond the individual role of any

single member, and that the conspiratorial venture functioned as a continuing unit for a

common purpose.  The defendants adopted the goal of furthering and facilitating the

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT
Case No. C-7-04755-JW

criminal endeavor.  Their stake in the criminal venture was in making profits, which they knew could come only from their informed and interested cooperation with each other, and their active assistance, stimulation, and instigation of money laundering, fraud, corruption, Treaty violations, and legal proceedings designed to place their frauds before the Courts of the United States, France and Luxembourg.

161.  Defendants, together with each member of the conspiracy, agreed and conspired to violate 18 U.S.C. Section 1962(c) by participating, directly and indirectly, in the operation and management of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.


### **PRAYER FOR RELIEF**

WHEREFORE, Gidding and Pivotal prays:

1.    That judgment be entered against Defendants Anderson, Zappettini, PCF-1, PCF-2, PCA, PCM, PLB, PPSA, Lagune, Hauchart, Lemal, and DOES 1 through 100 inclusive, each of them jointly and severally.

    a)  In an undetermined amount not less than Eight Million Dollars ($8,000,000) upon the First Claim for Relief, for violation of 18 U.S.C. Section 1962(c), the sum duly trebled in accordance with 18 U.S.C. Section 1964(c).

    b)  In an undetermined amount not less than Eight Million Dollars ($8,000,000) upon the Second Claim for Relief, for violation of 18 U.S.C. Section 1962(d) by conspiracy to violate 18 U.S.C. Section 1962(c), the sum duly trebled in accordance with 18 U.S.C. Section 1964(c).

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

2.  For the costs of suit including reasonable attorney's fees in accordance with 18 U.S.C. Section 1964(c).

3.  For equitable relief against Defendants in the form of such injunctive and related relief as might be appropriate in accordance with 18 U.S.C. Section 1964(a) including:

   a)  Reasonable restrictions on the future activities and investments of Defendants.

   b)  An equitable accounting for all benefits, consideration and profits received directly or indirectly or underlying, including but not limited to, the imposition of a constructive trust with tracing.

   c)  The imposition and execution of equitable liens.

   d)  Indemnification for any and all sums and losses that may be judged to be due or payable from Gidding and Pivotal as a consequence of the Defendants' conduct alleged herein.

   e)  Any restrictions which may be appropriate on future conduct or activities.

   f)  For disgorgement of all profits, monies and benefits received by defendants and each of them

4.  For prejudgment interest as is just and equitable

5.  Costs of suit incurred herein, and

6.  For such other and further relief that the Court determines to be just and proper.

BIRNBERG & ASSOCIATES

Dated: 2 June 2008                    By: _/s/ Cory A. Birnberg____
                                      Cory A. Birnberg
                                      Attorneys for Plaintiffs

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA. 94103

TEL (415) 398-1040
FAX (415) 398-2001

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

1

2

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury in this matter.

3

4

5

BIRNBERG & ASSOCIATES

6

7

Dated: 2 June 2008                    By: _/s/ Cory A. Birnberg____
                                          Cory A. Birnberg
                                          Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BIRNBERG &
ASSOCIATES

26

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103

27

TEL (415) 398-1040
FAX (415) 398-2001

28

SECOND AMENDED COMPLAINT

Case No. C-7-04755-JW

## VERIFICATION

I have read the foregoing **SECOND AMENDED COMPLAINT FOR**

**DAMAGES FOR: (1) RICO (U.S.C. 18 1962(c)); AND (2) CONSPIRACY TO**

**COMMIT RICO (U.S.C. 18 1962(d))** and know the contents thereof. I am an authorized

officer of PIVOTAL, INC and a plaintiff in this action. The matters stated in the foregoing

document are true of my own knowledge except as to those matters which are stated on

information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States pursuant to 28

U.S. C. § 1746 that the foregoing is true and correct.

Executed this 2nd day of June 2008 at Luxembourg.

John Gidding

IRNBERG & ASSOCIATES
703 MARKET STREET
SUITE 630
SAN FRANCISCO
CA, 94103

TEL (415) 288-1046
FAX (415) 288-2601

Plaintiffs' Verification                                         1                                        Case No. 7-04755