1   MATTHEW F. QUINT, ESQ.
    California Bar No. 54369
2   WILSON & QUINT LLP
    250 Montgomery Street, 11th Floor
3   San Francisco, California 94104
    Telephone: 415.288.6700
4   Facsimile: 415.398.1608
    Email: mfquint@aol.com
5
    Attorneys for Defendants
6

7                   UNITED STATES DISTRICT COURT

8                 NORTHERN DISTRICT OF CALIFORNIA

9
    JOHN GIDDING, an individual and          )   CASE NO.  C-07-4755 JSW
10  PIVOTAL INC., a California corporation,   )
                                             )   **PLANTAGENET DEFENDANTS' NOTICE**
11              Plaintiffs,                   )   **OF MOTION AND MOTION TO DISMISS**
                                             )   **PLAINTIFFS' SECOND AMENDED**
12         vs.                               )   **COMPLAINT; SUPPORTING**
                                             )   **MEMORANDUM OF POINTS AND**
13  DEREK ANDERSON, et al., and DOES 1       )   **AUTHORITIES**
    through 100, inclusive,                  )
14                                           )   Date:      August 29, 2008
                Defendants.                  )   Time:        9:00 A.M.
15                                           )   Courtroom: 2, 17th Floor
                                                 Judge:     Hon. Jeffrey S. White
16  _____

17         NOTICE IS HEREBY GIVEN to plaintiffs JOHN GIDDING and PIVOTAL INC. and to

18  their attorneys of record that on August 29, 2008, at 9:00 a.m., or as soon thereafter as the matter

19  may be heard, in Courtroom 2 of the United States District Court, Northern District of California,

20  located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California 94102, defendants

21  Derek Anderson ("Anderson"), Plantagenet Capital Management LLC, Plantagenet Capital

22  America LLC, Plantagenet Capital Fund LP, Plantagenet Capital Fund LP II, PLB Holdings SA

23  (PLB) and Plantagenet Partners SA (PPSA) (collectively, the "Plantagenet Entities") will, and

24  hereby do, move this Court to dismiss the Second Amended Complaint ("SAC") herein for failure

25  to state a claim under Fed. R. Civ. P. 12(b)(6) and for failure to effect service of process on PLB

26  and PPSA under Fed. R. Civ. P. 12(b)(5) on the following grounds:  Plaintiffs have not pleaded

27

28
                                              1

1   and cannot plead essential elements of their first claim for relief, for alleged violation of RICO, 18

2   USC §1962(c) or their second claim for relief, for alleged conspiracy to violate RICO, 18 USC

3   §1962(d); those claims should therefore be dismissed.  Additionally, neither PLB nor PPSA has

4   been sufficiently served with process.

5

6        The motion is based on this notice of motion, the accompanying memorandum of points

7   and authorities, the Declaration of C. Derek Anderson filed on January 31, 2008 (Doc. 20), the

8   papers, records and file herein, and all such evidence or argument as may be presented at the

9   hearing of the motion.

10

## STATEMENT OF ISSUES
(N.D. Cal. Civ L.R. 7-4)

11

12      1.    Are all moving defendants entitled to an order pursuant to Fed. R. Civ P. 12(b)(6)

13   dismissing the Second Amended Complaint for failure to state a claim against them?

14      2.    Are defendants PLB and PPSA entitled to an order pursuant to Fed. R. Civ

15   P(2)(b)(5) dismissing the claims against them for failure to effectuate service of process?

16   DATED: June _20_ , 2008.

17                   WILSON & QUINT LLP

18

19                   By _____

20                    Matthew F. Quint
                   Attorneys for Defendants Derek Anderson,

21                    Plantagenet Capital Management, LLC, Plantagenet
                   Capital America LLC, Plantagenet Capital Fund LP,

22                    PLB Holdings SA, and Plantagenet Partners SA

23

24

25

26

27

28                                2

## TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………..1

DISCUSSION AND SUMMARY OF THE ALLEGATIONS
OF THE SECOND AMENDED COMPLAINT………………………………………….3

      A. "Usurpation Of The Plaintiffs' Commerce In Champagne Le Brun"………….3

      B. InterferenceWith Plaintiffs' Ability To Collect
        Their California State Court Judgment Against SCEV………………………..5

      C. Scheme To Frame Plaintiffs For Tax Evasion……………………………...6

      D. Loss Of Lagune Commissions And Consulting Fees…………………………7

      E. The Money Laundering Claims…………………………………………..7

ARGUMENT……………………………………………………………………….8

    I. Plaintiffs Have Not Sufficiently Served Either PLB or PPSA…………………………8

    II. Plaintiffs Fail to State a Claim That is Plausible on its Face……………….10

    III. Plaintiffs Fail to State A Claim Under RICO………………..……………………….14

        A. The SAC Alleges No Predicate Acts…………………………..…………………15

            1. Plaintiffs do not plead any acts of mail fraud……...………………….17

            2.  Plaintiffs do not allege any acts of wire fraud…………….…...……..19

            3. Mail and wire fraud are only predicate acts if
               they are the proximate cause of Plaintiffs' injuries………………..19

        B. The Alleged Racketeering Activity Did Not
          Proximately Cause Plaintiff to Suffer Any Damages………..……………….20

            1. The California state court judgment………………….…………..22

            2. Lagune fees and commissions…………………….…………..23

    IV. Plaintiffs Fail To State A Claim For Conspiracy To Violate RICO…………..…...24

CONCLUSION…………………………………………………………………......25

# TABLE OF AUTHORITIES

## STATUTES

18 U.S.C. § 1341………………………………………………….………16

18 U.S.C. § 1343………………………………………………………….16

18 U.S.C. § 1964(c)…………………………………………………….14

California CCP§ 415.95…………………………………………………...........9

## RULES

Federal Rule of Civil Procedure 4(h)………………………………………..9

Fed.R.Civ. P. 9(b)………………………………………………………….16

## CASES

*7 Appletree Square I, Ltd. P'ship v. W.R. Grace & Co.*,
29 F.3d 1283 (8th Cir. 1994)……………………………………………..20

*American National Bank & Trust co. v. Haroco, Inc.*, 473 U.S. 606 (1985)……….………21

*Anza v. Ideal Steel Supply Corp.*126 S.Ct. 1991 (2006)…………………………….….21, 24

*Bell Atlantic Corp. v. Twombly*, 127 U.S. 1955 (2007)…………………………………10-14

*Blount Fin. Servs. v. Walter E. Heller & Co.*, 819 F.2d 151
(6th Cir.1987)), *cert. denied*, 496 U.S. 926 (1990)………………………………………..20

*Brown v. Cassens Transp. Co.*, 492 F.3d 640 (6th Cir. 2007)………………………………19

*Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008)…………………………24

*Carpenter v. United States*, 484 U.S. 19 (1987)……………………………………………16

*Chisholm v. Transouth Fin. Corp.*, 95 F.3d 331 (4th Cir. 1996)………………………………20

*Condict v. Condict*, 826 F.2d 923 (10th Cir.1987)……………………………………………24

*County of Suffolk v. Long Island Lighting Co.*,
907 F.2d 1295 (2nd Cir.1990)…………………………………………………………..20

*Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055 (2d Cir. 1996)………..…………………………24

*Edwards v. Marin Park, Inc.*, 356 F.3d 1058 (9th Cir. 2004)………..……………….……………17

*In re Anschuetz & Co., GmbH*, 754 F.2d 602 (5th Cir. 1985)……………………….……..…10

*In re Bank of Credit and Commerce Intern.l Depositors Litigation*,
1992 WL 696398 (C.D. Cal. 1992)……………………………………………….24

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)………….……………...24

*Mathon v. Feldstein*, 303 F.Supp.2d 317 (E.D.N.Y.2004)…………………………..………16

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)……………………………..…..16

*Ove v. Gwinn,* 264 F.3d 817 (9th Cir.2001)……………………………………….........14

*Parr v. United States*, 363 U.S. 370 (1960)…………..………………………………16

*Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991)…………………………………………20

*Pobursky v. Madera County*, 2007 WL 4557090 (E.D.Cal.  2007)..…….…………..…………11

*Poulos v. Caesars World, Inc*. 379 F.3d 654 (9th Cir. 2004)……..……………………………..20

*Republic of Colombia v. Diageo North America*,
 2007 WL 1813744 (E.D.N.Y. Jun. 19, 2007)………………………….….………………….11

*Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co.*,
319 F.3d 205 (5th Cir. 2003)……………………………………………………………20

*Sanville v. Bank of America National Trust & Savings Ass' n*,
18 Fed. Appx. 500 (9th Cir. 2001)……..………………………………………..15

*Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479 (1985)…………..……………………………..21

*Sybersounds Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008)…..…………………..24

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006)……………………………….………………16

*Tate v. PG & E Corp*., 94 Fed.Appx. 529 (9th Cir. 2004)…..……………………………………17

*United States v. Johnson,* 297 F.3d 845 (9th Cir.2002)……..………….…………………………18

*United States v. Montgomery,* 384 F.3d 1050 (9th Cir.2004)…………..………………………18

*World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc*., 2007 WL 4623027
(S.D. N. Y. Dec. 21, 2007)………………………………………..………………………11

## **OTHER AUTHORITIES**

4B, Wright and Miller, *Federal Practice & Procedure* § 1134…………………………………..8

1
2

## INTRODUCTION

3

The Plantagenet defendants[1] move this Court to dismiss the Second Amended Complaint

4

("SAC") of Plaintiffs John Gidding and Pivotal, Inc.  Defendants respectfully urge the Court to

5

review the Second Amended Complaint in its entirety, before proceeding further with this

6

memorandum. Nothing will better demonstrate to the Court why this case should be dismissed

7

than a reading of the SAC itself.

8
9

This case, as originally pled and in its last iteration, the First Amended Complaint

10

("FAC"), stemmed from a garden-variety commercial dispute over an alleged breach of contract to

11

distribute wine. That dispute was litigated in California State court nearly ten years ago.  Plaintiff

12

negotiated a settlement with the moving Plantagenet defendants in the California State court

13

lawsuit, received a $150,000 settlement payment from them, and released them from further

14

claims. Thereafter, Plaintiffs proceeded to obtain a judgment in the California State court action

15

against a non-settling foreign corporation, SCEV, then had trouble collecting that judgment in

16
17

France. When Plaintiffs grew frustrated with their unsuccessful collection efforts against the

18

judgment debtor, SCEV, they filed this RICO action to try to extract more money from the

19

Plantagenet defendants, even though these Defendants already had settled with Plaintiffs and been

20

released from all future claims.

21
22

23

24

25

26

27

28

[1] Moving defendants here are Plantagenet Capital Management, LLC (styled in the complaint, "PCM"), Plantagenet Partners SA (styled in the complaint, "PPSA"), PLB Holdings SA (styled in the complaint "PLB"), and Derek Anderson (an individual who associated with the Plantagenet entities. The SAC also names Plantagenet Capital Management LLC, Plantagenet Capital America, LLC, Plantagenet Capital Fund LP, and Plantagenet Capital Fund LP II, who are also moving parties, as defendants, but none of the complaint's allegations appear to pertain to any of these entities. As these last four Plantagenet entities are not further mentioned in the SAC, they should be dismissed as improvidently and improperly named. For ease of reference, all the moving defendants will collectively be referred to as "Plantagenet."

The Second Amended Complaint (SAC) is not, properly speaking, an amended pleading at all. It presents an entirely different story.  Most of the factual allegations which formed the basis of the FAC are completely missing from the SAC. None of the 46 Exhibits attached to the original Complaint and FAC are even referenced in the SAC, which has its own set of new and entirely different exhibits.

The SAC rests almost entirely on allegations of a vast international money laundering conspiracy and claims that Plaintiffs have been framed for tax evasion in France by corrupt French Treasury officials with the help and cooperation of the IRS. Incredibly, neither the original Complaint nor the FAC so much as mention either tax evasion or money laundering.  More specifically, in the SAC,  Plaintiffs allege that a  company not even mentioned in the FAC, new defendant Lagune  "framed" Plaintiffs for tax evasion by using "corrupted [French] treasury officials to steal [Plaintiffs'] documents" (SAC ¶36.a). New defendant Lagune allegedly is behind Plaintiffs' ongoing struggle with the French government, which has been attempting for many years now to hold Plaintiffs accountable for criminal tax evasion.

To tie all the unrelated events alleged in the SAC together, Plaintiffs now claim that various otherwise unrelated French wine companies, along with moving Defendants, the French and United States governments, and Plaintiffs' own former French lawyers are all part of a scheme to frame Plaintiffs.  The alleged purpose of this scheme between business competitors and governments was to allow all the various unrelated defendants to secretly launder money. Not surprising, Plaintiffs never specify what made the money "dirty" in the first place. Further, the SAC never explains how framing Plaintiffs in any way would further such a scheme.

This litigaton is a classic misuse of the RICO statute.  Plaintiffs do not allege, nor can they allege, facts sufficient to state a civil RICO claim. For this reason, Defendants move once again, pursuant to Rule 12(b)(6) for dismissal, with prejudice, of plaintiffs' RICO and conspiracy

2

1  to violate RICO claims. Defendants PLB and PPSA also move to dismiss for failure to effect

2  service of process on them under Rule 12 (b)(5).

3  
4  ### DISCUSSION AND SUMMARY OF THE ALLEGATIONS
   ### OF THE SECOND AMENDED COMPLAINT

5      The Second Amended Complaint ("SAC") is self-contradictory, redundant, non-

6  chronological, opaque, and incoherent.  Unfortunately, the sheer incoherence of the pleading

7  makes it difficult to address.  The problem is compounded by the SAC's omission of vast portions

8  of the allegations contained in the original Complaint and the FAC.  Moving Defendants will

9  nevertheless refer to a portion of those omitted allegations to try to make some sense of the

10 jumbled mess of facts pled.

