**BIRNBERG & ASSOCIATES**
**CORY A. BIRNBERG (SBN 105468)**
**BIRNBERG & ASSOCIATES**
**703 Market Street, Suite 600**
**San Francisco, CA 94103**
**Telephone: (415) 398-1040**
**Facsimile: (415) 398-2001**

**Attorneys for Plaintiffs**
**JOHN GIDDING, PIVOTAL, INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **JOHN GIDDING, PIVOTAL, INC.** | ) **Case No. C-7-04755-JSW** |
| | ) |
| **Plaintiffs,** | ) **PLAINTIFFS OPPOSITION TO** |
| | ) **DEFENDANTS' MOTION TO** |
| **v.** | ) **DISMISS** |
| | ) |
| **DEREK ANDERSON, et al.,** | ) |
| | ) **DATE: AUGUST 29, 2008** |
| **Defendants.** | ) **TIME: 9:00 A.M.** |
| | ) **PLACE: CTRM. 2, 17TH FLOOR** |
| _____ | ) |

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

1

**TABLE OF CONTENTS**

2

I. INTRODUCTION……………………………………………………………...1

3

II. DISCUSSION………………………………………………………………….2

4

III. ARGUMENT…………………………………………………………………8

5

    A. Plaintiffs' Service on PLB and PPSA Was Proper………………………………..8

6

    B. Plaintiffs State a Claim That is Plausible on its Face……………………………12

7

    C. Plaintiffs State a Claim Under RICO……………………………………………16

8

        1. The RICO Enterprise……………………………………………………16

9

        2. The Conduct of the RICO Enterprise………………………………………17

10

        3. The Enterprise Affected US Commerce……………………………………17

11

        4. The Enterprise / Defendant Distinction……………………………………18

12

        5. Plaintiffs Allege Enough Specific Content to Satisfy FRCP 9(b),

13

        and Plaintiffs Specifically Allege The Management of the Rico Enterprise

14

        Through a Pattern of Racketeering Activity……………………………………...18

15

            a. Pattern…………………………………………………………..….22

16

            b. Detrimental Reliance…………………………………………......22

17

        6. Proximate Damage………………………………………………….......23

18

        7. Conspiracy to Commit RICO……………………………………..…….24

19

IV. CONCLUSION………………………………………………….………….25

20

21

22

23

24

25

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Statutes:**

3

18 U.S.C. § 1962(c)……………………………………………………...……1, 25

4

18 U.S.C.A. 1956(a)(1)……………………………………………………....…16

5

6

**Rules:**

7

FRCP Rule 4(h)(1)(B)………………………………………………...……..9, 11

8

FRCP Rule 4(h)(2)…………………………………………………...……...11

9

FRCP 8(a)(2)………………………………………………………………12

10

FRCP 9(b)…………………………………………………………...…....18, 20

11

**Cases:**

12

*American National Bank & Trust Co. v. Haroco, Inc.,*
13  473 U.S. 606,609 (1985)…………………………………………………………24

14  *Bein v. Brechtel Jochim Group, Inc.* (1992) 6 Cal. App. 4th 1387, 1392…………....10

15  *Bell Atlantic Corp. vs. Twombly,* 127 U.S. 1955, 1974 (2007)………...…12-14, 16, 17

16  *Bennett v. Berg*, 685 F.2d 1053, 1061-62 (8th Cir. 1982)……………………..…18

17  *Carver v. Condie* (7th Cir. 1999) 169 F3d 469, 472………………………………5

18  *Conley v. Gibson* (1957) 355 US 41, 47………………………………………....12

19  *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989)………………………..……...21

20  *Diamonds Plus, Inc. v. Kobler,* 960 F.2d 765, 769 (8th Cir. 1992)……………..…16

21  *Edwards v. Marin Park, Inc.*, 356 F. 3d 1058, 1065-1066 (9th Cir. 2004)……...18, 19

22  *Erickson v. Pardus* (2007) 127 S.Ct. 2197…………………………………….…13

23  *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229 (1989)………………………….…..22

24  *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir.2007)………………………….…13

25

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

26

27

28

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS      iii

Case No. C-7-04755-JSW

*King v. Dogan* (5th Cir. 1994) 31 F3d 344, 346………………………………..……5

*McLaughlin v. Anderson*, 962 F.2d 187 (Cir 1992)…………………………………21

*Pasadena Medi–Center Associates v. Sup.Ct. (Houts)* (1973)

9 Cal.App.3d 773, 778…………………………………………………………..…11

*Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954)…..21

*Poburky v. Madera County*, Slip Copy, 2007 WL 4557090 (E.D.Cal.,2007)…..…13

*Poulos v. Ceasars World Inc.,* 379 F.3d 654, 664 (9th Cir. 2004)…………..…..20, 22

*Reeves v. Ernst & Young,* 507 U.S. 170, 183 (1993)…………………………..…….17

*Republic of Colombia v. Diageo North America* (E.D.N.Y. 2007)

No. 04-CV-4372, 2007 WK 1813744………………………………………..……12, 13

*River City Markets, Inc. v. Fleming Foods West, Inc.,* 960 F.2d 1458, 1461 (9th Cir. 1992)…………………………………………………………………..……18

*Salinas v. United States*, 522 U.S. 22, 63-64 (1997)………………………………24

*Scheuer v. Rhodes*, 416 US 232, 235 (1974)………………………………..……..12

*Schmuck v. United States,*
489 U.S. 705, 712, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989)………………21

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,

806 F.2d 1393 (9th Cir. 1986)…………………………………………………..19

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)…………………………24

*Summers v. McClanahan* (2006) 140 Cal.App.4th 403, 407–411…………………11

*United States v. Allen,* 155 F.3d 35, 42-43 (2nd Cir. 1998)………………………17

*United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989)………………………21

*United States v. Elliott*, 89 F.3d 1360 (8th Cir. 1996)………………………………17

*United States v. LaFerriere*, 546 F.2d 182, 187 (5th Cir. 1977)……….……..……22

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS      iv

Case No. C-7-04755-JSW

*United States v. Tarnopol,* 561 F.2d 466, 471-72 (3rd Cir.1977)………………..21

*United States v. Turkette,* 452 U.S. 576, 580-81 (1981)………………………16

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS        v

# I. INTRODUCTION

In their Second Amended Complaint (SAC), Plaintiffs John Gidding and Pivotal, Inc. (hereinafter "Plaintiffs"), allege that the Plantagenet Defendants[1] (hereinafter "Defendants") were associates in a money laundering operation, i.e. <u>an Enterprise</u>[2], that affected interstate commerce. It is further alleged that the Defendants operated this Enterprise through a pattern, i.e. <u>plan and relatedness</u>, of racketeering activity, i.e. <u>acts of mail and wire fraud</u>. This action stems from the injuries that Plaintiffs sustained as a proximate result of the pattern of the Defendants' racketeering activity.

