1    MATTHEW F. QUINT, ESQ.
    California Bar No. 54369
2    WILSON & QUINT LLP
    250 Montgomery Street, 11th Floor
3    San Francisco, California 94104
    Telephone: 415.288.6700
4    Facsimile:  415.398.1608
    Email: mfquint@aol.com
5
    Attorneys for Defendants
6

7

8             UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10

11    JOHN GIDDING, an individual and     )    CASE NO.  C-07-4755 JSW
    PIVOTAL INC., a California corporation,   )
12                              )    **PLANTAGENET DEFENDANTS' REPLY**
            Plaintiffs,            )    **MEMORANDUM OF POINTS AND**
13                              )    **AUTHORITIES IN SUPPORT OF MOTION**
          vs.                     )    **TO DISMISS PLAINTIFFS' SECOND**
14                              )    **AMENDED COMPLAINT**
    DEREK ANDERSON, et al., and DOES 1   )
15    through 100, inclusive,            )    Date:         August 29, 2008
                             )    Time:         9:00 A.M.
16                              )    Courtroom: 2, 17th Floor
           Defendants.           )    Judge:       Hon. Jeffrey S. White
17    _____ )

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

I.      INTRODUCTION………………………………………………………..     1

3

II.     ARGUMENT………………………………………………….………     2

4

        A.      Plaintiffs Plead No Viable Claims Against Moving Defendants………...     2

5

                1.      Plaintiffs concede the Le Brun damage claims against the
6                               Plantagenet Defendants have been released and dismissed w

7                               with prejudice……………………………………………………     3

8                       2.      Plaintiffs concede there was no money laundering scheme………     3

9                       3.      The Lagune damage claims do not implicate the Plantagenet
                                Defendants……………………………………………………..     4
10

11      B.      The SAC Alleges No Predicate Acts………………….………………     5

12                      1.      Plaintiff's opposition brief cannot supply the specificity
                                missing in the Second Amended Complaint……………............     6
13

14                      2.      The acts of mail fraud were all released or unrelated to
                                moving defendants……………………………….………………     7
15

16                      3.      The acts of wire fraud were all released or unrelated to
                                moving defendants……………………………….………………     8

17      C.      The SAC Does Not Allege Proximate Causation……………….…………     9

18      D.      The SAC Fails To Meet The Threshold "Plausibility" Standard…………     11

19      E.      Plaintiffs Have Not Served PLB or PPSA…………………….…………     14

20

III.    CONCLUSION………………………………………………………..     15
21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

## Statutes

18 U.S.C. § 1341………………………………………………………………  5

18 U.S.C. § 1343………………………………………………………………  5

18 U.S.C. § 1964(c) ………………………………………………………..  10

## Rules

Fed. R.Civ. P. 8(a)(2)……………………………………………………....  11, 12

Fed. R.Civ. P. 9(b)………………………………………………….………  6

Fed. R.Civ. P. 12(b)(5)……………………......………………………………  15

Fed. R.Civ. P. 12(b)(6)………………….......………………………………  15

## Judicial Decisions

*Bell Atlantic Corp. vs.Twombly,* 127 U.S. 1955 (2007)…………………………  12

*Cervantes v. City of San Diego,* 5 F.3d 1273, 1274 (9th Cir.1993)……………….....  7

*H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239 (1989)…………………  9

*Hilton, Sea, Inc. v. DMR Yachts, Inc.* 750 F.Supp. 35 (D.Me.1990) ……………………  5

*Intri-Plex Technologies, Inc. v. Crest Group, Inc.,* 499 F.3d 1048 (9th Cir. 2007)………...  7

*Lee v. City of Los Angeles,* 250 F.3d 668 (9th Cir. 2001)…………………………….…..  7

*Sanchez v. Triple-S Management Corp.,* 492 F.3d 1 (1st Cir. 2007)……………………...  5

*Schreiber Distribution Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393 (9th Cir. 1986)….  6

*Shaver v. Operating Engineers Local 428 Pension Trust Fund,*
332 F.3d 1198 (9th Cir. 2003)……………………………………………………..…..  7

*United States v. 14.02 Acres of Land More or Less in Fresno County,*
--- F.3d ----, 2008 WL 2498103 (9th Cir. June 24, 2008)…………………………………  6