11     Perhaps the best way to begin is to attempt to focus on the Plaintiffs' alleged grievances.

12 Even considered most broadly, there are only four categories of  "losses" alleged by Plaintiffs: (1)

13 
14 loss of the Le Brun Champagne accounts, (2) inability to collect their Los Angeles Superior Court

15 judgment against SCEV in France, (3) loss of commissions and consulting fees owed by Lagune,

16 and (4) framing Plaintiffs for tax evasion and "fiscal fraud".[2]

17 
18     **A.    "Usurpation Of The Plaintiffs' Commerce In Champagne Le Brun".**

19     Plaintiffs have alleged throughout the course of these amended pleadings that their

20 "commerce in Champagne Le Brun" was somehow "usurped."  SAC ¶38.[3]  Champagne Le Brun

21 
_____

22 [2] It is noteworthy that only the first two of these four grievance are mentioned anywhere in the
23 original complaint or the FAC.  Nevertheless, each will be addressed in this motion.

   [3] It is worth mentioning that the SAC uses phraseology which is not typical of American legal
24 pleading or writing. For example, rather than saying that their right to distribute Le Brun
   Champagne was interfered with, Plaintiffs allege that their "commerce in Champagne LeBrun"
25 was "usurped". Instead of alleging that they obtain a judgment against SCEV in the California
   State Court action, Plaintiffs state: "It was the courts [sic] decision to condemn SCEV to pay
26 Plaintiffs $!,536,543…" SAC ¶ 80. The often stilted language in the SAC leads Defendants to
27 believe that much of the language was probably simply translated, verbatim, from some foreign
   legal pleading, rather than being drafted for this case.
28

_____

was at all times produced by French company SCEV which has been dismissed as a defendant in this action. SAC ¶21. When Plantagenet acquired SCEV in 1998, Plaintiffs were importers and agents for Champagne Le Brun in the United States. SAC ¶28.

In July 1999, Plaintiffs filed suit against SCEV and one of the Plantagenet entities in Los Angeles Superior Court (the "California State Court Lawsuit"), alleging that SCEV breached oral agreements to make Plaintiffs its exclusive distributors of Le Brun Champagne in the United States. FAC ¶26, Ex. 1; SAC ¶66.

In March 2000, while the California State Court Lawsuit was still pending, former defendant Levant (now dismissed) acquired SCEV. FAC ¶18. Since March 2000, none of the Plantagenet Defendants have had any ownership interest or involvement in SCEV or any other champagne business.

In September 2001, the Plantagenet entities' insurer, Hartford Insurance Company, negotiated a settlement with Plaintiffs on behalf of all its insureds. Pursuant to that settlement, Defendants paid Plaintiffs $150,000. FAC ¶34. In connection with that settlement, Plaintiffs allege that Defendants' insurer, Hartford Insurance Company, "forge[d] a settlement agreement." SAC ¶76. Plaintiffs allege that the "authentic" settlement agreement is dated September 20, 2001. SAC ¶76.c. This "authentic" settlement agreement is attached as Exhibit 5 to the original Complaint. Under the express terms of the settlement agreement which Plaintiffs admit is "authentic", all claims against the Plantagenet Defendants arising from Plaintiffs' loss of Champagne Le Brun business were dismissed <u>with prejudice</u>. FAC ¶34 and Exhibit 5.[4]

---

[4] While Plaintiffs continue to complain about the "usurpation" of their commerce in Chateau Le Brun, they do not allege, as they did in the FAC, that they lost this commerce as a result of Defendants' mail and wire fraud. See, SAC ¶138. Presumably, Plaintiffs have elected not to pursue this grievance as a RICO claim, having to acknowledge that they long ago released moving Defendants from any further claims arising out of their alleged loss of the Le Brun business.

**B.    Interference With Plaintiffs' Ability To Collect Their California State Court Judgment Against SCEV.**

This is one of the two categories of damages specifically alleged by Plaintiffs at SAC ¶138.  In support of this damage claim Plaintiffs allege that, in early December 2001, SCEV failed to appear in court to defend itself, and the California State Court subsequently entered judgment in favor of Plaintiffs and against SCEV for approximately $1.5 million.  FAC ¶37; SAC ¶80.  In September 2002, Plaintiffs began proceedings in the French courts to have the California judgment validated. SAC ¶84.  Thereafter, at ¶¶85-101, the SAC alleges various legal machinations involving Plaintiffs and numerous French parties.  These legal activities included principally (1) SCEV's efforts to set aside the California State Court Judgment, and (2) Plaintiffs' attempts to have the judgment ratified in France and to collect it. While this section of the SAC contains specific allegations of wrongful conduct by dismissed defendants Raulet, Levant, SCEV, and Simon, there are no allegations  that any of  the Plantagenet entities were party to any of these court proceedings. They were not. And all of the French parties against whom actual wrongdoing is alleged in this section have previously been ordered dismissed from this case by this Court.

The SAC does allege that the Plantagenet entities participated in the "forgery" of various documents which French defendants submitted to the French court.  These documents included a "Contract of Guarantee" in which the selling Plantagenet entity, Defendant PLB, agreed to indemnify SCEV and its new purchasers from any liability to Plaintiffs.  According to Plaintiffs' theory, the indemnity agreement was "forged" to remove Defendant PPSA as an additional indemnitor (SAC ¶81).  While Plaintiffs allege that SCEV's new owners and Plantagenet conspired to remove PPSA's name from  the Contract of Guarantee, they have not and cannot explain why SCEV would want to deprive itself of a solvent indemnitor by deleting that indemnitor from the Contract of Guarantee.  Further, Plaintiffs do not and cannot explain how the

5

alleged suppression of an additional solvent guarantor would or could have helped SCEV avoid the judgment pending against it.

### C.    Scheme To Frame Plaintiffs For Tax Evasion.

The scheme to frame Plaintiffs for tax evasion is not mentioned in either the original Complaint or the First Amended Complaint.  It appears to involve, primarily, defendant Lagune, who is not even mentioned, much less named as a defendant, in the original pleading or the FAC. Plaintiffs do not allege that they were deprived of either money or property as a result of the allegedly wrongful accusations of tax evasion.  SAC ¶138.

The "scheme to frame" is  articulated at SAC ¶¶102-136.  While the "scheme" is largely incomprehensible, it appears to begin with defendant Lagune issuing Plaintiffs tax exempt invoices for champagne which Lagune had delivered to Plaintiffs and which Plaintiffs admit they received and retained.  SAC ¶¶103, 109. Plaintiffs allege they were not permitted to receive tax exempt invoices and refused to accept them.  SAC ¶103.  Nonetheless, a French court-appointed administrator entered these invoices on Lagune's books.  SAC ¶106.  Thereafter, according to Plaintiffs, "Treasury officials raided Madeline Gidding's home and stole the originals and copies of the Lagune invoices."  [emphasis added]. SAC ¶115.  Plaintiffs blame the French government's alleged theft of their documents on Defendants in this case.  SAC ¶36A.