Though the SAC clearly sets out the necessary allegations in pleading RICO causes of action, in its Motion to Dismiss, Defendants have confused the alleged activity of the Enterprise, i.e. <u>money laundering in France</u>, with the alleged racketeering activity of the Defendant Persons, i.e. <u>related acts of mail and wire fraud in the United States</u>. This confusion permeates their motion to dismiss to such an extent that Defendants finally misstate the law in order to justify their argument: "***Despite its many complexities, RICO at its core has a fairly simple design: it prohibits a person from using a pattern of unlawful activities to infiltrate an interstate enterprise. 18 U.S.C. §1962.***" [*sic*] Motion to Dismiss, at p.14:18-19. This faulty definition of RICO excludes the "association-in-fact" type Enterprise at the core of 18 U.S.C. §1962(c). Having vitiated the statute they are accused of violating, Defendants go on to conclude that Plaintiffs have failed to state a claim.

---

[1] The "Plantagenet" Defendants are composed of a number of similarly named corporations, founded and owned by Derek Anderson ("Anderson"), which operate as a single unit and with a common purpose. Anderson used these corporations to direct and employ Defendants Serge Hauchart ("Hauchart"), Ollivier Lemal ("Lemal"), and John Zappettini ("Zappettini"), in the following manner: Plantagenet Capital Management LLC ("PCM") and Plantagenet Capital America LLC ("PCA"), both Delaware corporations with no structure other than Anderson's office in Mill Valley, employed or employs Zappettini. Plantagenet Capital Fund LP ("PCF-1") and Plantagenet Capital Fund LP II ("PCF-2"), both Cayman Island corporations with no structure other than Anderson's office in Mill Valley, employed or employs Hauchart. Plantagenet Partners SA ("PPSA"), a French corporation that had offices in Paris and Mill Valley, employed Lemal. PLB Holdings SA ("PLB"), a Luxembourg corporation with no structure other than Anderson's office in Mill Valley, had no employees.

[2] Enterprise" is defined in the RICO statute at 18 U.S.C. § 1961(4) (2000): "[E]nterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    1

Case No. C-7-04755-JSW

BIRNBERG & ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

While what constitutes money laundering in France[3] *can* be the equivalent of off-shore tax evasion in the United States (SAC ¶42), nowhere in the SAC is the concept of "dirty money" mentioned in the meaning of 18 USC §1956, nor does the SAC contain any allegation of predicate acts of money laundering.  That the French government is seeking to indict Plantagenet for money laundering and corruption (SAC ¶4) can come as no surprise, as Anderson, after hiring a corrupt French official (SAC Exhibit C) under indictment for money laundering (SAC exhibit B) to spearhead his French operations, published his intentions "to avoid heavy French Taxes (by doing) his deals in Luxembourg."  SAC exhibit F.

This case is certainly not a simple commercial dispute over a breach of contract, as Defendants would have this court believe.  The predicate acts of mail and wire fraud that proximately injured the Plaintiffs were committed in furtherance of two schemes that ran parallel to the money laundering operation: (1) a scheme to fund the operation with the proceeds of the Plaintiffs' commerce in Champagne, and (2) a scheme to dissimulate the 18MF being laundered by framing the Plaintiffs for evading an identical sum in taxes.  The SAC focuses upon the consequences of the "pattern" of the predicate acts, rather than the consequences of each predicate act *per se*, and alleges the following in the context of each scheme: the money laundering operations of the RICO Enterprise (SAC ¶39 to ¶57); the Defendants' racketeering activity, inside of either the Scheme to Fund the Enterprise (SAC ¶58 to ¶101) or the Scheme to Frame the Plaintiffs (SAC ¶102 to ¶136); and the proximate injuries to the Plaintiffs, totaling over $2M (SAC ¶80, ¶113).

## II.  DISCUSSION

The money laundering activity of the Defendants' Enterprise brings this case close to the "Mafia" model Congress had in mind when it enacted the RICO statutes.  This action is

---

[3] The Prosecutor of the French Republic is seeking to indict the Defendants and their accomplices for money laundering and corruption.  SAC ¶4.  Under the French Penal Code, it is sufficient that the origin of the money is "unknown" or "purposely concealed" to be criminalized.

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

not a "garden variety commercial suit" (Motion to Dismiss, at p. 2:9), but rather the Plaintiffs' attempt to repair the collateral damage caused by the nefarious schemes engineered by a convicted money launderer, Hauchart.[4]

Before the money laundering operation began in earnest, the Defendants moved against the Plaintiffs: PCM told the Plaintiffs that they owned SCEV in order to learn about their interstate distribution of Champagne (SAC ¶58), i.e. the "Scheme to Fund," and Defendant SCEA Chateau La Lagune ("Lagune") offered the Plaintiff's 18MF in commercial credit to participate in a deal that would enhance their US distribution (SAC ¶108), i.e. the "Scheme to Frame. When the schemes to defraud the Plaintiffs were in place, PLB converted the 18MF into shares of SCEV (SAC ¶50), Plantagenet took over the Plaintiffs' Champagne distribution (SAC ¶60), and Lagune set the wheels in motion for the French Fiscal police to tax the Plaintiffs for an illegal 18MF transaction (SAC ¶107, ¶111, ¶115). The Plaintiffs' initial resistance and subsequent litigation to keep their businesses and stay out of jail, obliged the Defendants to modify their schemes, and the modifications engendered the additional and related predicate acts needed to accomplish the same ends.

When the Plaintiffs litigated[5] to protect their businesses they encountered a new problem: SCEV and Lagune were represented by the same law firm (FIDAL) that had drafted the documents that dissimulated Hauchart's acquisition of SCEV (SAC ¶43a). During the first years of the litigation, with Hartford Insurance defending the real parties in interest in California, and FIDAL handling everything in France, the sundry members of the RICO Enterprise openly exchanged documents and information. However, when the

---

[4]  Eva Joly, the judge who first indicted Hauchart for money laundering (SAC Exhibit B), uncovered billions of dollars that had been siphoned away from legitimate concerns and then laundered to pay for the party's needs. As a result of her challenge to the French government, Joly received regular death threats, had her private telephone tapped, was robbed several times, and was eventually forced into exile, similar to plaintiffs.

[5]  On July 1, 1999, Pivotal & Gidding sued PCM and SCEV in the Superior Court of California, County of Los Angeles. On September 5, 1999, SCEV sued Pivotal & Gidding in the Commercial Court of Reims, France. On June 15, 2000, Gidding sued Champagne Ayala & Champagne Montebello (Lagune) in the Commercial Court of Chalons-en-Champagne.

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

Plaintiffs began to prevail, the Defendants pretended not to know each other while they tried to obliterate the traces of money laundering, as follows:

      1)    Anderson replaced SCEV's lawyers with himself (SAC ¶73), hid behind the differing and bogus Contracts of Guaranty (SAC ¶43, ¶74, ¶78, ¶79), and abandoned the California litigation (SAC ¶80).

      2)    Raulet initiated collusive sham litigation[6] against PLB and Zappettini in Luxembourg  (SAC ¶82), and brought criminal charges PLB, Anderson, and the Plaintiffs SAC ¶87, ¶94).

      3)    Lagune, after refusing to pay the Plaintiffs' fees and commissions (SAC ¶113), caused corrupted officials to steal the documents that connected them to SCEV (SAC ¶115, Exhibit I) while they liquidated Champagne Ayala and Montebello (¶114).