*United States v. Johnson,* 297 F.3d 845 (9th Cir.2002)…………………………………  8

*United States v. Montgomery,* 384 F.3d 1050, 1063 (9th Cir.2004)…………....……….  8

## Other Authorities

Gregory P. Joseph, Civil RICO, A Definitive Guide 86 (2d. ed. 2000)……………………  5

ii

## I.    INTRODUCTION

In their Opposition to Plantagenet Defendants' Motion to Dismiss, Plaintiffs make two crucial concessions which eviscerate any serious contention that they have pled or can plead RICO claims against these moving Plantagenet Defendants.  First, Plaintiffs concede that Defendants are not actually money launderers at all, under any legally accepted meaning of that term in this country.  Opposition Brief 16:4-6.  Second, Plaintiffs concede that they have released and dismissed with prejudice the Plantagenet Defendants from any claims for damages arising out of Plaintiffs' loss of the Le Brun Champagne distributorships – the major damage claim asserted in the Second Amended Complaint ("SAC").

Plaintiffs' opposition brief also all but concedes that the SAC does not adequately plead any predicate acts of mail or wire fraud or, for that matter, any predicate acts of racketeering activity at all. In addition, as will be shown below, Plaintiffs have not alleged and cannot allege any RICO injury resulting from any pattern of racketeering activity conducted by the Plantagenet Defendants.

In an effort to avoid the irremediable flaws in their pleading, Plaintiffs in their opposition brief continue their past practice of misstating the contents of their pleading and wildly misrepresenting the alleged contents of supporting exhibits.  Virtually every citation to the SAC contained in Plaintiffs' opposition misstates the actual allegations in the SAC.  A few examples will have to suffice.

• At page 3, lines 7-9 of their opposition brief, Plaintiffs state:  "… (Lagune) offered the Plaintiffs 18MF in commercial credit to participate in a deal that would enhance their U.S. distribution (SAC ¶108)."  SAC ¶108 contains no such allegation.

• At page 3, line 10, Plaintiffs state:  "… PLB converted the 18MF into shares of SCEV (SAC ¶50)."   SAC ¶50 contains no such allegation.

• At page 4, line 12 of their opposition brief, Plaintiffs cite SAC ¶32 for the proposition that Rapeneau controlled SCEV "from the outset."  SAC ¶32 contains no such allegation.

- At page 7, lines 13-15 of their opposition brief, Plaintiffs cite SAC ¶87 for the proposition that "Raulet's criminal suit accused PCM and Anderson of colluding…." SAC ¶87 contains no such allegation.

- At page 24, lines 7-9, Plaintiffs assert: "The subsequent civil and criminal litigation over these [Lagune] fees and commissions turned on Lagune's involvement with Jean-Luc Mercier, a public official that Plantagenet had bribed (SAC ¶50, ¶108)[emphasis added]." Neither SAC ¶50 nor ¶108 contains any such allegation.  In fact, there is no allegation anywhere in the SAC that any Plantagenet defendant ever bribed Mr. Mercier or anyone else.

Plaintiffs obviously do not care whether or not their references to their own pleading are accurate. They just make it up as they go along, as they have throughout the course of this litigation.

## II.    ARGUMENT

### A.    Plaintiffs Plead No Viable Claims Against Moving Defendants

Defendants suggested in their opening brief that the best way to sort through the haze and confusion of Plaintiffs' pleadings and arguments was to focus first on the Plaintiffs' damage claims. Defendants believe this is still the best approach.

In one of the few clear, coherent statements in their opposition brief, Plaintiffs set forth their damage claims as follows:

> "The Plaintiffs have alleged that the 'Scheme To Fund The Enterprise' was the cause of the loss of their commerce in Champagne Le Brun (SAC ¶¶58-101) and that the 'Scheme To Frame' was the cause of the loss of their commerce in Champagne Ayala and Montebello.  (SAC ¶102-136)."  Opposition Brief 17:24-18:1.

Thus, Plaintiffs allege only two categories of damages resulting from all the allegedly wrongful conduct contained in the SAC:  (1) the loss of their SCEV distributorship business in Le Brun Champagne (the "Le Brun Damage Claims"), and (2) the loss of their Lagune distributorship business in Ayala and Montebello Champagnes (the "Lagune Damage Claims").  The first category is barred by a release, and the second has nothing to do with the Plantagenet Defendants.

**1.      Plaintiffs concede the Le Brun damage claims against the Plantagenet Defendants have been released and dismissed with prejudice.**

As the Plantagenet Defendants pointed out in their moving papers, Plaintiffs filed suit against them, and others, back in 1999, for breach of alleged distributorship agreements making Plaintiffs exclusive distributors of Le Brun Champagne in the United States. That complaint is attached as Exhibit 1 to the original Complaint in this action. FAC ¶26, Exh. 1; SAC ¶66.