Subsequently, French Treasury officials accused Plaintiffs of "fiscal fraud."  SAC ¶116. According to the SAC, French Treasury Department, with the assistance of the IRS, have been attempting to collect taxes from Plaintiffs ever since.  SAC ¶116-134.  As late as April 2007, only months before the original Complaint in this action was filed, the French Treasury Department was still attempting to collect more than 300,000 Euros in back taxes from Plaintiffs and threatening Plaintiff Gidding with imprisonment for failure to pay those taxes.  SAC ¶¶135-136. All this somehow is Defendants' fault. According to the SAC, all the French government's efforts

6

to collect hundreds of thousands of dollars in taxes from Plaintiffs over the past several years have been controlled by Defendants as part of Defendants' international money laundering scheme.

### D.     Loss Of Lagune Commissions And Consulting Fees.

The loss of the Lagune commissions and consulting fees appears for the first time in the SAC. It is not even mentioned in any of the earlier pleadings.  The facts supporting the alleged loss of the Lagune business are set forth only at paragraphs 112 through 114 of the SAC.  In these paragraphs, Plaintiffs allege that Plaintiff Gidding sent Lagune's lawyer a summary of commissions and consulting fees owing in January 2000, but, in April 2000, the new owner of Lagune, SA Group Frey, (not a defendant in this action) refused to pay Plaintiff Gidding's commissions or consulting fees.  SAC ¶114.  There is no allegation that Plaintiffs have pursued any claim for these fees or commissions in the eight years since Lagune refused to pay them, no explanation why these claims (and parties) were not even mentioned in the original Complaint or FAC, and no explanation why the statute of limitations has not long since run on this eight year-old claim for lost commissions and fees.

### E.     The Money Laundering Claims.

The money laundering claims are so convoluted as to be incomprehensible. Nor can they be unraveled in any fashion which makes them comprehensible.  Nonetheless, a couple of points regarding the money laundering allegations must be noted.  First, these allegations appear for the first time in the SAC.  Neither the original Complaint nor the FAC so much as mentioned money laundering.  Second, while the SAC places the label "money laundering" on many ordinary business activities and, at SAC ¶¶37 and 38,  refers to a money laundering scheme, the SAC contains no explanation of what criminal proceeds were being laundered or how purchasing or selling a bakery or a wine company accomplished this goal.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Paragraph 41 does suggest that there was "… a scheme to fund the money laundering operations with the proceeds of the plaintiff's commerce in Chateau Le Brun." This, however, literally puts the cart before the horse. Plaintiffs allege that Defendants (1) first acquired Chateau Le Brun, (2) next, (as owners of Chateau Le Brun) wrongfully breached Plaintiffs' distributorship agreements for Chateau Le Brun, and, (3) only subsequently, used the distributorship proceeds that would have otherwise flowed to Plaintiffs to acquire Chateau Le Brun as part of the money laundering scheme. The allegation is mutually self-contradictory. Even if it made sense, the wrongful breach of Plaintiffs' distributorship agreement would be a mere breach of contract, not a crime. Money flowing from such a civil wrong could not be the subject of "money laundering" as a matter of law. Additionally, there is no explanation of how canceling Plaintiffs' distributorship "fueled" money laundering.

The litigation and French tax collection efforts apparently continue in Europe, with SCEV and Plaintiffs exchanging charges of fraud and other wrongful conduct against each other and with Plaintiffs continuing to face tax evasion charges. Plaintiffs have now, however, opened a new front in this Court, filing the RICO complaint that is the subject of this motion.

## ARGUMENT

### I.    Plaintiffs Have Not Sufficiently Served Either PLB or PPSA

The only service plaintiffs attempted on either PLB (which was incorporated in Luxembourg before it was liquidated) and PPSA (incorporated in France and now in the process of formal liquidation) was attempted service through Derek Anderson, who resides in Marin County, California. While Mr. Anderson had an ownership interest in both PPSA and PLB, he has not been actively involved in either entity for many years. More specifically, he is not, and at the time of attempted service was not, an officer,  managing or general agent, nor any other agent

8

authorized by appointment or by law to receive service of process for either PPSA or PLB.  See

Affidavit of C. Derek Anderson, filed on January 31, 2008. (Doc.31)

Federal Rule 4(h)(1) provides two methods by which a corporation can be served in the

Northern District of California.  These two methods are:

- in the manner prescribed by Rule 4(e)(1) for serving an individual; or

-  by delivering a copy of the summons and of the complaint to an officer, a managing
  or general agent, or any other agent authorized by appointment or by law to receive
  service of process and--if the agent is one authorized by statute and the statute so
  requires--by also mailing a copy of each to the defendant;

Rule 4(e)(1), in turn, allows service "pursuant to the law of the state" in which the district

court is located—California.  Under California CCP§ 415.95, service on a business organization

can be made by 1) service on a registered agent or 2) "by leaving a copy of the summons and

complaint during usual office hours with the person who is apparently in charge of the office of

that business organization, and by thereafter mailing a copy of the summons and complaint by

first-class mail, postage prepaid, to the person to be served at the place where a copy of the

summons and complaint was left." Since neither PPSA nor PLB has offices where service was

attempted on Mr. Anderson, and since Mr. Anderson was not an officer, managing agent, or agent

for service of process, there was no valid service under Rule 4(h)(1).

Federal Rule of Civil Procedure 4(h)(2) provides that service on a foreign corporation "at a

place not within any judicial district of the United States, [is to be done] in any manner prescribed

by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." In turn, Rule

4(f) states such service is to be made,

a. by any internationally agreed means of service that is reasonably
   calculated to give notice, such as those authorized by the Hague
   Convention on the Service Abroad of Judicial and Extrajudicial
   Documents;

Both France and Luxembourg are signatories to the Hague Convention. *In re Anschuetz & Co.*, *GmbH*, 754 F.2d 602, 604 n.1 (5th Cir. 1985). Article 2 of the Convention requires that all signatory nations must designate a "Central Authority" whose responsibility it is to accept requests of service from any other signatory nation.. 4B, Wright and Miller, *Federal Practice & Procedure* § 1134.

Plaintiffs did not attempt any of this. Instead, they simply attempted to serve these foreign corporations as if they could do so in the Northern District of California, by serving Derek Anderson, an individual formerly associated with the foreign entities, who happened to live in the United States. No corporation, let alone a foreign one, can be served that way. PPSA and PLB are therefore entitled to an order granting their motion to dismiss for insufficiency of service of process.