      4)    Jean-Francois and Christophe Rapeneau, who controlled both SCEV and Lagune from the onset (SAC ¶32), picked up all the pieces of SCEV (SAC ¶83, ¶89, ¶95), added PLB as party to the French civil litigation (SAC ¶101), and ended the Plaintiffs' hopes of recovering their proximate damages from either SCEV or La Lagune.

The litigation that runs through the Defendants' schemes to "Fund" and "Frame" required a high degree of coordination, provided them with a buffer between themselves and money laundering, and allowed them to keep the proceeds of the Plaintiffs' commerce in Champagne.

Finally, although it is true that the PCM, PPSA, PLB, Anderson, and Zappettini were dismissed with prejudice in the Los Angeles action for the matters alleged in the Los Angeles complaint (i.e. the LeBrun commissions), the allegations contained in the SAC are *new and subsequent acts of mail fraud*, and are part of the overall scheme, *neither of which*

---

[6] "Collusive sham litigation", a common technique of money launderers, is where the parties pretend to sue one another for damages equivalent to the amount of money being laundered. Raulet sued PLB for the exact US$ equivalent of the 15MF PLB used to purchase SCEV.

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS     4

*were covered by the settlement release*.[7]  PLB was substituted for PPSA in the release so that SCEV could allege that PLB, previously liquidated, conspired with Plaintiffs to obtain a default judgment against SCEV.  The Plantagenet Defendants' involvement in the scheme to frame, minimally the predicate acts of wire fraud that paid the bribe of the public official in charge of Lagune (SAC ¶50, ¶107, 108) are outside of the settlement release.

Plantagenet further complicates their motion to dismiss by confusing the First Amended Complaint (hereinafter "FAC") with the SAC and misrepresenting key facts.[8]  Plaintiffs will illustrate, using five examples from the Motion to Dismiss:

**Example 1**: In a footnote to their impending confusion, Plantagenet states that they have cause to believe that the SAC was "*simply translated, verbatim, from some foreign legal pleading, rather than being drafted for this case*".  Motion, at p. 3:26-28.  Plantagenet is wrong.  There are no French equivalents of RICO, mail fraud, or wire fraud, nor are there "pleadings" in French criminal investigations.  While the SAC reflects the French Prosecutor's evidentiary findings of money laundering committed in ***France***, it only contains allegations of predicate acts of mail and wire fraud committed in the ***United States***.

**Example 2**: "*Most of the factual allegations which formed the basis of the FAC are completely missing from the SAC.  None of the 46 Exhibits attached to the original FAC are even referenced in the SAC, which has its own set of new and entirely different exhibits.*"  Motion to Dismiss, at p. 2:1-6.  The amended complaint supersedes the original complaint and renders it of no legal effect, unless the amended complaint incorporates by reference portions of the prior pleading. See *King v. Dogan* (5th Cir. 1994) 31 F3d 344, 346; *Carver v. Condie* (7th Cir. 1999) 169 F3d 469, 472.  The same facts and occurrences are alleged in

---

[7] The Plaintiffs did not suspect they were the victims of organized crime until Hauchart's conviction for money laundering made the headlines in February 2004 and detailed his web of "offshore" connections.   In September 2004, the Plaintiffs informed the French Prosecutor that the Cayman Islands were the connecting link between Anderson and Hauchart, which letter opened the door to a new criminal investigation.  SAC ¶36, Exhibit J-1.  Attached to the Declaration of John Gidding as Exhibit H and incorporated herein by reference is a translation of the relevant portions of a letter to the French prosecutor.

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the SAC as were present in the FAC, but greater emphasis is placed on other areas of the

Enterprise and predicate acts to make the SAC conform to the RICO statute. New evidence

and new counsel have required the amendments, all as set forth in the motion to amend.

The SAC has replaced the FAC, the one does not contradict the other, and no comparison is

necessary.  Moreover, the FAC is a subset of the SAC and the same predicate acts are now

found in the "Scheme to Fund the Enterprise".  The Plaintiffs are not required to supply any

exhibits at this stage of the proceedings, and the 57 exhibits given to the Defendants by way

of the FAC can only add to their comprehension of the facts or facilitate their discovery.

      *Example 3*: "*While the Plaintiffs allege the SCEV's new owners and*

*Plantagenet conspired to remove PPSA's name from the Contract of Guarantee, they have*

*not and cannot explain why SCEV would want to deprive itself of a solvent indemnitor by*

*deleting that indemnitor from the Contract of Guarantee*".  Motion to Dismiss, at p. 5:24-

27.  The SAC clearly indicates that: (1) Anderson is not laundering his money, rather he is

laundering Patrick Raulet's ("Raulet") money; (2) Raulet financed Anderson's purchase of

SCEV in January 1999; and (3) Anderson and Raulet are signers of the "Contract of

Guaranty."  SAC ¶44-¶57.  The SAC makes it clear that Anderson and Raulet are joint

venturers in the same criminal enterprise.  If SCEV sued PPSA in a French court over a

bogus Contract of Guaranty, Anderson, Lemal, and Raulet would all be hauled off to jail for

money laundering and tax evasion.  PLB was substituted for PPSA in the release so that

SCEV could allege that PLB conspired with Plaintiffs to obtain a default judgment against

SCEV.  Thus, Plaintiffs have explained why SCEV "*deprived itself of a solvent indemnitor*

*be deleting that indemnitor from the Contract of Guarantee.*"

      *Example 4*: "*Since March 2000, none of the Plantagenet Defendants have any*

*interest or involvement in SCEV or any Champagne company.*"  Motion to Dismiss, at p.

4:10-12.  "*While this section of the SAC contains specific allegations of wrongful conduct*

*by dismissed defendants Raulet, Levant, SCEV, and Simon, there are no allegations that any*

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    6

Case No. C-7-04755-JSW

*of the Plantagenet entities were party to any of these court proceedings*." Both of these statements are incorrect. Not only was Plantagenet involved with SCEV after March 2000, but PLB and Anderson were party to the various court proceedings. Plantagenet admits to having signed a Contract of Guaranty with Levant in March 2000, which insures Plantagenet's perpetual "involvement" with SCEV. On June 4, 2001, Anderson became SCEV's attorney of record in the Los Angeles litigation (despite not being a licensed attorney!) and failed to show up for the trial. SAC ¶73. Plantagenet's predicate acts continued after they had settled out of the Los Angeles litigation on September 20, 2001 (SAC ¶76c). Anderson faxed a letter to Raulet, dated September 28, 2001, where he revealed that there was no "Contract of Guaranty," only his "personal" guarantee (which Anderson did not honor). SAC ¶79. In January 2002, when SCEV and PLB pretended to sue one another in Luxembourg, Anderson provided Raulet with a bogus December 3, 2001 California judgment to lend credence to their sham litigation. SAC ¶82. Raulet's criminal suit accused PCM, PLB and Anderson of colluding with the Plaintiffs (Raulet took great pains to spare PPSA and Lemal). SAC ¶87. In September 2004, PLB joined SCEV as a Defendant in the Plaintiff's litigation to have the French Court validate their California judgment. SAC ¶98.