In September 2001, the Plantagenet Defendants entered into a Settlement and Release Agreement with Plaintiffs. The authentic copy of that settlement and release, according to Plaintiffs, is attached as Exhibit 5 to the original Complaint in this action.  FAC ¶34 and Exh. 5. In their written settlement agreement, Plaintiffs released the Plantagenet Defendant from,

> "… all claims, demands, damages, debts … actions and causes of action of any kind and nature whatsoever whether now known or unknown from the suspected or unsuspected which Plaintiffs now have, own or hold, or at any time heretofore ever had owned or held or may hereafter have, own or hold relating to the Claims [in the Action]."  Compl. Exh.5

Plaintiffs' rights under California Civil Code §1542 also were specifically waived. Defendants paid these very Plaintiffs $150,000 for that release. FAC ¶34.

<u>Plaintiffs concede in their opposition brief that they have dismissed with prejudice all claims against the Plantagenet Defendants for damages related to this loss of the Le Brun business</u>. Opposition Brief 4:20-22.  Thus, by Plaintiffs' own admission (both on the face of their pleadings and in their opposition brief) their claims of wrongful conduct set forth at SAC ¶58-101 which allegedly caused the loss of Plaintiffs' "commerce in Champagne Le Brun" are no longer viable, having been both released and dismissed with prejudice.

**2.      Plaintiffs concede there was no money laundering scheme.**

Defendants pointed out in their opening brief that money laundering was never mentioned in either the Complaint or the FAC.  The allegations of vast money-laundering conspiracies appeared for the first time in the SAC. Plaintiffs now concede in their opposition brief that all the money-laundering allegations contained in the SAC are legally meaningless and that Defendants are not actually money launderers at all.  As Plaintiffs now admit:  "Plaintiffs never made allegations that Defendants participated in criminal money laundering under U.S. laws."     Opposition Brief 16:4-6.

Plaintiffs further concede they are not accusing the Plantagenet Defendants of laundering "dirty money," or alleging any predicate acts of money laundering.  Opposition Brief 2:1-4.

To nail the coffin shut, Plaintiffs expressly admit that, "… Plaintiffs are not making actual allegations against Defendants for money laundering …."  Opposition Brief 16:15-16.

Despite these concessions, the SAC is rife with accusations of money laundering. Given Plaintiffs' admission that they "are not making actual allegations against Defendants for money laundering" one must ask what purpose is served by the SAC's repeated use of that term, other than to place a now admittedly meaningless pejorative label on Defendants.

It is true that Plaintiffs' opposition brief asserts that, in France, money laundering involves some unspecified activity that would not be considered criminal conduct in the United States.  Not surprisingly, Plaintiffs fail to inform the Defendants or the Court what the elements of money laundering might be under French law so there is no way for Defendants or the Court to determine what conduct is being alleged by the use of the term "money laundering" in the SAC. In any event, since the use of the term "money laundering" in the SAC, whatever it may mean, is not intended to describe any criminal conduct in this country or any predicate act, Defendants are unable to understand why the term is used at all, except to place a prejudicial label on the Plantagenet Defendants.

In sum, all that the SAC alleges against the Plantagenet defendants, in plain English, is that they acquired SCEV, a company that produced Le Brun champagne.  They then refused to continue to do business with SCEV's existing United States distributor -- the Plaintiffs. This change of distributors saved the SCEV money which the Plantagenet Defendants, as owners of the company, used to "fund" their business.  Plaintiffs sued, claiming breach of contract.  That suit against the Plantagenet Defendants was long ago settled, and all claims against the Plantagenet Defendants based on the change of distributors were dismissed with prejudice and released.  There is nothing more to these claims against Plantagenet in this lawsuit.

**3.  The Lagune damage claims do not implicate the Plantagenet Defendants.**

The only remaining claims are those arising from the "Scheme to Frame."  These damages arise from Plaintiff's alleged "lost commerce" in the Lagune business; that is, their right

1  to fees and commissions for acting as distributor for Ayala and Montebello champagnes.  There is

2  no allegation in the SAC that any Plantagenet Defendant had any involvement in Lagune's

3  decision not to pay Plaintiffs their fees or commissions. (SAC ¶¶ 113,114).

4  **B.    The SAC Alleges No Predicate Acts.**

5         Even if the Plaintiffs had suffered some cognizable harm, they have not alleged any harm

6  resulting from a pattern of racketeering activity by the Plantagenet Defendants because they have

7  not pled any legally sufficient claims that the Plantagenet Defendants committed predicate

8  racketeering acts. In their opposition, Plaintiffs admit that the only predicate acts they attempt to

9  plead are mail fraud and wire fraud.  However, nothing in the SAC sufficiently alleges such acts.