## II.     Plaintiffs Fail to State a Claim That is Plausible on its Face

Although this motion assumes *arguendo* the truth of the SAC's allegations, that does not mean that the court should ignore when the factual assertions in a complaint collapse from internal contradictions and incoherence. The Supreme Court recently admonished that a complaint must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 U.S. 1955, 1974 (2007). In other words, "Factual allegations must be enough to raise a right to relief above the speculative level." 127 U.S. at 1965. The *Twombl*y Court, applying that standard to a Sherman Act antitrust action, found that where "the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id*. at 1974. In *Twombly*, the Court explained that the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." 127 U.S. at 1965 (internal citations omitted).

1  Courts have begun to apply the "plausibility" test to RICO claims. For instance, in

2  *Pobursky v. Madera County*, 2007 WL 4557090, * 15 (E.D.Cal.  2007), a court in this circuit cited

3  *Twombly*'s admonition that "[f]actual allegations must be [sufficient] to raise a right to relief

4  above the speculative level ..." in dismissing RICO claims against county officers stemming from

5  a putative conspiracy to harass and falsely arrest plaintiffs and take their children into protective

6  custody.  See also *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, No. 04-CV-8223, at

7  * 4 (2007 WL 4623027 S.D. N. Y. Dec. 21, 2007)(applying the *Twombly* plausibility standard to

8  grant defendants' motion to dismiss an attempt to turn a licensing dispute into a RICO claim);

9  *Republic of Colombia v. Diageo North America*, No. 04-CV-4372, 2007 WL 1813744 at *8

10  (E.D.N.Y. Jun. 19, 2007)(citing *Twombly*, and stating "courts should strive to flush out frivolous

11  RICO allegations at any early stage of the litigation.")

12  

13  Here, Plaintiffs' incoherent recitation of grievances does not even cross the "conceivable"

14  threshold, much less reach the Supreme Court's plausibility standard. Consider, for example, the

15  following allegations:

16  
17  • Defendants  "framed" Plaintiffs for tax evasion by using "corrupted [French]
       treasury officials to steal [Plaintiffs'] documents" (SAC ¶36.a)

18  
19  • All relevant documents have been forged. (SAC ¶43)

20  • Hartford Insurance Company participated in the forgery of a settlement agreement.
       (SAC ¶76)

21  
22  • Defendant Anderson forged a court judgment. (SAC ¶82)

23  • Plaintiffs' own French counsel, Marie-Claude Simon, was actually part of
       Defendants' alleged conspiracy, and to futher this conspiracy she and her partner
24     lied to Plaintiffs  about French court orders and  presented forged documents to the
       French court, all while continuing to represent Plaintiffs. SAC ¶¶ 77, 88-93.

25  
26  • Letters mailed by the IRS, the French Treasury Department, the Fiscal attaché to
       the American Embassy in Paris and Wells Fargo Bank were all acts of criminal
27     wire fraud and were all part of Defendants' racketeering activity. (SAC ¶ 142)

28  
11

Even if one assumes all the facts alleged are true, at best the right to relief is purely speculative. The gist of the alleged scheme is that Lagune allegedly "framed" Plaintiffs with the help of "corrupt French Treasury officials" who tried to hold Plaintiffs responsible for tax evasion and fiscal fraud. The SAC further alleges that both the French and the United States government were engaged in a corrupt vendetta against Plaintiffs. *See, e.g.,* SAC ¶141, claiming that unspecified <u>defendants ...."caused officials of the French Government to tax the Plaintiffs for sums they knew to be false," and "...involved the IRS in their attempts to silence and ruin the Plaintiffs."</u> [emphasis added].

Somehow or another, this scheme generated money that had to be laundered, which, inexplicably, was accomplished by having Plantagenet buy SCEV and hold it, secretly, for others, then have Raulet/Levant buy it, then three years later have Rapeneau/Reniers buy it. In this process, according to Plaintiffs, Raulet/Levant actually paid twice for the same company – once supplying Plantagent with the funds to buy it (SAC ¶ 47), then a year later paying again to buy the same company it had already paid for (SAC ¶¶ 52,53) . Even more remarkably, to complete these transactions, it was for some unexplained reason necessary to the overall scheme to breach Plantiffs' distributorship agreement.

After Plaintiffs sued over that breach, they settled with and released the Plantagenet defendants and thereafter obtained a judgment against SCEV. Plaintiffs then speculate that SCEV had received a secret indemnity from PPSA as well as from PLB, but that, just when SCEV could have turned to PPSA, a solvent entity according to Plaintiffs, and enforced its indemnity to pay off the judgment, SCEV instead chose to alter the guaranty to delete PPSA as guarantor. Plaintiffs do not allege, and cannot possibly explain, how it would be advantageous for SCEV to deprive itself

of a solvent indemnitor.[5]  None of this meets the minimal "plausibility" threshold established in *Twombly.*

Even if the sheer implausibility of these claims could be set aside, the SAC must fail because it relies on "mere labels and conclusions" in just the way the Supreme Court in *Twombly* instructed was not good enough to survive a motion to dismiss.  For example, a key part of the SAC's narrative is the assertion that every unpleasant event Plaintiffs have ever suffered is part of an elaborate "money laundering" scheme which was not so much as mentioned in the original Complaint or FAC.  As the Court explained in *Twombly,* "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  127 S.Ct. at 1964-65 (internal citation and quotation marks omitted).  Here, all Plaintiffs have done is label a series of normal business transactions as "money laundering" without bothering to identify the criminal proceeds which allegedly were being laundered. To be laundered, money has to be dirty in the first place, ie, the proceeds of some unlawful activity. 18 U.S.C.A. § 1956(a)(1)

Plaintiffs appear to imply that the initial source of the illegal funds is related somehow to Lagune's issuance to Plaintiffs of tax exempt invoices for wine which Lagune had shipped to Plaintiffs. (SAC ¶¶ 103,108).  Plaintiffs admit that they kept both the wine and the tax exempt invoices (at least until the invoices were "stolen" by corrupt French treasury officials (SAC ¶¶ 103, 109, 115) but then Plaintiffs state they "refused the transaction" – whatever that means. There is no explanation how these invoices could create a source of "dirty money"?  Plaintiffs do not even hint at an answer.

---

[5] It is clear that SCEV did not ignore this hypothetical guaranty from PPSA out of some great affection for the Plantagenet entities.  To the contrary, according to the FAC, SCEV has complained loud and long in courts in both the United States and France that the Plantagenet entities colluded with the Plaintiffs to damage SCEV!

13

The label "money laundering" as applied to the moving Plantagenet defendants is even emptier. Apart from labeling these defendants as "money launderers", and accusing them of forging every document in sight, the only actual activity which the SAC alleges these defendants participated in was the purchase and sale of a wine company (SCEV) and the termination of Plaintiff's SCEV distributorship. These are business activities, not money laundering. The SAC also alleges that in these business transactions, Plantagenet had "silent partners." Even if that were true, how is having partners or investors, silent or otherwise, money laundering? In fact, the only money laundering alleged against Plantagenet is the constant labeling of the defendants as money launderers. Only labels-- no acts of money laundering by the Plantagenet Defendants are ever alleged.