     ***Example 5***: "*The litigation and French tax collection apparently continue in Europe, with SCEV and the Plaintiffs exchanging charges of fraud and other wrongful conduct against each other and with the Plaintiffs continuing to face tax evasion charges.*" Motion to Dismiss, at p.13:14-17. The facts, of course, are different: the IRS has rejected all of the French tax claims against the Plaintiffs; the French Prosecutor has rejected SCEV's criminal charges against the Plaintiffs, and closed the case on Lagune's criminal charges; the Wrongdoers who settled out of the FAC settled the French civil matters at the same time.

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

Lastly, Plaintiff's letter to the French Prosecutor, besides referencing many of the same facts that the SAC uses to describe the Defendants' schemes to "Fund" and "Frame" (which facts in turn led to the present criminal investigation), also indicates that the only way to contact PLB, subsequent to its liquidation (April 7, 2000 SAC ¶55), was to contact Anderson.  Attached to the Declaration of John Gidding as Exhibit H and incorporated herein by reference is a translation of the relevant portions of Plaintiff's letter to the French prosecutor.  In the translation of Exhibit H, Raulet had told the French Prosecutor that "on January 7, 2002, (he) activated the Contract of Guaranty with PLB".  Gidding informs the French Prosecutor that Raulet only "pretends that this activation of the Contract of Guaranty was addressed to PLB, while in reality it was addressed to Mr. Anderson in the USA and did not even mention PLB."

## III.  ARGUMENT

### A.    <u>Plaintiff's Service on PLB and PPSA Was Proper</u>

The Defendants claim that service on PLB and PPSA was not proper, because service was effected through Derek Anderson in Marin County, California.  However, the primary link between PLB and PPSA is Derek Anderson, their common director.

Federal Rule 4(h)(1) provides two methods by which a corporation can be served in the Northern District of California:

(A) in the manner prescribed by Rule 4(e)(1) for serving an individual; or

(B) by delivering a copy of the summons and of the complaint to an officer, a managing or general

agent, or any other agent authorized by appointment or by law to receive service of process and--if

the agent is one authorized by statute and the statute so requires--by also mailing a copy of each to

the defendant;

Though Rule 4(e)(1) allows service pursuant to the law of the state where service is made, here California, Defendants cited to CCP §415.95, which provides for service on a "business organization, form unknown," and is the improper section for service on a

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

corporation in this case. The proper section is CCP §416.10, which provides that a

summons may be served on a corporation by delivering a copy of the summons and the

complaint by *any of the following methods*:

> (a) To the person designated as agent for service of process, or
>
> (b) To the president, chief executive officer, or other head of the corporation, a vice president, a
>
> secretary or assistant secretary, a treasurer or assistant treasurer, a controller or chief financial officer,
>
> a general manager, or a person authorized by the corporation to receive service of process.

Whether one chooses to effect service on a corporation via FRCP Rule 4(h)(1)(B),

or by CCP §416.10, service is valid if the summons and complaint are served on an officer,

a managing agent or otherwise general manager of that corporation. Here, Plaintiffs hand-

served Derek Anderson with the summons and complaint on behalf of Defendants PLB and

PPSA, at Mr. Anderson's residence in Marin County, California. While Defendants would

have this court believe that Mr. Anderson is no longer "actively" involved with PLB and

PPSA, documents obtained from the SEC and from Plantagenet's own website indicate

otherwise. As of 1999, Derek Anderson was listed as an agent of Plantagenet Capital Fund,

LP, and the senior managing partner of Plantagenet Capital Partners, LP, and Plantagenet

Capital Management, LLC. See Exhibit B to the Declaration of John Gidding, at pages 15-

23 and incorporated herein by reference. As of 1999, Derek Anderson was listed as an

agent of Plantagenet Capital Management, LLC. As of 2000, Derek Anderson was listed as

an agent of Plantagenet Capital Partners, L.P. and Plantagenet Capital Management, LLC.

See Exhibit B to the Declaration of John Gidding, at pages 1-4; 13-14. As recent as 2005,

Derek Anderson has been listed as a signatory of Plantagenet Capital Fund, LP, Plantagenet

Capital Fund II, LP, Plantagenet Capital Management, LLC., Plantagenet Capital Partners

L.P., and Plantagenet Capital Partners II L.P. See Exhibit B to the Declaration of John

Gidding, at pages 5-6 and incorporated herein by reference. As of the filing of this motion,

Derek Anderson is listed as the senior managing partner of Plantagenet Capital on

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS       9

Case No. C-7-04755-JSW

Plantagenet's website, with an address in Mill Valley, California.  See Exhibit A to the Declaration of John Gidding, at page 2, and incorporated herein by reference.  Lastly, an article posted on Plantagenet's website, which was last updated in 2006, clearly indicates that Derek Anderson is the founder and senior managing partner of Plantagenet (though the exact corporate form is not mentioned).[9]  .  See Exhibit A to the Declaration of John Gidding, at page 7-8, and incorporated herein by reference.  Plaintiffs, therefore, justifiably believe that Mr. Anderson is an *active* officer, a managing agent or general manager of the PLB entities, and therefore personal service on Derek Anderson on behalf of PLB was proper.

Exhibit A to the Declaration of John Gidding, page 7-8 further indicates that Plantagenet Holdings, which was founded by Anderson, then when on to found Plantagenet Partners, otherwise known as PPSA.  It appears that regardless of the form that the various Plantagenet entities take, Anderson is a founding member, and is a controlling and managing individual.  Further, in his attempts to locate the proper agent for service of both PLB and PPSA, Plaintiff John Gidding has visited Paris and Luxembourg since the filing of the original complaint. See Declaration of John Gidding, at ¶3, 10.  During these times, he has visited the Registry and discussed the matter of service with notaries and lawyers, in both Luxembourg and Paris, has been unable to discover any means of serving a liquidated Luxembourg company, such as PLB, or a liquidated French company, such as PPSA, other than serving their presumed "beneficiary owner," here Derek Anderson.  Plaintiffs therefore have complied with the code to the best of their ability in effecting proper service on the elusive entities of PLB and PPSA, through Mr. Anderson.

In determining whether service is valid, California Courts have routinely held that the service of process statutes are to be liberally construed to effectuate service.  *Bein v. Brechtel Jochim Group, Inc*. (1992) 6 Cal. App. 4th 1387, 1392.  As long as the defendant

---

[9] See Declaration of John Gidding for further recitations as to Derek Anderson's involvement in the Plantagenet entities.

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

receives *actual notice* of the lawsuit, substantial compliance with the Code provisions governing service of summons will generally be held sufficient. *Pasadena Medi–Center Associates v. Sup.Ct. (Houts)* (1973) 9 Cal.App.3d 773, 778; *Summers v. McClanahan* (2006) 140 Cal.App.4th 403, 407–411.  Here, PLB and PPSA have received actual notice of this matter, and are simply attempting to evade service by claiming that Derek Anderson is not actively involved with the corporation, though SEC documents and Plantagenet's own website indicates otherwise.  See Exhibits A and B to Declaration of John Gidding.