10        The essence of both mail fraud and wire fraud is a "scheme or artifice to defraud, "

11  involving the use of mails, 18 U.S.C. § 1341, or wire, radio or television transmission. 18 U.S.C. §

12  1343.  Despite Plaintiff's melodramatic "Scheme To Fund The Enterprise" label, no "scheme or

13  artifice to defraud" is alleged. All Plaintiffs have ever claimed was a breach of contract -- an oral

14  distributorship agreement which they claim the defendants breached. Yet, it is axiomatic that

15  "breach of contract itself does not constitute a scheme to defraud."  *Sanchez v. Triple-S*

16  *Management Corp.***,** 492 F.3d 1, 12 (1st Cir. 2007).   *See* Gregory P. Joseph, Civil RICO, A

17  Definitive Guide 86 (2d. ed. 2000) ("A simple breach of contract, breach of fiduciary duty,

18  anticompetitive behavior, and even violation of statute do not constitute actionable wire or mail

19  fraud, *unless the plaintiff has been deceived.*") (emphasis added).  As the court pointed out in

20  *Hilton, Sea, Inc. v. DMR Yachts, Inc.* 750 F.Supp. 35, 39 (D.Me.1990),

21         A failure to perform [a contract] as promised does not, without more*,* constitute
22         fraud. If the opposite were true, every breach of contract would present a colorable
            claim for fraud and, perhaps, a RICO violation. But breaches of contracts, and even
23         some illegal schemes perpetrated using the mails and wires, are not violations of the
            federal wire and mail fraud statutes.
24
25         Not only was the scheme itself here not fraudulent, Plaintiffs have not identified any

26  fraudulent misrepresentations in the wire or mail communications themselves.  In fact, and this is

27  a key point Plaintffs try to obfuscate in their opposition brief, Plaintiffs have not actually

28  identified the communications at all.

If Plaintiffs seek to plead fraudulent misrepresentations in the letters and faxes, they must do so with sufficient particularity to meet the standards of Fed. R.Civ. P. 9(b). The opposition brief argues vociferously that Plaintiffs are not required to attach copies of the letters and faxes they claim were instances of mail or wire fraud.  Defendants have not contended that attachment of the mailings was required, although it is odd that Plaintiffs have resisted doing so.  What is required, though, is that Plaintiffs at least plead the content of these communications. To reiterate the Ninth Circuit's injunction that Plaintiffs themselves quoted in their opposition brief at 19:16-18, "… the pleader must state the time, place and *specific content* of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distribution Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986)(emphasis supplied).  What is entirely missing from the SAC is the "specific content" of the communications on which Plaintiffs rely.

Plaintiffs acknowledge (Opposition Brief 19:1-5) that Rule 9(b) requires them to either (1) allege the specific contents of the false representations or (2) attach the documents containing the false representations as exhibits.   Plaintiffs have done neither. The allegations of mail and wire fraud at SAC ¶142 are clearly inadequate since no copies of the letters or faxes are attached and no attempt is made to specify the allegedly fraudulent content. When neither the document itself nor a sufficiently particular description of its contents are part of the complaint, that complaint fails to meet the requirements of Fed. R.Civ. P. 9(b).

**1.    Plaintiff's opposition brief cannot supply the specificity missing in the Second Amended Complaint.**

Plaintiffs concede the inadequacy of their pleading, *sub silentio*, by attempting to supply the missing required elements through an Exhibit I to the Declaration of John Gidding (filed with the opposition). That exhibit refers each alleged act of mail fraud or wire fraud back to a specific paragraph reference in the SAC.

Exhibit I, of course, is improper; and the Court should not consider it. "As a general rule, a district court may not consider materials not originally included in the pleadings in deciding a Rule 12 motion…."  *United States v. 14.02 Acres of Land More or Less in Fresno County*, --- F.3d ----, 2008 WL 2498103 at * 7 (9th Cir. June 24, 2008).  *See also Intri-Plex Technologies, Inc.*

1  *v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007)(" Generally, a court may not consider

2  material beyond the complaint in ruling on a Fed.R.Civ.P. 12(b)(6) motion.");  *Shaver v.*

3  *Operating Engineers Local 428 Pension Trust Fund*, 332 F.3d 1198, 1201 (9TH Cir. 2003)

4  ("Generally, on a 12(b)(6) motion, the District Court should consider only the pleadings.") In other

5  words,  "when the legal sufficiency of a complaint's allegations is tested by a motion under Rule

6  12(b)(6), "[r]eview is limited to the complaint." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9TH

7  Cir. 2001), quoting *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir.1993).

8          Even if the Court considers Exhibit I, however, that exhibit does not solve the pleading

9  problem because it lacks any specific content of allegedly false misrepresentations in the mail and

10  wire communications.