Without "money laundering" as a connecting device, Plaintiffs cannot tie together any of their disparate grievances and innuendos against unrelated people and entities into an enterprise, a key element of RICO. In fact, the SAC fails to set forth the fundamental elements of any RICO claim and must be dismissed for that reason as well.

**III.   Plaintiffs Fail to State A Claim Under RICO**

Despite its many complexities, RICO at its core has a fairly simple design: it prohibits a person from using a pattern of unlawful activities to infiltrate an interstate enterprise. 18 U.S.C. § 1962. To avoid abuse of the statute, the courts wisely take a close look at RICO claims to be assured that all the necessary elements are alleged. To state a civil RICO claim, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs' 'business or property.' " *Ove v. Gwinn,* 264 F.3d 817, 825 (9th Cir.2001) (quoting 18 U.S.C. § 1964(c)). Here, even the most generous reading of the SAC does not show any predicate acts of "racketeering activity" that meet the standards for a RICO claim. Additionally, and critically, Plaintiffs have not alleged any way in which these alleged acts caused

14

any injury to Plaintiffs' business or property.

Even if the SAC were plausible and passed the *Twombly* test of alleging more than "mere labels and conclusions," it fails to identify any predicate acts of racketeering activity and fails to show how such acts proximately cause any injury to Plaintiffs.  As noted above, although the SAC is liberally sprinkled with claims of a vast money laundering enterprise involving several different unrelated companies and the French government itself, it never goes beyond labels and conclusions to establish that enterprise.  The SAC never explains how any of the business transactions it mentions were transformed from normal business activity into criminal activity, other than to label it so.

Without these labels, instead of a ten year long "money laundering scheme" all the SAC describes is a series of disparate, business transactions in France, involving several otherwise unconnected companies.  That is not an "enterprise."

Furthermore, the SAC does not allege any pattern of racketeering activity because the SAC alleges no predicate acts at all.

## A.     The SAC Alleges No Predicate Acts

To try to minimize the temptation for would-be RICO plaintiffs to recast ordinary commercial disputes as racketeering activity, courts strictly require a RICO complaint to allege every essential element of each predicate act. *See, e.g., Sanville v. Bank of America National Trust & Savings Ass'n*, 18 Fed. Appx. 500, 501 (9th Cir. 2001) (affirming the dismissal of plaintiff's RICO claims for failure to plead with sufficient particularity that the defendants had the specific intent to deceive or defraud as required for both mail and wire fraud).  Plaintiffs are prime examples of would-be RICO plaintiffs who are trying to manufacture a RICO complaint out of nothing.

Plaintiffs have not attempted to plead any predicate acts of racketeering activity other than mail and wire fraud.[6] In examining the SAC, it is clear that plaintiffs have not pled any acts of mail or wire fraud, either. Without predicate acts, there cannot be any racketeering activity, and thus no pattern of racketeering activity.

The elements of mail fraud, 18 U.S.C.A. § 1341, and wire fraud, 18 U.S.C. § 1343, are identical. They are: (1) a scheme to defraud; (2) involving use of mails or wire; and (3) for the purpose of executing a fraudulent scheme. *Carpenter v. United States*, 484 U.S. 19, 24, (1987). The mailings or wire communications must be "in furtherance" of a scheme to defraud. Routine mailings not "in furtherance" of a scheme are those routine mailings made without the presence of a fraudulent scheme. *Parr v. United States*, 363 U.S. 370 (1960). As seen below, most of the uses of the mail alleged by Plaintiffs appear to be nothing more than such routine mailings.

In any case, if plaintiffs want to allege these mailings were fraudulent, it is incumbent on them to plead their facts with specificity. Allegations of mail fraud, like any other fraud, must be made with particularity under Fed.R.Civ. P. 9(b). ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.") *McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992). Because this particularity requirement of federal pleading rules applies to claims of mail and wire fraud, the complaint must set forth the time, place and contents of alleged false representation, the identity of the party making the false statements and the consequences thereof. *Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006). *See also Mathon v. Feldstein*, 303 F.Supp.2d 317 (E.D.N.Y.2004) (Plaintiff failed to set forth the contents of mailed

---

[6] The SAC does allege that Defendants are guilty of money laundering, which if indictable under 18 U.S.C. §1956 is a predicate act under RICO, 18 U.S.C. §1961. However, the SAC has not pled the elements of money laundering and, it appears that the schemes which Plaintiffs speculate existed (buying and selling French companies and French wines and allegedly hiding the sources of French francs) are not acts indictable in the United States under 18 U.S.C. §1956. In any case, the SAC does not list money laundering as a predicate act.

items, or specify how each item was false or misleading, as required to plead mail fraud with particularity under the rules of civil procedure).

The rule of particularity certainly is not relaxed for RICO claims. Courts do and should scrutinize RICO claims of mail or wire fraud with the same or greater care as they do with any other claims of fraud. *See Tate v. PG & E Corp.*, 94 Fed.Appx. 529 (9th Cir. 2004) (the heightened pleading standards applicable to fraud claims apply to a RICO action alleging predicate acts of mail fraud.)

It is not enough to say who mailed a letter and when. To plead mail fraud, a plaintiff must allege the specific contents of the mailings, how they contribute to the fraudulent scheme, and the mailings should be attached as exhibits to the pleadings. Thus, in *Edwards v. Marin Park, Inc.*, 356 F.3d 1058 (9th Cir. 2004), the Ninth Circuit held that a mobile home park resident failed to state a RICO claim with requisite particularity against the mobile home park. Although the resident properly alleged the time and place that the park's purportedly fraudulent legal notices were delivered and named the parties involved, the complaint failed to allege the notices' specific contents, and the resident failed to attach the notices to her complaint or to any other filing.

As can be seen by looking at the SAC, the same failing that led to dismissal in *Edwards* exists here. Despite claiming that various letters or faxes are fraudulent, plaintiffs have not attached any of them to the SAC nor otherwise identified how they can be located. There is, further, not a word about the contents of any of the mailings alleged to be fraudulent. It is not enough simply for Plaintiffs to say someone mailed a letter. Mailing letters and mail fraud are not at all the same thing.

As will be shown below, an examination of the laundry list of twenty mailings and twenty-one uses of the wires alleged in the SAC shows no allegations of fraud whatsoever.

1

### 1.  Plaintiffs Do Not Plead Any Acts of Mail Fraud

2

3      In SAC ¶ 142, plaintiffs list twenty alleged instances of "mail fraud."  None are attached as

4   exhibits.  None of the contents are described.  None are alleged to contain fraudulent

5   misrepresentations.  None are shown to be part of any particular fraudulent scheme.