It is similarly instructive that, in their motion, Defendants give no indication that Mr. Anderson, an individual whose name has been so significantly attached to PLB and PPSA, has resigned, or has relinquished his management of these entities.  Further, the Affidavit of C. Derek Anderson makes it no more believable that Mr. Anderson is not actively involved in these entities, especially when Plaintiff's research indicates simply that Mr. Anderson is still a principle of both PLB and PPSA.[10]  Plaintiffs have properly served PLB and PPSA in compliance with the code, and therefore in compliance with FRCP Rule 4(h)(1).

Lastly, FRCP Rule 4(h)(2) does indeed provide for service on a foreign corporation at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual.  Typically, this would require compliance with the Hague Convention and Service Abroad of Judicial and Extrajudicial Documents.  However, it is unnecessary for Plaintiffs to serve PLB and PPSA according to the rules of the Hague Convention when proper service in compliance with the code can be effected on an officer, a managing agent or general manager, such as Derek Anderson.  Further, Anderson is aware that there are no French or Luxembourg equivalents of "agents for service" and that the Hague Convention only deals with active corporations.  Plaintiffs' own research has revealed that service on PLB and PPSA in the countries in which they were incorporated

---

[10] It is difficult to accept as true the word of an individual who recently engaged in the unauthorized practice of law!

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    11

Case No. C-7-04755-JSW

BIRNBERG & ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

would be futile.  It remains that since Plaintiffs effected proper service on PLB and PPSA

through Derek Anderson, that service via FRCP Rule 4(h)(2) is unnecessary.

## B.  Plaintiffs State a Claim That is Plausible on Its Face

Defendants claim that the facts alleged in the SAC do not raise the right of relief

above the speculative level, citing to *Bell Atlantic Corp. v. Twombly* (2007) 127 S. Ct. 1955,

1974 .  See Motion, at p. 10-12.[11]  While it is true that a complaint must "state a claim to

relief that is plausible on its face," in applying the general standards of what a plaintiff must

plead in order to state a claim, FRCP 8(a)(2) requires only a "a short and plain statement of

the claim showing that the pleader  is entitled to relief," in order to "give the defendant fair

notice of what the ... claim is and the grounds upon which it rests," *Twombly*, supra at 1964,

citing *Conley v. Gibson* (1957) 355 US 41, 47.

In addition to its plausibility standard, *Twombly* also states that a well-pleaded

complaint may proceed even if it appears that a recovery is very remote and unlikely.

*Twombly*, at 1965, citing *Scheuer v. Rhodes*, 416 US 232, 235 (1974).  The *Twombly* court

further reminded district courts weighing a motion to dismiss to ask "not whether a plaintiff

will ultimately prevail but whether the claimant is *entitled to offer evidence to support the*

*claims.*" (emphasis added) *Twombly*, supra, at 1969 n. 8 (quoting *Scheuer v. Rhodes*, supra,

at 236).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that

actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.' "

*Twombly*, supra, at 1965.

While *Twombly* is no doubt applicable to the case at bar, Defendants over-emphasis

its application to the case at bar.  In *Republic of Colombia v. Diageo North America*

(E.D.N.Y. 2007) No. 04-CV-4372, 2007 WK 1813744, a Second Circuit case that interprets

*Twombly* in which the court found that plaintiffs therein had alleged sufficient conspiracy

---

[11] Defendants cite to *Twombly* incorrectly, as 127 U.S. 1955.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS        12

Case No. C-7-04755-JSW

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

and enterprise to survive a motion to dismiss,[12] the Second Circuit explained that *Twombly* imposes a plausibility requirement on pleadings under Rule 8, **but does not, as a general matter, change the Rule 8 pleading standard**. *Republic of Colombia,* supra. According to the Second Circuit, the outcome of *Twombly* is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible "plausibility standard," which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible. *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir.2007). The Supreme Court case has neither heightened the Rule 8 pleading standard. See *Andrews Farms v. Calcot, Ltd*. 527 F.Supp.2d 1239 (E.D.Cal. 2007); *Erickson v. Pardus* (2007) 127 S.Ct. 2197.

Additionally, the cases that Defendants cite to in support of its proposition that the SAC fails to meet *Twombly*'s probability test in application to a RICO claim, are clearly distinguishable from the case at bar, and fail to instruct this Court as to the applicability of the probability standard to a RICO cause of action. For instance, in *Pobursky v. Madera County*, Slip Copy, 2007 WL 4557090 (E.D.Cal.,2007), the Poburskys alleged violations of their constitutional rights and RICO, arising out of a putative conspiracy to harass and falsely arrest them and take their children into protective custody. While the *Pobursky* case did indeed cite to *Twombly*'s plausibility standard, it did so only in the context of plaintiff's several causes of action for violations of plaintiff's constitutional rights. In fact, in evaluating the Poburskys' RICO cause of action itself, the court therein did not even reach the issue of plausibility, as the RICO cause of action was summarily brief, devoid of facts, failed to meet the enterprise standard, and was not even labeled as a specific cause of action. *Pobursky*, supra, at 6-7. Defendants misconstrue the holding in *Pobursky*; in fact,

---

[12] Curiously, Defendants cite to this case in furtherance of their plausibility argument, yet the court in *Republic of Colombia* actually denied defendant's motion to dismiss.

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

1

2

*Pobursky* is completely not instructive in the application of *Twombly*'s plausibility standard to a RICO cause of action.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

Defendants cite to six allegations in the SAC, in an attempt to illustrate that the facts alleged in the SAC are "inconceivable." Defendants fail to persuade that these allegations do not satisfy *Twombly*'s plausibility standard. For instance, the first two cited allegations, are in fact, "Hobbs Act"- type violations (SAC ¶36, ¶43, and ¶142) as they occurred outside of the United States. These allegations are not predicate acts, and as such are not fleshed out, neither do they require fleshing out, in the SAC. The cited allegations three through six are predicate acts that are further fleshed out in the SAC, and that are mutually bolstered by one another. That Anderson caused Hartford to make three different settlement offers to protect PPSA (SAC ¶76), forged a California judgment to protect PPSA (SAC ¶82), and supplied his joint venturers with a forged Hartford release to protect PPSA (SAC ¶77, ¶88 to ¶93), are part and parcel of the Defendants "Scheme to Fund the Enterprise". PPSA and Anderson were the direct beneficiary of this scheme, as the former never had to honor their bogus "Contract of Guaranty", and the later never had to honor his worthless "Personal Guaranty." SAC ¶78, ¶79.

17

18

19

20

21

22

Further, the cited allegations five through six were plausible enough in the eyes of the French Prosecutor that, in addition to other allegations, the French Prosecutor sought to indict Defendants and their accomplices for money laundering and corruption. SAC ¶4. The French Prosecutor, before coming to his decision to convene a rogatory commission to seek an indictment, analyzed the documentary evidence collected from five related criminal investigations, one of which led to the conviction of Hauchart.