11          **2.    The acts of mail fraud were all released or unrelated to moving defendants.**

12          According to Gidding Decl. Exh I, nine of the twenty mail fraud allegations refer back to

13  specific allegations of misconduct found in SAC ¶¶58-101.  That conduct, in turn, allegedly

14  caused the loss of the Le Brun/SCEV business (Opposition Brief 17:24-25). However, Plaintiffs

15  concede that these claims have long ago been released and dismissed with prejudice. Therefore,

16  these nine allegations of mail fraud cannot be a basis for any claims in this action.  Even if these

17  claims had not been dismissed with prejudice however, the nine claims set forth in the referenced

18  portion of the SAC which Plaintiffs style "Scheme to Fund the Enterprise" do not constitute mail

19  fraud or wire fraud.  With the elimination of the pejorative "money laundering" label, the

20  allegations contained in the "Scheme to Fund the Enterprise" section allege nothing more than that

21  Defendants breached Plaintiffs' distributorship agreements with LeBrun and used the gains

22  resulting from that breach to fund their activities.  This is not fraud, but merely breach of contract.

23  While Plaintiff need not show false representations in every act of mail fraud or wire fraud

24  alleged, the alleged acts do have to further some underlying scheme to defraud.  Here, there is no

25  scheme to defraud.

26          Of the remaining eleven alleged acts of mail fraud, eight are mailings by the French

27  Treasury, the French Postal Service, the IRS, or attachés to the French or American embassies.

28  Such mailings by governmental entities or officials acting outside of defendants' control cannot,

as a matter of law, constitute acts of mail fraud. After all, it is a basic element of mail fraud that the defendant have used the mail or wires or caused another to use it to further the defendant's scheme. *United States v. Montgomery,* 384 F.3d 1050, 1063 (9th Cir.2004); *United States v. Johnson,* 297 F.3d 845, 870 (9th Cir.2002).

Of the three mailings remaining, one is a mailing by Wells Fargo Bank. As with the governmental mailings, this mailing cannot be an act of mail fraud by these Defendants because these Defendants did not and could not have initiated it, and there is no allegation as to how these Defendants could have caused Wells Fargo to have mailed it. This leaves two remaining mailings [SAC ¶142 (a)(ii) and (iii)]. One was Lagune's mailing of an invoice prepared by a court appointed official to Gidding on April 16, 1999. The second, and last, was a December 21, 1998 letter. According to Gidding Declaration, Exhibit I, this letter refers to the events in SAC ¶106. SAC ¶106 in turn states:

> "On or around December 1, 1998 Alain Ducellier publicly denounced the Rapeneaux for manipulating the finances of Lagune and had circular letters distributed to this effect. These letters were mailed to Lagune and Gidding."

Plaintiffs do not allege the content of any false representations contained in these letters or how they caused Plaintiffs any damage and therefore have not sufficiently alleged any act of mail fraud. Additionally, neither mailing came from the Plantagenet Defendants, or had anything to do with any business Plantagenet was involved in. The SAC does not allege the Plantagenet Defendants ever owned Lagune or participated in any business with Lagune.

### 3.    The acts of wire fraud were all released or unrelated to moving defendants.

The twenty-one separate acts of wire fraud alleged at SAC ¶142(b) are even more sparsely described than the alleged acts of mail fraud. Eighteen of the twenty-one acts of wire fraud, according to Gidding Declaration Exhibit I, refer back to matters pertaining to the loss of the Le Brun accounts alleged at SAC ¶¶58-101, which have previously been released and dismissed with prejudice.

The three remaining acts of alleged wire fraud are ¶142b(vii), (viii), and (xxi). ¶142b(vii) according to Gidding Declaration Exhibit I refers to the events in SAC ¶110 which states: *"On or around July 21, 1999, Champagne Montebello faxed Pivotal asking that Vinesmith be given*

*permission to pay Pivotal's invoices."*  Plaintiffs fail to allege how a request to pay Plaintiffs' own invoices could contain any false representations or could further any scheme to defraud Plaintiffs. ¶142b(viii) alleges that the French court administrator Mercier faxed a report to Plaintiff Pivotal. According to Gidding Declaration Exhibit I, ¶142b(xxi) refers to the events in SAC ¶135 which states:  *"On or about February 7, 2007, the French Treasury Department mailed Gidding a demand to pay 314,089 Euros in back French taxes accompanied by orders to pay or be imprisoned for debt."*  As explained above, this item cannot be wire fraud by the Plantagenet Defendants because they could not have initiated the mailing. Additionally, the Plaintiffs identified no false representations. Moreover, of course, these three faxes have nothing to do with the Plantagenet Defendants or any of their dealings with Plaintiffs.