6      Of these twenty mailings, a significant number—eight of them—were mailings from either

7   the French or the American government (that is, the IRS) to Plaintiffs and a ninth was from Wells

8   Fargo Bank to Plaintiff.  (See ¶ 142(a)(vi),(vii),(x),(xi),(xiii),(xiv),(xvi),(xviii) and (xx)).  To

9   commit mail fraud, of course, the defendant must have: "(1) participated in a scheme with the

10   intent to defraud, and (2) the scheme used or caused the use of the mails in furtherance of the

11   scheme." *United States v. Montgomery,* 384 F.3d 1050, 1063 (9th Cir.2004) ( *quoting United*

12   *States v. Johnson,* 297 F.3d 845, 870 (9th Cir.2002)).  Yet in the nine instances cited above, the

13   defendants were not involved in the mailing at all. Even these Plaintiffs cannot seriously suggest

14   that mail which the IRS sent to Plaintiffs is an example of defendants' use of the mails or that the

15   United States government was committing mail fraud in its capacity as corrupt co-conspirator of

16   these moving Defendants..

17      Of the remaining eleven mailings, only three allegedly were sent by anyone affiliated with

18   the moving Plantagenet defendants—a May 25, 1999 letter and a June 9, 1999 letter from

19   Anderson to Gidding and a December 21, 1998 intra-company letter from Erica Valentine to a

20   Plantagenet business affiliate, Zappetini.  (See ¶ 142(a)(i),(iv),(v)).  The contents of these letters

21   are not described, and there is no explanation how they connect to any scheme that injured

22   Plaintiffs.  They are not alleged to have been part of the alleged scheme to "frame" plaintiffs with

23   tax-exempt invoices, and they logically could not have been part of any alleged scheme to thwart

24   plaintiff's collection of its judgment against SCEV, since Plaintiffs did not even obtain that

25   judgment until more than two years after these letters were mailed.

18

1   This leaves eight other mailings in plaintiffs' list of mailings.  Two are letters from

2   Lagune, or persons affiliated with Lagune, sent to plaintiff (See ¶ 142(a)(ii),(iii)).  There is no

3   description whatsoever of the content or topic of the first letter.  The second letter, from April 16,

4   1999, is described as mailing an invoice to Plaintiff, which may or may not be part of the

5   described "scheme to frame"—Plaintiffs never specify.  What is clear, however, is that the SAC

6

7   never describes any way in which Plantagenet was purportedly connected to an unrelated

8   company's alleged tax evasion schemes.

9   The six remaining letters, by their dates, seem to come from the period of time in which

10  SCEV's new French owners were opposing Plaintiffs' efforts to collect the California state court

11  judgment. None were placed in the mails by a Plantagenet entity, and nowhere do plaintiffs allege

12  that any of the Plantagenet defendants caused them to be placed in the mail.  (See,

13  ¶142(a)(viii)(ix)(xii),(xv),(xvii),(xix).

14

15              **2.    Plaintiffs Do Not Allege Any Acts of Wire Fraud**

16  There is very little that can be said about the list of 21 phone calls or faxes the SAC sets forth

17  as alleged acts of wire fraud, because that list not only fails to plead any fraud, it contains no

18  actual information about the communications at all.  (See ¶ 142(b)).  There simply is a list of 21

19  telephone calls and faxes, dates, and sender/caller and recipient.  The content of those calls, and

20  how and why they were fraudulent or furthered a fraudulent scheme, is entirely missing. There is

21  no attempt to produce the faxes as exhibits, and no way to know their content.

22

23              **3.    Mail and wire fraud are only predicate acts if
              they are the proximate cause of Plaintiffs' injuries.**

24  Most federal courts of appeals have held that a plaintiff must plead and prove reliance to

25  sustain a civil RICO claim predicated on acts of mail fraud. See *Brown v. Cassens Transp. Co.*,

26  492 F.3d 640, 643 (6th Cir. July 10, 2007)("As plaintiffs acknowledge, the well-established

27

28

19

precedent of this circuit requires that a civil RICO plaintiff alleging mail or wire fraud plead

reliance, that is, that a defendant made fraudulent representations to the plaintiff on which the

plaintiff relied.")  *Accord*, *Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance

Co.*, 319 F.3d 205 (5th Cir. 2003); *Chisholm v. Transouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir.

1996); *7 Appletree Square I, Ltd. P'ship v. W.R. Grace & Co.*, 29 F.3d 1283, 1286 (8th Cir. 1994);

*Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991); *Blount Fin. Servs. v. Walter E. Heller & Co.*,

819 F.2d 151, 152 (6th Cir.1987)), *cert. denied*, 496 U.S. 926 (1990). These courts reason that, in

a RICO case, the plaintiff must establish injury to business or property "by reason of" a predicate

act of mail or wire fraud.  A plaintiff can only show injury "by reason of" of the fraud if the

plaintiff can establish detrimental reliance on the alleged fraudulent acts. See *County of Suffolk v.

Long Island Lighting Co.*, 907 F.2d 1295, 1311 (2nd Cir.1990).

      While the Ninth Circuit has not directly decided whether reliance must be pleaded and

proved, the court in *Poulos v. Caesars World, Inc.* 379 F.3d 654, 664 (9th Cir. 2004) noted, "It is

well settled that, to maintain a civil RICO claim predicated on mail fraud a plaintiff must show

that the defendants' alleged misconduct proximately caused the injury," and "reliance may be 'a

milepost on the road to causation.'"  Here, of course, Plaintiffs did not rely at all on any of the

alleged acts of "mail fraud," assuming any occurred.

### B.    The Alleged Racketeering Activity Did Not
####      Proximately Cause Plaintiff to Suffer Any Damages

      The Supreme Court has yet to rule whether reliance on fraudulent communications is an

element of a RICO claim predicated on mail or wire fraud,[7] but it has held that the fraudulent

communication itself must be the proximate cause of injury to the plaintiff—meaning that the

---

[7] But see *Bridge v. Phoenix Bond & Indemnity Co.*, 2008 WL 54347 (Mem. S.Ct. January 4, 2008), granting *certiorari* on the issue, "Whether reliance is a required element of a RICO claim predicated on mail fraud and, if it is, whether that reliance must be by the plaintiffs."

plaintiff must show that the mailing itself was the direct, legal cause of the alleged injury. In *Anza v. Ideal Steel Supply Corp.*126 S.Ct. 1991 (2006), a case bearing some factual similarities to the instant action, the court approved the dismissal of a RICO action predicated on mail fraud where the plaintiff sued a competitor because of the competitor's alleged practice of submitting fraudulent sales tax returns in violation of mail fraud or wire fraud statutes. The Supreme Court held that the competitor's alleged defrauding of state tax authority was not the proximate cause of the plaintiff's lost sales. Further, it stated that "when a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* at 1994.

One of the most critical elements for a RICO claim, therefore, is that the plaintiff show he "has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The only injuries that are compensable are those that are "caused by predicate acts sufficiently related to constitute a pattern." *Id.* at 497. To recover, a plaintiff must show he suffered damages from the proscribed predicate offenses, not from some other cause. *American National Bank & Trust co. v. Haroco, Inc.*, 473 U.S. 606, 609 (1985).