23

24

25

26

27

In September 2004, the Plaintiffs informed the French Prosecutor that the Cayman Islands were the connecting link between Anderson and Hauchart (Exhibit H to the Decl. of John Gidding), which letter opened the door to a new criminal investigation. SAC ¶36, Exhibit J-1. Exhibit J to the SAC, the "Order to Join" issued by the French criminal court of

28

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

Paris, demonstrates the French Prosecutor's belief in the "plausibility" of the various criminal actions of Raulet, Marie-Claude Simon, etc. As such, the factual allegations relative to the RICO Enterprise and the Defendants' schemes to defraud have been raised far above the standard set by the *Twombly* Court. *Twombly*, supra.

Defendants further seek to invalidate the plausibility of Plaintiff's allegations in the SAC, by stating that the right to relief is purely speculative. However, in so doing, Defendants fundamentally and willfully misunderstand the allegations in the SAC. While Defendants state otherwise, Plaintiffs did not in fact "speculate that SCEV had received a secret indemnity from PPSA as well as from PLB …. " See Motion to Dismiss, at p. 12:20-23. Rather, the Plaintiffs stated that the owner of PPSA, i.e. Anderson, was washing money for the owner of SCEV i.e. Raulet (SAC ¶47 to ¶50), both joint venturers in the same money laundering enterprise. Anderson and Raulet have no reason to sue each other and they have every reason to defraud the Plaintiffs, therefore they replaced PPSA, a solvent French corporation, with PLB, a liquidated Luxembourg corporation.

Further, Defendants devote several paragraphs to Plaintiffs' alleged reliance on "mere labels and conclusions," apparently taking issue with Plaintiffs' characterization of the Defendants actions as "money laundering" in France. See Motion to Dismiss, at p. 13:3-16. Again, as is Defendants' *modus operandi* throughout the motion to dismiss, Defendants fundamentally and willfully misunderstand the references to money laundering in the SAC. Had Defendants given the SAC a thorough review, it would have been clear to them that *Plaintiffs never make any allegations against Defendant for money laundering in the United States*. Rather, Plaintiffs use the term "money laundering" to illustrate and categorize the series of activities in which Defendants acted as an enterprise in their various schemes, which is necessary to state a cause of action for RICO. Plaintiffs use the actions that are characterized as "money laundering" to establish enterprise, and nothing more.

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

The standard for bringing a criminal money laundering action in the U.S. is actually higher than the standard for criminal money laundering in France. The various acts that Defendant considers a mere "series of normal business transactions," (see Motion, at p. 14:1-11) the French Prosecutor labels "money laundering." See SAC ¶¶41-42. Plaintiffs never make allegations that Defendants participated in criminal money laundering under U.S. laws; rather, Plaintiffs make allegations against Defendants for wire and mail fraud only, and use the actions of Defendants, the balance of which would be considered money laundering in France, as a means to establish enterprise. See SAC ¶¶39-42.

Further, Defendants continually state that the SAC is deficient and implausible, because it does not state the source of the "dirty money," citing 18 U.S.C.A. 1956(a)(1). As previously mentioned, Plaintiffs is not making any allegations against Defendant for criminal money laundering under U.S. laws. In establishing enterprise, Plaintiffs allege various acts of money laundering under French laws, specifically stating that, under the French Penal Code, Articles 324-1 and 324-1, it is sufficient that the origin of the money is "unknown" for the act to be criminalized. SAC ¶42. However, since Plaintiffs are not making actual allegations against Defendants for money laundering, it is not necessary to allege the source of the laundered money.

The SAC as written raises the right of relief above the speculative level, and is certainly sufficient to suggest that discovery would yield further evidence of wrongdoing. *Twombly*, supra at 1965.

## C. Plaintiffs State a Claim Under RICO

### 1. The RICO Enterprise

In order to bring a claim under any subsection of RICO, Plaintiffs are required to name an enterprise which may be either an illegitimate enterprise (i.e. a mafia family, as Congress originally intended), a legitimate enterprise such as a corporation (see *United States v. Turkette* (1981) 452 U.S. 576, 580-81), or any informal group as an association-in-

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

fact as long as the group possesses three characteristics: 1) some continuity of structure and personnel, 2) a common or shared purpose, and 3) an ascertainable structure distinct from that inherent in the pattern of racketeering. *Diamonds Plus, Inc. v. Kobler*, 960 F.2d 765, 769 (8th Cir. 1992).

In light of the French Prosecutor seeking to indict Plantagenet for their participation in a money laundering operation, the Plaintiffs amended their first complaint to redefine the RICO Enterprise as an "association-in-fact of venturers in an international money laundering scheme". SAC ¶1. The French Prosecutor, before coming to his decision to convene a rogatory commission to seek an indictment, analyzed the documentary evidence collected from five related criminal investigations, one of which led to the conviction of Hauchart. As such, the factual allegations relative to the RICO Enterprise and the Defendants' schemes to defraud have been raised far above the standard set by *Twombly*. *Twombly,* supra at 1974.

### 2.    The conduct of the RICO Enterprise

The Plaintiffs have alleged that the Defendants did "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. §1962(c). The Supreme Court has interpreted this language to mean that a defendant must "operate or manage" the enterprise. *Reeves v. Ernst & Young* (1993) 507 U.S. 170, 183. Given the Supreme Courts' crystal clear guidance in *Reeves*, the question of whether a particular defendant actually operates or manages an enterprise is generally considered by the lower courts to be a question of fact that is left to the jury. *United States v. Allen,* 155 F.3d 35, 42-43 (2nd Cir. 1998).

### 3.    The Enterprise affected US Commerce

The Plaintiffs have alleged that the "Scheme to Fund the Enterprise" was the cause of the loss of their commerce in Champagne LeBrun (SAC ¶58 to ¶101), and that the "Scheme to Frame" was the cause of the loss of their commerce in Champagne Ayala and

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    17

Case No. C-7-04755-JSW

Montebello.  SAC ¶102 to ¶136.  Both of these schemes affected interstate commerce.
Moreover, because the U.S. Constitution confers the postal powers upon the federal
government, acts of mail fraud, even intrastate use of the mails, have an inherent nexus with
interstate commerce. *United States v. Elliott*, 89 F.3d 1360 (8th Cir. 1996).  Further, the
Defendants' schemes evolved to counter the Plaintiffs' resistance, engendering additional
predicate acts that interfered with a Mandate of a Court of the United States (SAC ¶82, ¶85,
¶86, ¶93, ¶101) and violated a Treaty of the United States.  SAC ¶130, ¶135.

### 4.    The Enterprise / Defendant distinction

An 18 U.S.C. §1962(c) claim requires pleading and proof of two separate entities, an
"Enterprise" and a "Defendant person."  In addition to being distinct from the pattern of
racketeering activity, the enterprise must also be distinct from the defendant person.  The
Enterprise / Defendant distinction arises from the long-standing common law maxim that a
person cannot conspire with himself.  *River City Markets, Inc. v. Fleming Foods West, Inc.*,
960 F.2d 1458, 1461 (9th Cir. 1992).  Plaintiffs have alleged that the Defendants' schemes
to defraud were facets of a larger scheme to launder money and, as such, the activity of the
RICO Enterprise is clearly distinct from the Defendants' "racketeering activity."  Further,
the SAC has shown that the alleged Enterprise possesses a continuity of personnel, a
common purpose, and an ascertainable structure distinct from that inherent in the Defendant
persons' pattern of racketeering.  *Bennett v. Berg*, 685 F.2d 1053, 1061-62 (8th Cir. 1982).