After removing from consideration the alleged instances of mail and wire fraud which are subject to the earlier release and dismissal and those which were generated by governmental entities, it is important to note that (1) none of the scattered few remaining wires or mailings were sent by any of the Plantagenet Defendants, and (2) these few isolated, unrelated mailings and wires present no pattern of racketeering activity within the meaning of RICO**.**  They simply do not meet the test of  "continuity plus relationship" required to create a pattern.  As the Supreme Court of the United States has explained:

> A pattern is not formed by "sporadic activity," S.Rep. No. 91-617, p. 158 (1969), and a person cannot "be subjected to the sanctions of title IX simply for committing two widely separated and isolated criminal offenses," 116 Cong. Rec., at 18940 (1970) (Sen. McClellan). Instead, "[t]he term 'pattern' itself requires the showing of a relationship" between the predicates, *ibid.,* and of " 'the threat of continuing activity,' " *ibid.,* quoting S.Rep. No. 91-617, at 158. "It is this factor of *continuity plus relationship* which combines to produce a pattern."

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). These scattered mailings and faxes, even if there were some aspect of fraud in them, do not meet the Supreme Court's test.

**C.    The SAC Does Not Allege Proximate Causation**

In order to present a RICO claim, Plaintiffs must show that injuries to their business or property were proximately caused by the alleged predicate acts. The Plantagenet Defendants in

their moving papers showed that Plaintiffs had not and could not satisfy the proximate cause requirement.

In their opposition, Plaintiffs offer two examples of how their reliance on the Plantagenet Defendants' alleged misrepresentations was the proximate cause of their damages. The first example, according to Plaintiffs, was that the alleged misrepresentations proximately caused Plaintiffs' loss of the Champagne Le Brun business, a claim which Plaintiffs, admittedly, have already released.

The second example, according to Plaintiffs, is that the Plantagenet Defendants somehow made Plaintiffs' collection of their judgment against SCEV more difficult. But, as the Plantagenet Defendants pointed out in their moving brief, mere difficulty in collecting a legally valid judgment is not an injury to business or property within the meaning of 18 U.S.C. §1964(c). Plaintiffs, in their opposition brief, have not disputed this assertion.

Moreover, Plaintiffs' two examples of proximate causation simply make no sense. In Example One, Plaintiffs refer to the allegations in SAC ¶58, then proceed to describe in great detail a purported telephone conversation between Defendant Zappatini and a Mr. Gillolly, (apparently the president of Pivotal). Unfortunately for Plaintiffs, virtually none of the facts alleged in this example are contained in SAC ¶ 58, or anywhere else in the SAC for that matter. Plaintiffs simply continue to make it up as they go along. Even assuming, for purposes of discussion only, that the facts in Plaintiffs' Example One had been alleged, the facts show only that Plantagenet, which admittedly was in the process of acquiring SCEV, contacted Pivotal requesting information regarding Pivotal's distribution of SCEV champagne and requesting that samples of the champagne be sent to Plantagenet's offices. This is nothing more than typical conduct for any company in the process of acquiring another company's business. No fraudulent activity is alleged.

Example Two is even more baffling. Here, Plaintiffs allege that Hartford Insurance Company offered them a form of settlement agreement that Plaintiffs signed: "The plaintiffs believed that Hartford was making a final proposal and signed and returned the offer. SAC ¶76(a)." (Emphasis in original.) Opposition Brief 23:21-22. However, Plaintiffs immediately

thereafter alleged that, within days, Hartford sent Plaintiffs a second and third version of the settlement agreements containing additional parties to be released <u>and that Plaintiff signed and returned each of them to Hartford</u> ( SAC ¶76(b) and 76(c)).  Therefore, even if Plaintiffs somehow had relied upon their belief that Hartford's initial draft was a final proposal in signing and returning it, they obviously were quickly aware that it was not a final proposal when they admittedly signed and returned later settlement drafts in the coming days.  There is and can be no causal connection between Plaintiffs' reliance in signing the first draft and any damages later sustained by Plaintiff for any reason.