Plaintiffs fail this proximate cause test.  Given the gravity of Plaintiffs'RICO claim, it is both odd and illuminating that the SAC never sets forth, explicitly, how the various "patterns of racketeering activity" they attempt (unsuccessfully) to allege caused them any damage. The closest Plaintiffs come to doing so is in ¶138 of the SAC, where they state that "[t]hese acts of mail fraud… deprived Gidding and Pivotal of money and property" in two respects:  (1)"their duly obtained judgment against SCEV in the Los Angeles County Superior Court" and (2)"their duly earned commissions and consulting fees owed by Lagune." (SAC ¶ 138). No other RICO damages are alleged in the SAC.

1

2

**1. The California State Court Judgment**

3

Plaintiffs assert that the predicate acts somehow contributed to the difficulty they have had

4

collecting their California judgment against SCEV. Initially, it is important to note that this claim

5

does not in fact assert any injury to business or property as required under 18 U.S.C. § 1964(c).

6

Plaintiffs continue to retain all their property rights in their judgment which, presumably, has the

7

8

same validity and enforceability it had the day Plaintiffs obtained it.

9

The SAC does not describe Plaintiffs' difficulties collecting their judgment in nearly the

10

detail that the FAC did, but in essence, Plaintiffs went to France hoping to enforce that judgment,

11

and instead have been caught up in a furious battle in the French courts. They attribute their

12

difficulty collecting the judgment to SCEV (not the Plantagenet defendants, who were never

13

parties either to the California judgment or the collection proceedings in France) having filed an

14

altered indemnity agreement ("Contract of Guarantee") in the French court proceedings.(SAC

15

¶74(b)).    The alterations supposedly deleted or suppressed PPSA's identity as a party to this

16

indemnity agreement. Yet even now, in their third attempted pleading, Plaintiffs cannot explain

17

how the suppression of PPSA in any way could have hurt them since they admit that they had long

18

19

ago released PPSA from any liability for the events giving rise to the California judgment.[8]  While

20

Plaintiffs allege that the Contract of Guaranty was "forged" to suppress PPSA's identity, they have

21

not and cannot explain why SCEV would want to deprive itself of a solvent indemnitor by

22

23

_____

24

[8] It is important to note that plaintiffs do not attach a copy of the alleged "authentic" Contract of

25

Guaranty containing PPSA's indemnity.  Plaintiffs do not even claim to have ever seen such a
document or heard anyone ever refer to its existence. While not relevant to the pending  motions,

26

it is important for the Court to understand that this case is never going anywhere because
plaintiffs' imagined PPSA Contract of Guaranty never existed.  PPSA had conveyed its interest in

27

SCEV to PLB prior to the sale to Levant.  At the time of that sale, PLB was the only owner of
SCEV and, for that obvious reason, was the only indemnitor under the Contract of Guarantee.

28

22

deleting that indemnitor from the Contract of Guaranty. Nor can Plaintiffs explain how that alleged suppression of an additional solvent guarantor would or could have helped SCEV avoid the judgment pending against it.

In their SAC, Plaintiffs have added one key new allegation -- one that actually destroys this claim in its entirety.  Plaintiffs now freely admit that the reason they cannot collect their California judgment is that they have chosen not to try anymore! The SAC states that in November of 2006 "Plaintiffs abandoned their attempt to validate the California Judgment and sued for RICO." (SAC ¶ 101).  The parties, then, who deprived Plaintiffs of their "duly obtained judgment" were, in fact, Plaintiffs themselves, and no one else.

### 2.  Lagune Fees and Commissions

The other claimed damages – loss of commissions and fees owed by Lagune – were not even alleged in the original Complaint or the FAC and appear to have nothing to do with any Plantagenet defendants. There is no allegation that the Plantagenet Defendants had any involvement in Lagune's decision not to pay Plaintiffs their fees or commissions. (SAC ¶¶ 113,114).  Certainly, these damages were not proximately caused by any action that could be called a predicate act.

It is somewhat surprising that, after spinning an elaborate tale of being framed for tax evasion by Lagune, Plaintiffs limit their Lagune-related damage claims (SAC ¶138) to their loss of fees and commissions from Lagune more than eight years ago. SAC ¶¶113,114. These are not RICO claims. If Plaintiffs' distributorship relationship with Lagune was not terminable at will, then Plaintiffs may have had a breach of contract claim against Lagune.  Breach of contract, however, is not fraud.  There is absolutely no causal connection pled between the alleged predicate acts of mail or wire fraud and  Plaintiffs' loss of its commissions and fees from Lagune. Plaintiffs lose sight of the most basic premise of a claim under RICO, which is that they must at least be

23

able to allege that their "...harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation." *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to plaintiff's injuries." *Sybersounds Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008), *quoting Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).   Just as in *Anza*, where the Supreme Court held that a competitor's alleged defrauding of a state tax authority was not the proximate cause of the plaintiff's own lost sales, Lagune's alleged tax fraud schemes with the French government and any mailings or other communications that might have served that scheme was not the proximate cause of Plaintiffs' lost business with Lagune.  The proximate cause of that loss was, simply, Lagune's decision to stop doing business with Plaintiffs.

Plaintiffs allege no other losses to their business or property.  Therefore, they have not alleged any RICO injury at all and their RICO claim should be dismissed.

## IV.     Plaintiffs Fail To State A Claim For Conspiracy To Violate RICO

Any claim under 18 U.S.C. § 1962(d) "based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir. 1996), citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993); *Condict v. Condict*, 826 F.2d 923, 927 (10th Cir.1987) ("any claim under section 1962(d) based on a conspiracy to violate the provisions of 18 U.S.C. section 1962(a), (b), or (c) must necessarily fail if the substantive claims are themselves deficient "). See also *In re Bank of Credit and Commerce Intern.l Depositors Litigation*, 1992 WL 696398 at n.19 (C.D. Cal. 1992)("The Court's dismissal of substantive RICO claims constitutes a dismissal of the conspiracy alleged under section 1962(d) as well.)

24

1

## CONCLUSION

2   Plaintiffs have rewritten and re-invented their story in the SAC, but it remains incoherent,

3 implausible, and states no claims whatsoever against any defendant, especially not the Plantagenet

4 defendants. There is no cognizable "racketeering activity" alleged and no legally cognizable

5 injury to Plaintiffs. Therefore, the Plantagenet defendants respectfully move this Court to dismiss

6
7 the Second Amended Complaint with prejudice.

8

9 DATED: June 21, 2008.                    Respectfully submitted,

10                                          WILSON & QUINT LLP

11

12                                          By _____
13                                             Matthew F. Quint
                                             Attorneys for Defendants Derek Anderson,
14                                           Plantagenet Capital Management, LLC, Plantagenet
                                             Capital America LLC, Plantagenet Capital Fund LP,
15                                           PLB Holdings SA, and Plantagenet Partners SA

16
17
18
19
20
21
22
23
24
25
26
27
28