### 5.    Plaintiffs' Allege Enough Specific Content to Satisfy FRCP 9(b), and Plaintiffs Specifically Allege The Management of the RICO Enterprise through a pattern of racketeering activity.

Defendants cite to *Edwards v. Marin Park, Inc.*, 356 F. 3d 1058, 1065-1066 (9th Cir.
2004), indicating that the mobile park resident failed to state a RICO claim with requisite
particularity, because the resident properly alleged the time and place that the park's
purportedly fraudulent legal notices were delivered and named the parties involved, but did
not alleged the specific contents of the notices, ***and failed to attach the notices to her***

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS       18

Case No. C-7-04755-JSW

***complaint or to any other filing.*** However, this case does not so state that F.R.C.P. 9(b) requires to have the documents attached. *Edwards* does state, and infer, that in lieu of alleging the specific contents of the false representations, required under F.R.C.P. 9(b), that the documents could be attached as exhibits to the complaint *–or any other filing in the case-* which is a fairly liberal standard. However, contrary to Defendants' assertion, *Edwards* and F.R.C.P. 9(b) ***do not require the documents containing the fraudulent representations be attached***. In fact, such documents may not even be available to the alleging party until discovery is commenced and thus would be a bar to Plaintiff alleging fraud if it was required to attach all documents showing the specific contents of the fraud.

In fact, as *Edwards* states, RICO only requires those regular Rule 9(b) pleadings that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity" applies to civil RICO fraud claims. *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1989)." *Edwards,* supra, at 1065-1066. *Edwards* relies on *Neuman*, and *Neuman* relies upon *Schreiber Distrib. Co. v. Serv-Well Furniture Co*., 806 F.2d 1393 (9th Cir. 1986).

*Schreiber* states,
"We have interpreted Rule 9(b) to mean that the pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation. *Id* at 1393.

Plaintiffs complied with *Schreiber* in the following manner, and for every predicate act beginning with the first (illustrated below) to the last:

1.    The SAC first alleged the predicate act in the context of the scheme whose purpose it furthered, and this allegation contained the time, place, parties, and the specific content of the act e.g.: "Scheme to Fund the Enterprise: On October 28, 1998, Zappettini telephoned Pivotal to acquire samples for the agents who were replacing the Plaintiffs and to learn about Pivotal's commerce in Champagne." SAC ¶58;

2.    Then, the SAC summarized the part of the Scheme the predicate furthered: It

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    19

Case No. C-7-04755-JSW

was part of the Scheme to Fund the Criminal Enterprise that the Defendants intentionally and knowingly usurped the Plaintiff's commerce in Champagne LeBrun" ¶140;

3.    Finally, the SAC alleged whether the predicate was an act of wire fraud or mail fraud, and how the "US" wires or mails were used: "In particular the wires were used, among other times, on the following occasions: October 28, 1998 - Zappettini (San Francisco, CA) telephoned Pivotal (North Hollywood, CA)".  ¶142(b)(i).

4.    Attached as Exhibit I to the Declaration of John Gidding, and incorporated herein by reference is an appendix which details the summary of the predicate acts found in ¶142, with a notation indicating the relevant SAC paragraph where the predicate act is placed in the context of the larger scheme. Exhibit I goes through each of the predicate acts in FRCP 9(b) parlance, showing where the parties, time, place and the specific content of the alleged fraud is in the SAC. In a large scheme as this, and in RICO, there is not a black and white single occurrence of fraud.  In RICO, and in this case, there is a whole series of predicate acts, some legitimate on their face, but when put together they comprise an elaborate scheme, the overall theme of which is money laundering, which caused Plaintiffs damage. Defendants can be liable and Plaintiffs can sue the Defendants for the economic losses they have sustained by the reasons of the Defendants' overall pattern of racketeering. Plaintiffs' were just one cog in the wheel of Defendants' overall plan.

The Plaintiffs used this "3-prong" identification method not only because of the "pattern" requirement, but because the Defendants' use of the European wires and mails in furtherance of their frauds do not seem to qualify as predicate acts under 18 U.S.C. §§ 1341, 1341.

The Plaintiffs have alleged that the Defendants' "pattern of racketeering" was composed of the predicate acts of mail fraud, 18 U.S.C. §1341, and wire fraud, 18 U.S.C. §1343.  The SAC places each predicate act in the context of the scheme whose purpose it was to further, either the "Scheme to Fund the Enterprise" or the "Scheme to Frame," and

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

then summarizes all of the predicate acts, by wire or mail fraud, in chronological order. SAC ¶142. No one predicate act embodied the entire scheme whose purpose it furthered, but each predicate act *furthered* the scheme and was a "milepost on the road to causation." *Poulos v. Ceasars World Inc*., 379 F.3d 654, 664 (9th Cir. 2004).

The statutes concerning mail fraud and wire fraud are identical. To prove a violation of either, plaintiffs must establish the existence of a fraudulent scheme and a mailing or use of the wires in furtherance of the scheme. See *Schmuck v. United States* (1989) 489 U.S. 705, 712, 109 S.Ct. 1443, 1448; *Pereira v. United States* (1954) 347 U.S. 1, 8. While there is no requirement that the defendant personally mail a letter, send a fax, or telephone, the plaintiff must show "... 1) that the defendant 'caused' the mailing (or use of the wires) ... and 2) that the mailing (or use of the wires) was for the purpose of executing the scheme or ... 'incidental to an essential part of the scheme.' " *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989) (quoting *Pereira v. United States,* supra at 8-9).

The SAC detailed how the pattern of the predicate acts contributed to the ultimate success of the Defendants' schemes to "Fund" and "Frame". While each alleged predicate act was "incidental to an essential part of the scheme (See *United States v. Bortnovsky*), not every predicate act contained statements that were false or misleading or contained particulars that were fraudulent, therefore these elements are alleged in the overall scheme. However, every allegation of a predicate act identified when and where the statements were made, and those responsible for the statements. See *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989).

Defendants, in citing to *McLaughlin v. Anderson*, 962 F.2d 187 (Cir 1992), have chosen a case where the RICO claim was dismissed because the Plaintiffs failed to establish the relationship of the predicate acts to the scheme that allegedly damaged them:

> "The district court, however, refused to consider the pre-bid mailings. The court reasoned that these
>
> mailings had occurred before the start of Anderson's fraudulent scheme and thus were outside the

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

purview of the mail fraud statute. See *United States v. Tarnopol*, 561 F.2d 466, 471-72 (3rd Cir.1977). While we are reluctant to set firm temporal restraints on mail fraud allegations, we do agree that the mail fraud statute punishes only mailings that have a place in a fraudulent scheme." *Id.*

The Plaintiffs have shown that the Defendants' initial predicate acts were used to hatch their

5

6

7

8

schemes.   Moreover, as the Court of Appeals for the Fifth Circuit said in *United States v. LaFerriere*, 546 F.2d 182, 187 (5th Cir. 1977), "the close relation of the mailings to the scheme does not turn on time or space, but on the dependence in some way of the completion of the scheme or the prevention of its detection on the mailings in question."