Plaintiffs present no other examples of damages proximately caused by these Defendants. All that is left is the other story Plaintiffs tell, their so called "Scheme to Frame,"  First, any causal connection between the alleged scheme to frame Plaintiffs for tax evasion and Plaintiffs' loss of the Lagune accounts is simply non-existent. Plaintiffs fail to provide any explanation as to how Lagune's alleged framing of Plaintiffs for tax evasion had any causal connection with Lagune's apparent decision to terminate Plaintiffs' distributorship agreement.  And, as with the lost Le Brun accounts, if Plaintiffs have any claims against anyone for their lost Lagune business, those claims sound in contract, not in fraud.

Second, it is important to note that none of the events surrounding Plaintiffs' alleged loss of the Lagune accounts have anything whatsoever to do with the Plantagenet Defendants.  There is no allegation in the SAC that the Plantagenet Defendants ever owned or had any other interest in Lagune or its Ayala and Montebello champagnes.  There is no allegation that the Plantagenet Defendants had anything to gain by or any involvement in Lagune's decision not to pay Plaintiffs their fees and commissions.  SAC ¶¶113, 114.

**D.    The SAC Fails To Meet The Threshold "Plausibility" Standard.**

Plaintiffs assert that under Fed. R.Civ. P. 8(a)(2) the Second Amended Complaint must contain,  "A short and plain statement of the claims showing that the pleader is entitled to relief." Defendants agree.  The SAC utterly fails to meet this basic standard.  It is the precise opposite of a short and plain statement.  It is long, overly and unnecessarily complicated, convoluted and incomprehensible. It fails to show that Plaintiffs are entitled to any relief whatsoever. Thus, it fails

1    to meet the basic requirements of Fed. R.Civ. P. 8(a)(2).

2    　　　　As demonstrated in the moving papers, the Complaint also fails to meet the minimal

3    requirements of plausibility established by the Supreme Court in *Bell Atlantic Corp. vs.Twombly,*

4    127 U.S. 1955 (2007).

5    　　　　Plaintiffs' responses to the six allegations in the SAC which Defendants offered as

6    illustrations of the SAC's inherent implausibility only serve to bolster Defendants' position.

7    Apparently, Plaintiffs continue to assert, without blushing, that:

8    　　• Defendants caused corrupt French Treasury officials to steal Plaintiffs' documents.

9    　　• All relevants documents have been forged.

10    　　• Hartford Insurance Company forged a settlement agreement.

11    　　• Defendant Anderson forged a court judgment (a document which Plaintiffs do not bother

12    　　　to produce in any of their scores of exhibits to the previous pleadings in this action).

13    　　• Plaintiffs' own French counsel was part of a conspiracy to defeat her own client's claims in

14    　　　French court by presenting forged documents to the court.

15    　　• The IRS, the French Treasury Department and Wells Fargo Bank all participated in

16    　　　Defendants' racketeering activity by committing acts of criminal mail and wire fraud.

17
18    　　　　As justification for these bizarre allegations, Plaintiffs (1) refer to the Hobbs Act (without

19    further explanation), and (2) argue, in substance, that the allegations must be plausible because,

20    (so claim Plaintiffs), the French government is seeking to indict the Plantagenet Defendants for

21    money laundering and corruption.  Opposition Brief 2:4-5.  Here, specifically is what Plaintiffs

22    say:

23    　　　　"In September 2004, the Plaintiffs informed the French prosecutor that the Cayman
　　　　Islands were the connecting link between Anderson and Hauchart  (Exhibit H to the
24    　　　　decl. of John Gidding) which letter opened the door to a new criminal investigation.
　　　　SAC ¶36, Exhibit J-1.  Exhibit J to the SAC, the 'Order to Join' issued by the
25    　　　　French Criminal Court of Paris demonstrates the French prosecutor's belief in the
　　　　plausibility of the various criminal actions of Raulet, Marie-Claude Simon, etc.  As
26    　　　　such, the factual allegations relative to the RICO enterprise and the defendants'
　　　　schemes to defraud have been raised far above the standard set by the Twombly
27    　　　　court."    Opposition Brief 14:23-15:4.

28

Not surprisingly, the documents referred to by Plaintiffs to support their assertion that the French Prosecutor intends to indict Defendants for money laundering demonstrate no such thing. In fact, they contradict and undermine Plaintiffs' assertion in crucial respects.