9

### a.    Pattern

10

11

12

13

14

15

16

17

18

19

20

21

22

In *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229 (1989), the Supreme Court determined that the factors of relatedness and continuity combine to produce a pattern of racketeering. To be related, the criminal actions that form the pattern must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics." *H.J. Inc.*, supra at 240.  Continuity may be close-ended or open-ended. *Id.* at 241. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242.  The Plaintiffs alleged the commission of 41 related predicate acts of mail and wire fraud spaced over nine years, each one of which contributed to the furtherance of either the "Scheme to Fund" or the "Scheme to Frame."  As the Defendants' racketeering activity were subsets of the overall money laundering operation, not only are the predicate acts in each scheme related, but the schemes themselves are related.

23

### b.    Detrimental Reliance

24

25

26

27

Defendants have invoked "detrimental reliance" as a precondition for a mailing or wire transmission to qualify as a predicate act, citing a number of cases where it is variously argued that a plaintiff should establish some level of "detrimental reliance" to validate his

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

claim that the pattern of the predicate acts was indeed the proximate cause of his injuries.[13] While the theory of "detrimental reliance" and its exact relationship to "predicate acts" has not been perfectly established, *Poulos v. Ceasars World Inc. 379 F.3d 654, 664 (9th Cir. 2004)* noted that: "reliance may be a milepost on the road to causation."

The Plaintiffs' reliance on the misrepresentations embodied in Defendants' predicate acts was a proximate cause of the damage they suffered. Two examples follow:

*Example 1*: Plantagenet's first predicate act of wire fraud occurred on October 28, 1998. SAC ¶58. Zappettini, in his capacity of a manager of PCM, telephoned the president of Pivotal (Mr. Gillooly), and informed Mr. Gillooly that: (1) PCM had purchased SCEV; (2) PCM required all information concerning Pivotal's distribution of Champagne in the United States; and (3) PCM needed samples of Champagne sent to their offices in San Francisco. In truth, PCM did not own SCEV, nor would they ever, and PLB would not own SCEV for another three months, but Zappettini's call had the desired effect. Mr. Gillooly <u>believed</u> Zappettini and provided him with confidential commercial information concerning Pivotal's interstate distribution. Plantagenet's second predicate act of wire fraud was committed on the same day. Zappettini faxed the confidential commercial information he had gleaned from Pivotal to Lemal in France. SAC ¶59. As a direct result of this deception, Lemal used this confidential information to usurp Pivotal's commerce in Champagne LeBrun. SAC ¶60.

*Example 2*: Hartford offered to settle PCM out of the California litigation on September 10, 2001. SAC ¶76(a). The Plaintiffs <u>believed</u> that Hartford was making a final proposal, and signed and returned the offer. SAC ¶76(a). This deception was repeated, adding PLB, and finally adding PPSA (SAC ¶76(b), ¶76(c)), giving Plantagenet the signed drafts necessary to produce a forged settlement agreement that Anderson would later put

---

[13] *Brown v. Cassan Transp. Co; Accord, Sandwich Chef of Texas Inc. v. Reliance National Indemity Insurance Co.; Chisom v. Transouth Fin. Corp.; 7 Appletree Square I, Ltd. P'ship v. W.R. Grace Co.; Pelletier v. Zweiful; Blount Fin. v. Walter E. Heller & Co.*

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

into play to deprive the Plaintiffs of a duly won judgment. SAC ¶88 to ¶94.

### 6.     Proximate Damage

When the French court admitted the "insolvent" PLB to the Plaintiffs litigation to validate the California judgment, the Defendants scheme to "Fund" had come full circle, and their ill-gotten gains were safe with PPSA (SAC ¶101).  The Plaintiffs loss of the Ayala and Montebello fees and commissions was instant and a direct and proximate result of the scheme to "Frame".  (SAC ¶113).  The subsequent civil and criminal litigation over these fees and commission turned on Lagune's involvement with Jean-Luc Mercier, a public official that Plantagenet had bribed (SAC ¶50, ¶108).  Once Lagune's criminal proceedings against the Plaintiffs suspended the Plaintiffs' civil suit to recover these sums, Lagune liquidated Ayala and Montebello. SAC ¶114.

As such, the Plaintiffs have alleged that they were injured by reason of the pattern of predicate acts that furthered the "Scheme to Fund" and the Scheme to Frame".  SAC ¶137 to ¶141.  Absent the Defendants' use of the wires and mails, the damage to the Plaintiffs could have been avoided in whole or in part.  Thus, the Plaintiffs have shown that they have "been injured in (their) business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.* (1985) 473 U.S. 479, 496.  The Plaintiffs' injuries are compensable because they were "caused by predicate acts sufficiently related to constitute a pattern." *Id.* at 497.  Further, Plaintiffs have shown that the injuries they suffered were the proximate result of the predicate offenses, not from any other cause.  *American National Bank & Trust Co. v. Haroco, Inc.* (1985) 473 U.S. 606,609.  Finally, the Plaintiffs have correctly calculated their monetary damages with certainty.  SAC ¶80, ¶113.

### 7.     Conspiracy to commit RICO

Anyone who agrees or conspires to pursue the same criminal objective can be held liable for a RICO violation. *Salinas v. United States* (1997) 522 U.S. 22, 63-64.  "If conspirators have a plan which calls for some conspirators to perpetrate the crime and

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS     24

Case No. C-7-04755-JSW

others to provide support, the supporters are as guilty as the perpetrators." *Id.* at 64. A conspirator must simply intend to further an endeavor which, if completed, would satisfy all elements of a civil RICO claim. *Id.* at 65.

As alleged in the SAC, by September 1998 it was certain in the Defendants' and Wrongdoers' minds that the Plaintiffs' commerce in Champagne LeBrun, Ayala, and Montebello, was forfeit.  All that was left to be decided were the ways and means of defrauding the Plaintiffs, and all possibilities involved the use of the mails and wires.  By October 1998, the Defendants were in a position to evaluate the amplitude of the damage they intended to cause the Plaintiffs and to calculate their own profit from this "by-product" of their Scheme to Launder 18MF.  SAC ¶44 to ¶57.  When, in November 1998, Lagune issued 18MF of fictitious invoices in the Plaintiff's names (SAC ¶103), they were aware that these invoices were meant to dissimulate the 18MF that Plantagenet would launder in January 1999 (SAC 41), and that these same invoices would provide their corrupt accomplices in the Treasury Department with the means to claim that the Plaintiffs were guilty of evading 18MF in French Taxes.  SAC ¶126.

## IV.  CONCLUSION

Based upon the foregoing arguments, Plaintiffs Second Amended Complaint states a cause of action under RICO 18 U.S.C. § 1962(c) and the motion should be denied.

BIRNBERG & ASSOCIATES

Dated: 14 July 2008

By: _/s/ Cory A. Birnberg____
Cory A. Birnberg
Attorneys for Plaintiffs

BIRNBERG &
ASSOCIATES

703 MARKET STREET
SUITE 600
SAN FRANCISCO
CA, 94103
TEL (415) 398-1040
FAX (415) 398-2001