The first such document, Gidding Declaration, Exhibit H, is a September 22, 2004 statement which Gidding wrote in response to a pending criminal complaint against himself. In this document, Mr. Gidding makes numerous allegations against Raulet, SCEV, Anderson, and various Plantagenet entities. Plaintiffs assert that as a result of the facts communiciated in this Exhibit H to the French prosecutor (who was then prosecuting Gidding!), the French government "is seeking to indict Plantagenet for money laundering and corruption." Opposition Brief, 2:4-5. Plaintiffs do not attempt to explain why no such indictment has issued in the nearly four years since Exhibit H was presented to the French courts and prosecutor. They do not explain how they know the French government is seeking to indict Plantagenet. And, it is certainly worth noting that while Plaintiffs have attached literally dozens of documents from French judicial proceedings (some translated into English, some not) as exhibits to various versions of their pleadings, Plaintiffs have failed to attach a single piece of paper evidencing any intent by any French prosecutorial entity or regulatory agency to pursue the Plantagenet Defendants for any alleged wrongful conduct whatsoever. To the contrary, the only documents evidencing French prosecutions which Plaintiffs attach to their pleading show that the French government is prosecuting Plaintiff Gidding himself for fraud, breach of trust, and tax evasion.

The one document which Plaintiffs do refer to as allegedly demonstrating "the French prosecutor's belief in the plausibility" of Plaintiffs' claims is Exhibit J to the SAC, (translated into English in Exhibit J-1). A review of this document is most revealing. It is, on its face, a Joinder Order issued by the Paris Court of First Instance, on January 4, 2006. It refers to two pending actions, one filed by Gidding against Raulet and others (but not naming or mentioning any of the Plantagenet Defendants) and the second, also filed by Plaintiff Gidding as agent for others against various parties who are mostly strangers to this proceeding (and, again, not including any of the Plantagenet Defendants). The court states in its Order: *" Whereas these two complaints were filed by the same civil parties and including the same facts, it appears necessary to combine these*

13

1   *complaints into a single proceeding, ...."*  The court concluded with an order consolidating the

2   two actions.  Nothing else is stated or adjudicated.  Incredibly, Plaintiffs refer to this Exhibit J-1 as

3   evidence that the French prosecutor found plausible Plaintiffs' allegations of criminal conduct

4   against the Plantagenet Defendants, who are not even mentioned in the Exhibit.

5        Such is the nature of Plaintiffs' case.

6   **E.    Plaintiffs Have Not Served PLB or PPSA**

7        Plaintiffs, in effect, admit they did not serve PLB or PPSA but argue their failure should

8   be excused because they tried hard to effectuate service. Instead of actually serving either

9   company, Plaintiffs want the Court to give them a free pass because they tried "to the best of their

10  ability" (Opposition Brief 10:21), and they "justifiably <u>believe</u>" (*id*., 10:8-9) they served the right

11  person because they "<u>presumed</u>" (*id*., 10:20) that Mr. Anderson was the right person to serve.

12  Plaintiffs' effort, beliefs and presumptions are legally irrelevant. They have not effectuated service

13  on PLB or PPSA.

14        In their opposition Plaintiffs admit that, in order to serve PLB or PPSA, Mr. Anderson

15  must have been an officer or managing agent of those companies, or otherwise authorized to

16  accept service of process for them at the time of service. Mr. Anderson has sworn, under penalty

17  of perjury, that he was none of these, and Plaintiffs have presented absolutely no evidence to the

18  contrary. Instead, the Opposition Brief, at 9:8 through 10:10, and accompanying Gidding

19  Declaration Exhibit A lists other Plantagenet business entities in which Derek Anderson is some

20  sort of officer, shareholder or partner. Those other Plantagenet entities, however, have not

21  objected to service. They have appeared and moved to dismiss under Rule 12(b)(6).  None of the

22  evidence offered by Plaintiffs states or implies that Mr. Anderson now is, or ever has been, an

23  officer, managing agent or agent for service of process of PLB or PPSA.

24  ///

25  ///

26  ///

27  ///

28

1

**III.   CONCLUSION**

2        For each of the reasons set forth above, and in their opening brief, the Plantagenet

3   Defendants respectfully submit that their motions to dismiss under Fed. R.Civ. P. 12(b)(5) and

4   Fed. R.Civ. P. 12(b)(6) should be granted, and the Second Amended Complaint should be

5   dismissed, without leave to amend.

6

7   DATED: July 23, 2008.                    WILSON & QUINT LLP

8                                            By _____

9                                               Matthew F. Quint

10                                           Attorneys for Defendants Derek Anderson,
                                             Plantagenet Capital Management, LLC, Plantagenet
11                                           Capital America LLC, Plantagenet Capital Fund LP,
                                             PLB Holdings SA, and Plantagenet Partners SA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLANTAGENET DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT